CASE NO. 23-632; 23-658; 23-780; 23-793

————

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

————

INTERNATIONAL LONGSHORE AND WAREHOUSE UNION AND
INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 19,

Petitioner/Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Petitioner/Respondent,

PACIFIC MARITIME ASSOCIATION,

Petitioner,

v.

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS, DISTRICT 160, LODGE 289,

Petitioner/Intervenor.

————

ON APPEAL FROM NATIONAL LABOR RELATIONS BOARD
CASE NOS. 19-CD-269624; 19-CD-269637
372 NLRB NO. 66

————

**PETITIONER/INTERVENOR'S OPENING BRIEF**

————

David A. Rosenfeld, Bar No. 058163
WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1375 55th Street
Emeryville, California 94608
Telephone (510) 337-1001
Fax (510) 337-1023

## <u>CORPORATE DISCLOSURE STATEMENT</u>

## <u>FEDERAL RULE OF APPELLATE PROCEDURE 26(1)(A)</u>

Petitioner, International Association of Machinists and Aerospace Workers, District 160, Local Lodge 289, is an unincorporated association and a labor organization.  It is a labor organization within the meaning of 29 U.S.C. § 152(5).

DATED:  April 18, 2024                    Respectfully Submitted


                                          /S/ *DAVID A. ROSENFELD*
                              By:    David A. Rosenfeld
                                     WEINBERG, ROGER & ROSENFELD
                                     A Professional Corporation

                                     Attorneys for Petitioner/Intervenor
                                     INTERNATIONAL ASSOCIATION OF
                                     MACHINSTS & AEROSPACE
                                     WORKERS DISTRICT LODGE 160,
                                     LOCAL LODGE 289

155739\1461864

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION..................................................................................1

II.     JURISDICTION ..................................................................................3

III.    STATEMENT OF THE ISSUES ........................................................4

IV.     RELEVANT STATUTES ....................................................................5

V.      STATEMENT OF THE CASE AND PROCEDURE...........................6

        A.    **FACTUAL BACKGROUND** ...................................................6

VI.     STANDARD OF REVIEW ..................................................................9

VII.    SUMMARY OF THE ARGUMENT ..................................................11

VIII.   ARGUMENT......................................................................................13

        A.    **THE ILWU'S PAY-IN-LIEU GRIEVANCES VIOLATED
              THE ACT.** ...........................................................................13

        B.    **THE BOARD'S FAILURE TO PROVIDE ADDITIONAL
              REMEDIES DOES NOT EFFECTUATE THE
              STATUTORY PURPOSE OF SECTION 10(K), OR THE
              ACT MORE BROADLY.** ......................................................17

        C.    **THE BOARD ERRED IN NOT REJECTING THE
              ILWU'S WORK PRESERVATION DEFENSE WHEN
              THE ILWU STIPULATED THAT THIS DISPUTE WAS
              A TRADITIONAL JURISDICTIONAL DISPUTE AT
              THE OUTSET OF THE 10(K) HEARING.** ...................................19

        D.    **THE BOARD ERRED BY NOT EXPRESSLY
              REAFFIRMING THE ALJ'S FINDING THAT M&R
              WORK IS NOT THE FUNCTIONAL EQUIVALENT OF
              STEVEDORING WORK.** ..................................................21

        E.    **THE BOARD SHOULD HAVE REJECTED ILWU'S**

155739\1461864

## TABLE OF CONTENTS (cont'd)

**Page**

WORK PRESERVATION DEFENSE BECAUSE THE
ILWU IS GAINING, NOT LOSING, M&R, AND
STEVEDORING JOBS. ...................................................26

F.    THE BOARD SHOULD HAVE REJECTED THE
ILWU'S WORK PRESERVATION ARGUMENT
BECAUSE AUTOMATION IS NOT THE CAUSE OF
ILWU'S JOB LOSSES. ...................................................27

G.    THE ASSERTED WORK PRESERVATION MUST BE
LIMITED TO THE PERIOD OF THE THEN CURRENT
AGREEMENT. ...............................................................30

H.    THE BOARD ERRED BECAUSE THE FINDING OF
THE COAST ARBITRATOR THAT THE WORK IN
DISPUTE COULD NOT BE AWARDED TO THE ILWU
FORECLOSED THE ILWU'S CLAIM TO THE WORK. ..........31

I.    INTERNATIONAL CARRIERS, WHICH ARE NOT
EMPLOYERS, CONTROL THE PMA AND IT IS NOT
A VALID EMPLOYER ASSOCIATION. ........................32

J.    IN ITS INTERVENOR AND REPLY BRIEFS, THE IAM
WILL MORE FULLY URGE THE COURT TO
RECOGNIZE THE DISTINCTION BETWEEN THE
DIFFERENT "WORK PRESERVATION" CONCEPTS
IN 29 U.S.C. § 158(B)(4)(B) AND (D).............................33

IX.    CONCLUSION...............................................................35

155739\1461864

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Associated Gen. Contractors of America, Inc. v. Int'l Union of*
    *Operating Eng'rs, Loc. 701,*
    529 F.2d 1395 (9th Cir. 1976) (*ACG*)...........................................13, 17

*Int'l Longshoremen's Union, Loc. 14 v. NLRB,*
    85 F.3d 646 (D.C. Cir. 1996) (*Sierra Pacific*)..............................12, 33

*Int'l Longshoremen's Union, Loc. 32 v. Pac. Mar. Ass'n,*
    773 F.2d 1012 (9th Cir. 1985) ......................................................17, 18

*Int'l Longshoremen's Union, Loc. 62-B v. NLRB,*
    *884 F.2d 919 (D.C. Cir. 1986)* ...........................................................10

*Int'l Longshoremen's Union v. NLRB,*
    884 F.2d 1407 (D.C. Cir. 1989) .................................................*passim*

*Int'l Tel. & Tel. Corp. v. Local 134, Int'l Bhd. of Elec. Workers,*
    419 U.S. 428 (1975)..............................................................14, 15, 20

*International Longshore & Warehouse Union, Local 4 v. NLRB,*
    978 F.3d 625 (9th Cir. 2020) (*Kinder Morgan*) ..................................12

*Loc. 30, United Slate, Tile & Composition Roofers Ass'n v. NLRB,*
    1 F.3d 1419 (3d Cir. 1993) .................................................................10

*Loc. Joint Exec. Bd. of Las Vegas v. NLRB,*
    309 F.3d 578 (9th Cir. 2002) ..............................................................10

*Loc. Joint Exec. Bd. of Las Vegas v. NLRB,*
    657 F.3d. 865 (9th Cir. 2011) .............................................................10

*M.W. Kellogg Constructors, Inc. v. NLRB,*
    806 F.2d 1435 (9th Cir. 1986)..........................................................3, 10

*Mead v. Retail Clerks Int'l Ass'n, Loc. Union No. 839,*
    523 F.2d 1371 (9th Cir. 1975) .............................................................11

iii

## TABLE OF AUTHORITIES (cont'd)

**Page**

*Nat'l Woodwork Mfrs. Ass'n v. NLRB,*
386 U.S. 612 (1967)..................................................14, 33

*NLRB v. Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler,
Pneumatic Tube, Ice Mach. & Gen. Pipefitters,*
429 U.S. 507 (1977)..........................................................25

*NLRB v. Food Store Emps. Union, Loc. 347,*
417 U.S. 1 (1974)..............................................................10

*NLRB v. Int'l Longshoremen's Ass'n,*
447 U.S. 490 (1980) (*ILA I*)..........................................21, 24

*NLRB v. Int'l Longshoremen's Ass'n,*
473 U.S. 61 (1985) (*ILA II*) ............................21, 22, 23, 26

*NLRB v. Musicians Union, AFM Loc. 6,*
960 F.2d 842 (9th Cir. 1992) ...........................................10

*NLRB v. Plasterers' Loc. Union No. 79,*
404 U.S. 116 (1971)......................................................13, 25

*NLRB v. Radio & Television Broad. Eng'rs Union, Loc. 1212,*
364 U.S. 573 (1961) (*CBS*)................................13, 14, 15, 17

*NLRB v. Seven-Up Bottling Co. of Miami,*
344 U.S. 344 (1953)...........................................................10

*NLRB v. United Ass'n of Journeymen of the Plumbing Indus., Loc. No.
741,*
704 F.2d 1164 (9th Cir. 1983) .............................................9

*Oil, Chem. & Atomic Workers Loc. Union No. 6-418 v. NLRB,*
694 F.2d 1289 (D.C. Cir. 1982)............................................3

*Recon Refractory & Constr. Inc. v. NLRB,*
424 F.3d 980 (9th Cir. 2005) (*Recon*)............................*passim*

iv

## TABLE OF AUTHORITIES (cont'd)

**Page**

*United Steel Workers v. NLRB,*
    482 F.3d 1112 (9th Cir. 2007) ...........................................................10

**NLRB Cases**

*Auto. Trades Dist. Lodge No. 190,*
    322 N.L.R.B. 830 (1997) ...................................................................21

*Dodge City of Wauwatosa, Inc.,*
    282 N.L.R.B. 459 (1986) ...................................................................23

*ILWU, Alaska Longshore Div,*
    369 N.L.R.B. No. 63 (Apr. 28, 2020) ................................................25

*Indus., Pro. & Tech Workers Int'l Union,*
    339 N.L.R.B. 825 (2003) .............................................................10, 34

*Int'l Ass'n of Machinists Dist. Lodge 160,*
    360 N.L.R.B. 520 (2014) ...................................................................18

*Int'l Ass'n of Machinists Dist. Lodge 160,*
    373 N.L.R.B. No. 39 (Mar. 29, 2024) .............................................3, 6

*Int'l Ass'n of Machinists, Lodge No. 1743,*
    135 N.L.R.B. 1402 (1962) ...................................................................8

*Int'l Bhd. of Teamsters, Loc. 107,*
    336 N.L.R.B. 518 (2001) ...................................................................34

*Int'l Longshore & Warehouse Union, Loc. 19,*
    361 N.L.R.B. 1031 (2014) ............................................................19, 34

*Int'l Longshoremen's Union Loc. 13,*
    290 N.L.R.B. 616 ...............................................................................19

*Int'l Longshoremen's Union, Loc. 14,*
    314 N.L.R.B. 834 (1994) ...................................................................34

v

## TABLE OF AUTHORITIES (cont'd)

**Page**

*Int'l Longshore & Warehouse Union, Loc. 8,*
    363 N.L.R.B. 121 (2015 ................................................................18, 19

*Int'l Longshoremen's Union,*
    278 N.L.R.B. 220 (1986) ........................................................22, 23, 30

*Int'l Longshoremen's Union, Loc. 14,*
    318 N.L.R.B. 462 (1995) ............................................................18, 19

*Int'l Union of Operating Eng'rs Loc. 18,*
    363 N.L.R.B. 1784 (2016) ................................................................20

*International Longshore & Warehouse Union, Local 4,*
    367 N.L.R.B. No. 64 (Jan. 31, 2019) ........................................12, 18

*Int'l Union of Operating Eng'rs Loc. 18,*
    365 N.L.R.B. No. 18 (Jan. 25, 2017) ........................................18, 20

*Int'l Union of Operating Eng'rs, Loc. 18,*
    360 N.L.R.B. 903 (2014) ................................................................24

*Loc. Union No. 7, Int'l Longshoremen's Union,*
    291 N.L.R.B. 89 (1988) ..................................................................19

*Loc. 32, Int'l Longshoremen's Union,*
    271 N.L.R.B. 759 ...........................................................................18

*Operative Plasterers' Int'l Ass'n Loc. 200,*
    357 N.L.R.B. 1921 (2011) ..........................................................18, 20

*Operative Plasterers Int'l Ass'n Loc. 200,*
    357 N.L.R.B. 2212 (2011) ..............................................................13

*Ship Owners Ass'n of the Pacific Coast,*
    7 N.L.R.B. 1002 (1938) ..................................................................32

*Spike Enter., Inc.,*
    373 N.L.R.B. No. 41 (Apr. 10, 2024) ............................................17

## TABLE OF AUTHORITIES (cont'd)

**Page**

*Steel, Paper House, Chem. Drivers Loc. No. 578,*
280 N.L.R.B. 818 (1986) ...................................................34

*Sw. Reg'l Council of Carpenters,*
354 N.L.R.B. 935 (2009) ...................................................21

*Thryv, Inc,*
371 N.L.R.B. No. 37 (Nov. 10, 2021) .................................17

*Tile, Marble, Terrazzo Finishers, Loc. 47-T,*
315 N.L.R.B. 520 (1994) ...................................................13

*Warehouse Union Loc. 6,*
275 N.L.R.B. 1128 (1985) .................................................19

*Warehouse Union Loc. 6,*
289 N.L.R.B. 1 (1988) .......................................................20

**Federal Statutes**

29 U.S.C. § 158(b)(4)(B) ....................................................12

29 U.S.C. § 158(B)(4)(B) AND (D) ...................................33

29 U.S.C. § 158(b)(4)(D) ..................................................4, 5

29 U.S.C. § 160(e) ...............................................................3

29 U.S.C. § 160(f) ...............................................................3

**Regulations**

19 C.F.R. § 103.40 ..............................................................32

155739\1461864

I.    **INTRODUCTION**

Petitioner/Intervenor International Association of Machinists & Aerospace Workers, District 160, Local Lodge 289 ("IAM") submits this brief in support of its petition for review of a Decision and Order of the National Labor Relations Board ("NLRB" or "Board"). That order is reported at 372 N.L.R.B. No. 66 (Apr. 6, 2023). (1-MER-2.)[1]

The IAM supports the Board's central holding because it correctly applies well-settled precedent. Petitioners/Respondents International Longshore and Warehouse Union and Local 19 (collectively ILWU) violated the National Labor Relations Act (Act) by filing pay-in-lieu grievances for work that was not lawfully theirs to claim. The work is the maintenance and repair work (M&R) at a new container terminal in the Port of Seattle managed by SSAT Terminals LLC (SSAT). The ILWU could not lawfully claim this work because, pursuant to 29 U.S.C. § 160(k) (10(k) or 10(k) hearing), the Board issued a Decision and Determination of Dispute ("award" or "10(k) award") awarding the work to mechanics represented by IAM. (1-MER-21.)[2] Because no court has ever sanctioned ILWU's conduct in this case – attacking a 10(k) award with pay-in-lieu grievances – the IAM joins in the NLRB's effort to enforce that aspect of the Board's subsequent Decision and Order.

Nevertheless, IAM pursues this Petition because the Board's remedies are inadequate. Despite finding the ILWU's grievances unlawful, the Board failed to

---

[1] MER refers to the Excerpt of the Record submitted by Petitioner and Intervenor Machinists District Lodge 160, Local Lodge 289. The record of the unfair labor proceeding consists of the record of the underlying 10(k) proceeding as well as the record in the subsequent unfair labor practice proceeding.

[2] So called because each Decision is a determination of the specific dispute which arises over identified and defined work which is disputed. The Decision and Order is the later decision of the Board involved in this proceeding which remedies the unfair labor practice.

155739\1461864

order the IAM reimbursed for the costs it incurred to seek judicial vacatur of the ILWU's unlawfully obtained arbitration award in the district court. (2-MER-244.) These costs are the direct consequence of the ILWU's unlawful conduct. The Board's prophylactic remedies – notice postings only in Seattle – are also too narrow in light of the ILWU's history of attacking 10(k) awards with pay-in-lieu grievances. Only a broader notice posting and reading will deter future unlawful conduct by the ILWU and serve to advise employees coastwide of the unlawful conduct.

Second, the Board did not address a number of issues raised by the IAM in support of the position that the ILWU's conduct violated the Act and that its defenses were impermissible. The IAM addresses those issues for two reasons. First, any of them would be an alternative basis for this Court to enforce the Board's Decision and Order and deny the Petition for Review filed by the ILWU and PMA. Second, the IAM seeks to preserve those issues in case this Court remands the matter to the Board for reconsideration.

Third, although the Board properly rejected the ILWU's central argument that its grievances were lawful under the "work preservation" defense, the IAM argues that this issue was not properly before the Board. Substantively, a true "work preservation dispute" occurs when an employer instigates a dispute between groups of workers by unilaterally reassigning work historically performed by one group of employees to another group. Where the employer creates a jurisdictional dispute, it is not entitled to the protection of section 10(k) and section 8(b)(4)(D). That is the extent to which the work preservation argument applies in the 10(k) context. That inarguably did not occur here as the ILWU stipulated that this dispute was a "classic jurisdictional dispute," and therefore *not* caused by the employer. (2-MER-152.) The Board has made that distinction *clear* again in a

2

recent case involving the same parties but where the Board found that employees represented by the ILWU not the IAM should perform the work described as cold-ironing. *Int'l Ass'n of Machinists Dist. Lodge 160*, 373 N.L.R.B. No. 39 (Mar. 29, 2024). Procedurally, because work preservation is a threshold issue, ILWU was not permitted to relitigate the issue later in the unfair labor practice proceeding. The IAM will address these issues in greater detail in its Intervenor and Reply Briefs.

The IAM, therefore, urges this Court to enforce the Board's finding that ILWU's pay-in-lieu grievances violated 8(b)(4)(D). Otherwise, the Court should remand the Decision and Order to the Board's to either adopt the suggested remedies or explain why it chooses not to do so.

## II.  <u>JURISDICTION</u>

This Court has jurisdiction to review the Board's final order pursuant to 29 U.S.C. § 160(f). *M.W. Kellogg Constructors, Inc. v. NLRB*, 806 F.2d 1435, 1438 (9th Cir. 1986). The Union is an aggrieved party as that term is defined in section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f). Whenever a charging party gets less than what they requested, they are treated as an aggrieved person under 29 U.S.C. § 160(f). *Oil, Chem. & Atomic Workers Loc. Union No. 6-418 v. NLRB*, 694 F.2d 1289, 1294-95 (D.C. Cir. 1982).

This Court has jurisdiction over the ILWU's Petition for Review because the ILWU challenges the Board's Decision. This Court has jurisdiction over the Pacific Maritime Association's (PMA) Petition for Review because they intervened on behalf of the ILWU and are aggrieved. Lastly, this Court has jurisdiction over the NLRB's Petition for Enforcement. 29 U.S.C. § 160(e).

155739\1461864

## III.   STATEMENT OF THE ISSUES

1.   Was the Board's remedy adequate, considering both the nature of the ILWU's conduct, and the statutory purpose of 29 U.S.C. § 158(b)(4)(D)?

2.   Whether the Board correctly determined that the work in dispute was M&R work at Terminal 5 and that employees represented by neither union's members had historically performed the work so that a classic jurisdictional dispute existed?

3.   Whether the Board erred in failing to find that M&R work is not the functional equivalent of stevedoring work and on this basis rejecting the ILWU's work preservation argument?

4.   Whether the Board should have rejected the ILWU's work preservation defense because the M&R workforce represented by the ILWU has consistently grown since 2007?

5.   Whether the Board should have rejected the ILWU's work preservation defense because the traditional stevedoring workforce represented by the ILWU has consistently grown since 2007?

6.   Whether the Board erred in not rejecting the ILWU's work preservation argument where stevedoring jobs are threatened by global trade patterns and consumption habits and other forces beyond the control of the bargaining parties but not automation described in the collective bargaining agreement?

7.   Whether the Board erred in not rejecting the ILWU's work preservation defense after the expiration of the applicable collective bargaining agreement?

8.   Whether the Board erred in not implementing the finding of the Coast Arbitrator that the work in dispute would not be awarded to the ILWU, which decision should have foreclosed the ILWU's claim to the work?

4

155739\1461864

9.     Whether the Board erred in not rejecting the ILWU's work preservation defense when the ILWU stipulated at the outset of the 10(k) hearing that this dispute was a "classic jurisdictional dispute"?

10.     Whether the agreement between the ILWU and the Pacific Maritime Association is an unlawful restraint on trade because the multi-employer association (Pacific Maritime Association) is controlled by international ocean carriers who are not employers regulated by the Act and because many PMA members are not employers?

## IV.    RELEVANT STATUTES

29 U.S.C. § 160(k) provides:

> Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

29 U.S.C § 158(b)(4)(D) provides:

> It shall be an unfair labor practice for a labor organization or its agents—
>
> (4)(i)to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

5

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

## V.    STATEMENT OF THE CASE AND PROCEDURE

### A.    FACTUAL BACKGROUND

This specific case concerns the long-running dispute between the ILWU and the IAM over M&R work at marine terminals throughout the West Coast.[3] This dispute, however, involved one newly renovated and reopened terminal in the Port of Seattle: Terminal 5.  Mechanics represented by IAM have performed M&R work in the Puget Sound region under bilateral collective bargaining agreements with terminal operators since the 1940s.  (1-MER-6-7.)  Prior to the present jurisdictional dispute, IAM performed M&R work under its collective bargaining agreement with American Presidents Line (APL), which operated Terminal 5 for decades until 2014.  (1-MER-12; 1-MER-22; 2-MER-162.).[4]  Never in those years did ILWU mechanics perform M&R work at Terminal 5. (1-MER-6; 1-MER-22; 2-MER-150-151, 153.)

M&R work at a container terminal consists of three departments or functions: (1) Crane maintenance of the overhead cranes which move the containers; (2) Container Equipment Maintenance (CEM), which includes repairing ocean going containers and the chassis on which they are moved on land;

---

[3] Indeed, the battle between the unions over work at the waterfront continues, as reflected in the Board's recent decision in *International Ass'n of Machinists, District Lodge 160*, 373 N.L.R.B. No. 39 (Mar. 29, 2024) (10(k) award issued on March 29, 2024 assigning cold ironing work to ILWU members at Terminal 5).

[4] "_MER-__" is a reference to the Machinist's Excerpt of Record.

6

155739\1461864

and (3) the power shop which maintains all the equipment on the terminal which is used to move the containers (e.g., bombcarts, transtainers, forklifts etc.).

In 2014, APL ceased its operations at T5. In 2018, SSAT entered into a lease to operate Terminal 5, and after a year of modernizing the equipment at Terminal 5, SSAT opened the terminal for ship traffic in 2019. (1-MER-21.) Even though ILWU mechanics had never performed M&R work at Terminal 5, and notwithstanding SSAT's employment of IAM mechanics at nearby Terminals 18 and 30, when SSAT opened Terminal 5, it temporarily assigned M&R work to mechanics represented by the ILWU employed by a contractor. SSAT did so on the advice of the PMA, the multi-employer association of which SSAT is a member and which employs stevedores represented by the ILWU at the Port of Seattle.

After SSAT initially assigned the M&R work to ILWU mechanics, the IAM threatened job action against SSAT. IAM's threat prompted SSAT to file unfair labor practice charges against IAM for instigating a jurisdictional dispute. Pursuant to section 10(k) of the Act, which authorizes the Board to resolve jurisdictional disputes, Region 19 issued a Notice of Hearing to effectuate this statutory mandate. (1-MER-13; 1-MER-21-22; 2-MER-92.). Region 19 held hearings in April and June of 2019. At the 10(k) hearing, the ILWU, through its counsel, stipulated that the work in dispute was M&R work at Terminal 5, which was stated so in the notice of the hearing.

At the 10(k) hearing,[5] the ILWU further stipulated that this is "a classic jurisdictional dispute" when the following exchange occurred:

> Mr. McMullen [Counsel for SSAT]: I will withdraw the
> question. But the purpose of this was simply to give
> some background and explain why things have evolved

---

[5] The record including transcripts and exhibits were made part of the record in the subsequent unfair labor practice hearing.

155739\1461864

> the way they did, and to indicate that, you know, we have
> a classic jurisdictional dispute that certainly didn't arise
> out of any conduct on their [SSAT's] part in any way.
>
> Ms. Morton [Counsel for ILWU]: We'll stipulate that this
> is a classic jurisdictional dispute.

(1-MER-13; 2-MER-152.)

After post-hearing briefing the Board issued its 10(k) award on July 16, 2020, and assigned the disputed M&R work to IAM-represented mechanics. The force of this 10(k) award therefore excused the IAM from threatening to strike under the statute. In equal measure, this Decision and Determination of Dispute barred the ILWU from taking future action to claim M&R work at Terminal 5.

To arrive at this conclusion, the Board applied the traditional factors which have been used in hundreds of 10(k) awards.[6]  The Board relied on: IAM's historical performance of the M&R work at the facility; SSAT's preference for IAM mechanics; the superior skills and training of IAM mechanics compared to ILWU mechanics; and the efficiency of operations IAM mechanics provide operators and the lower costs associated with IAM mechanics.  Furthermore, the Board found that the ILWU mechanics' limited performance of work during the pendency of the 10(k) proceedings was practically irrelevant to this dispute at Terminal 5.  After the Board issued its 10(k) award, SSAT assigned M&R work at Terminal 5 to IAM represented mechanics. SSAT staffed Terminal 5 by rotating in mechanics who were already working for SSAT at two nearby terminals – Terminals 18 and 30.

Despite the 10(k) award, the ILWU filed grievances against SSAT, seeking payment-in-lieu of the M&R work at Terminal 5.  (2-MER-97-103.)  These grievances sought to impose severe economic penalties on SSAT for the continued

---

[6] These factors were initially established in *Int'l Ass'n of Machinists, Lodge No. 1743*, 135 N.L.R.B. 1402, 1410-11 (1962).

155739\1461864

assignment of the M&R work to IAM represented mechanics. The remedy would have required SSAT to pay the wages it paid to IAM represented employees to ILWU members, thus doubling SSAT's costs. (2-MER-97-103.)

The ILWU pursued this grievance in spite of the fact that the NLRB had determined that M&R work at Terminal 5 was not lawfully claimable by the ILWU. The coast arbitrator, John Kagel, ruled that ILWU was entitled to pay-in-lieu, because SSAT had violated the Pacific Coast Longshore Contract Document ("PCLCD"), which is the coast-wide collective bargaining agreement between the ILWU and the PMA on behalf of its member companies. (2-MER-171-176.) Arbitrator Kagel concluded as much because SSAT did not effectively defend the assignment of the work to the ILWU in the 10(k) proceeding. Arbitrator Kagel rejected the ILWU's claim for reassignment of the work. With arbitral rulings awarding ILWU mechanics pay-in-lieu of work, the IAM sought to vacate the arbitrator's decision in district court. (2-MER-161.) That matter is still pending in the district court while this case proceeds.

The ILWU then filed grievances seeking pay-in-lieu on each day the IAM mechanics worked but these grievances contravened the prior 10(k) award, SSAT filed a charge against the ILWU to initiate unfair labor practice proceedings under 8(b)(4)(D). (2-MER-82.) The IAM filed a similar charge, and the Board issued a consolidated complaint. (2-MER-83; 2-MER-86.) An Administrative Law Judge (ALJ) held hearings for four days and found that the ILWU's post-10(k) grievances violated 8(b)(4)(D). The Board affirmed the ALJ's order but modified his Order to conform to a recent decision involving remedial orders. (1-MER-2.)

## VI.    <u>STANDARD OF REVIEW</u>

The Ninth Circuit will reverse the Board's decision in 8(b)(4)(D) cases if the agency's legal conclusions are arbitrary and capricious. *NLRB v. United Ass'n of Journeymen of the Plumbing Indus., Loc. No. 741*, 704 F.2d 1164, 1166 (9th Cir.

155739\1461864

1983); *see also Recon Refractory & Constr. Inc. v. NLRB*, 424 F.3d 980, 987-88 (9th Cir. 2005) (*Recon*) (same), *denying petition for review*, *Indus., Pro. & Tech Workers Int'l Union*, 339 N.L.R.B. 825, 828 (2003) (*Seafarers*); *see also Int'l Longshoremen's Union, Loc. 62-B v. NLRB*, 781 F.2d 919, 923 (D.C. Cir. 1986) (*Alaska Timber*) (adopting the Ninth Circuit's standard). "A Board decision is [arbitrary and capricious] if it ignores a controlling legal standard [or] relie[s] on factors which Congress has not intended it to consider . . . ." *Recon*, 424 F.3d at 987-88 (internal quotation and citation omitted). If a reviewing court cannot "discern the Board's rationale" for its decisions, then those decisions must be vacated. *Loc. Joint Exec. Bd. of Las Vegas v. NLRB*, 657 F.3d. 865, 871 (9th Cir. 2011).

The Board has very broad discretionary power to "fashion[] remedies to undo the effects of violations of the Act." *NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 346 (1953). The Board's choice of remedy is reviewed for a clear abuse of discretion. *United Steel Workers v. NLRB*, 482 F.3d 1112, 1116 (9th Cir. 2007). The agency's action will be upheld "on the basis articulated by the agency itself." *Loc. Joint Exec. Bd. of Las Vegas v. NLRB*, 309 F.3d 578, 583 (9th Cir. 2002) (quoting *Motor Vehicles Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)).

Courts generally lack the authority to "enlarge [the Board's] order," *NLRB v. Food Store Emps. Union, Loc. 347*, 417 U.S. 1, 2 (1974); remand is nevertheless appropriate "when a reviewing court concludes that an agency invested with broad discretion to fashion remedies has apparently abused that discretion by omitting a remedy justified in the court's view by the factual circumstances." *Id.* at 10.

A single unlawful objective makes the conduct unlawful. *Loc. 30, United Slate, Tile & Composition Roofers Ass'n v. NLRB*, 1 F.3d 1419, 1424 (3d Cir. 1993); and *NLRB v. Musicians Union, AFM Loc. 6*, 960 F.2d 842, 845 (9th Cir.

10

155739\1461864

1992).  *See also Mead v. Retail Clerks Int'l Ass'n, Loc. Union No. 839*, 523 F.2d 1371 (9th Cir. 1975) (where there are lawful and unlawful purposes which are not separable, the conduct under section 8(b)(4)(B) is unlawful).

## VII.   SUMMARY OF THE ARGUMENT

This Court should affirm the Board's central holding: the ILWU's post-10(k) pay-in-lieu grievances violated section 8(b)(4)(D).  The Board's remedies in this case, however, are insufficient.

Specifically, the Board failed to make IAM whole for the costs it incurred seeking judicial vacatur of the ILWU's unlawfully obtained arbitral award. And considering the ILWU's long history of attacking 10(k) awards with pay-in-lieu grievances, *see* n.11 *infra*, IAM's legal costs were certainly foreseeable to the ILWU – and undoubtedly caused by ILWU's violation of 8(b)(4)(ii)(D). The Board therefore abused its discretion by failing to make IAM whole. Furthermore, the Board should have ordered notice posting at all locations where the ILWU has union offices or worksites on the West Coast rather than only in Seattle because of the history of jurisdictional disputes. The Board should have also ordered notice readings at Union meetings.

The Board also failed to provide any rationale for not addressing a number of reasons advanced by the IAM to uphold the ALJ Decision.  In summary, those are as follows: (1) The M&R work in dispute is not the functional equivalent of the traditional stevedoring work which the ILWU claims to be losing; (2) The ILWU workforce performing traditional stevedoring work has grown throughout the West Coast; (3) The ILWU workforce performing M&R work on the West Coast has grown; (4)  The ILWU claims that it is losing work to trade patterns, automation in foreign ports and causes which are not related to automation at the ports covered by its collective bargaining agreement, which forecloses the application of any work preservation defense and furthermore automation will not cause the loss of

11

any jobs at SSAT's Terminal 5; (5) Any work preservation claim must be limited
to the period of the then existing collective bargaining agreement which has long
expired; (6) The Board failed to implement the decision of the Coast Arbitrator,
who ruled that the disputed work should not be reassigned to the ILWU; (7) The
ILWU waived its work preservation defense when its stipulated at the 10(k)
hearing that this is a "classic jurisdictional dispute"; and (8) The Board erred in
failing to address the issue that the PMA is controlled by non-employers and
therefore the agreement between the PMA and the ILWU is an unlawful restraint
on trade in violation of the anti-trust laws.

In its Intervenor and Reply briefs, the IAM will address the extent to which
the work preservation defense in a classic jurisdictional dispute such is this is the
same work preservation defense which may be used in a proceeding under 29
U.S.C. § 158(b)(4)(B) relating to secondary boycotts.  The IAM argues that these
are distinct concepts.[7]

Thus, the Board was correct in finding that a "classic jurisdictional dispute"
arose over the assignment of M&R work at the newly reopened Terminal 5 and
awarding that work to IAM represented employees.  The Board correctly rejected
the application of the ILWU's work preservation argument to this classic
jurisdictional dispute over the assignment of work which had not been historically
performed by members of either Union at the reopened Terminal 5.

---

[7] Prior to *International Longshore & Warehouse Union, Local 4 v. NLRB*, 978 F.3d
625 (9th Cir. 2020) (*Kinder Morgan*), *denying enforcement*, *International
Longshore & Warehouse Union, Local 4*, 367 N.L.R.B. No. 64 (Jan. 31, 2019), no
court had ever applied the work preservation defense to charges under subsection
(D). *Cf. Int'l Longshoremen's Union, Loc. 14 v. NLRB*, 85 F.3d 646, 653-54 n.4
(D.C. Cir. 1996) (*Sierra Pacific*) (rejecting the applicability of the work
preservation defense to charges under subsection (D)). The IAM will address
*Kinder Morgan* in its Intervenor and Reply Briefs. (*See also* n.8 *infra* (there are
distinct "theoretical bases" for subsections (B) and (D))).

12

## VIII.  <u>ARGUMENT</u>

A.  **THE ILWU'S PAY-IN-LIEU GRIEVANCES VIOLATED THE ACT.**

The Board correctly adopted the ALJ's holding that the ILWU violated section 8(b)(4)(D) of the Act by filing pay-in-lieu grievances in contravention of a prior 10(k) award.  (1-MER-2, 16.)  *See also Operative Plasterers Int'l Ass'n Loc. 200*, 357 N.L.R.B. 2212, 2214 (2011) (post-10(k) contractual enforcement, up to and including actions in court, violate 8(b)(4)(D)), *enforced sub nom. Operative Plasterers' Int'l Ass'n v. NLRB*, 547 F.App'x 812 (9th Cir. 2013); *Tile, Marble, Terrazzo Finishers, Loc. 47-T*, 315 N.L.R.B. 520, 522 (1994) (same).  To contextualize the Board's order in this case, the IAM briefly reviews the law controlling jurisdictional disputes.

Subsection 8(b)(4)(D) proscribes unions from using economic coercion to obtain other unions' work. "While the Taft-Hartley Act was the subject of acrimonious debate . . . , all sides agreed that strikes by one union to compel an employer to assign it work being performed by another union were counterproductive." *Associated Gen. Contractors of America, Inc. v. Int'l Union of Operating Eng'rs, Loc. 701*, 529 F.2d 1395, 1397 (9th Cir. 1976) (*ACG*). Congress enacted section 8(b)(4)(D) to prohibit jurisdictional strikes; and Congress passed 10(k) as "[t]he mechanism by which Congress sought to eliminate jurisdictional strikes." *Id.* Section 10(k) "quite plainly emphasizes the belief of Congress that it is more important to industrial peace that jurisdictional disputes be settled permanently than it is that unfair labor practice sanctions for jurisdictional strikes be imposed on unions." *NLRB v. Radio & Television Broad. Eng'rs Union, Loc. 1212*, 364 U.S. 573, 576-77 (1961) (*CBS*).  Accordingly, Congress explicitly assigned the Board authority to "resolve" the dispute. *Id.* at 577-80; *see also NLRB v. Plasterers' Loc. Union No. 79*, 404 U.S. 116, 123 (1971) (the unique purpose of subsection 8(b)(4)(D) "is interlocked" with the unique procedure in 10(k)).

155739\1461864

Subsection 8(b)(4)(D) "*assumes a primary dispute* between two separate groups of employees and [one] employer." *Int'l Longshoremen's Union v. NLRB*, 884 F.2d 1407, 1412 (D.C. Cir. 1989) (*Sea-Land*) (emphasis added), *enforcing Int'l Longshoremen's Union Loc. 13*, 290 N.L.R.B. 616 (1988). Jurisdictional disputes are said to emerge following an employer's allocation or reallocation of capital amidst "some change in the business environment that creates new working conditions." *Id.* When an industrialist's contraction or expansion brings two unions to into conflict, there is a jurisdictional dispute.[8] At that point, either union may take or threaten to take action to claim the work – as the IAM did in this case. That allows the employer or other union to charge the first union with violating subsection (D). The Board will exercise its power under 10(k) to award the work if "there is reasonable cause to believe that § 8(b)(4)(D) of the Act has been violated." *Recon*, 424 F.3d at 988. Reasonable cause exists when "(1) a union has used a proscribed means . . . to enforce its claim to the work in dispute; (2) there are [genuinely] competing claims to the disputed work . . . and (3) there is no agreed-upon method for resolving the dispute voluntarily." *Id.*

The "determination [in the 10(k) hearing] is not binding as such even on the striking union." *Int'l Tel. & Tel. Corp. v. Local 134, Int'l Bhd. of Elec. Workers*, 419 U.S. 428, 446 (1975) (quoting *Plasterers Loc. Union No. 79*, 404 U.S. at 122 n.10). It allows for voluntary compliance by all parties. The courts have emphasized that section 10(k) protects employers. *See CBS*, 364 U.S. at 576-77. This is true to the extent that employers are not punished for making a disinterested profit-driven decision to expand or contract. Still, this procedure also protects

---

[8] Technology can be relevant to "work preservation" under subsection (D), but it is not necessary – as it is in cases under 8(b)(4)(ii)(B) (subsection (B)), which proscribes secondary boycotts. *See Sea-Land*, 884 F.2d at 1412 ("the theoretical bases for each charge are different"); *accord Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 625-27 (1967) (explaining the differences among the different subsections of 8(b)(4)).

14

unions by exculpating any union that takes action to trigger the 10(k) in the first place – sanctions follow for non-compliance. *Id.* "Only if the union indicates that it will not comply with the Board's determination are further proceedings necessitated, and those proceedings will be under §8 (b)(4)(D), not § 10 (k)." *Loc. 134, Int'l Bhd. of Elec. Workers*, 419 U.S. at 447.

In the present case, SSAT expanded when it took over Terminal 5, formerly operated by APL. IAM threatened economic action when SSAT initially awarded the M&R work to ILWU mechanics – but IAM did not need to withdraw its threat and did not violate the Act, because the Board subsequently awarded to mechanics represented by IAM the disputed M&R work at Terminal 5. Rather than comply with the Board's order, the ILWU filed pay-in-lieu grievances against SSAT relying on the Decision of the Coast Arbitrator Kagel for work that was not lawfully theirs.[9]  This conduct generated charges by both the IAM and SSAT.  The Board correctly found that this conduct was unlawful under the "well settled" precedent proscribing post-10(k) grievances.  (1-MER-16.)

Indeed, the controlling facts of the instant case are analogous to *Sea-Land*, 884 F.2d 1407, which concerned a dispute between the ILWU and the Teamsters. In that case, ILWU members handled cargo – including stuffing and unstuffing, staging, grounding and flipping containers, as well as bundling chassis – for the Employer at its dockside facility in Long Beach, California.  Though ILWU members performed this work dockside pursuant to the PCLCD, Teamsters performed the same exact work directly for Sea-Land two miles away from the dock at a freight yard. The Teamsters' work was not covered by the PCLCD, but rather covered by a separate CBA. *Id.* at 1409-10.  Overcrowding at Sea-Land's

---

[9] The Kagel Decision imposes a remedy forever against SSAT. This goes beyond the contractual authority of the arbitrator to issue an award. It is also an invalid work preservation object since it looks to the period beyond the contract when the parties could bargain a new arrangement regarding work or SSAT could leave the bargaining unit.

15

facilities prompted it to rent an additional freight yard. When Sea-Land assigned the work handling cargo to employees represented by the Teamsters, a jurisdictional dispute between the ILWU and Teamsters ensued.

In the resulting 10(k) proceeding, the NLRB awarded the work at the new freight yard to employees represented by the Teamsters. *Id.* As in the present case, the ILWU continued to seek the new work, first by filing and winning pay-in-lieu grievances with Arbitrator Kagel, and then by threatening to strike. *Id.* at 1410. The Board found those grievances coercive, and thus held that the ILWU violated 8(b)(4)(D). *Id.* at 1411. It did not matter that the PCLCD arguably covered the work in dispute. *Id.* at 1412-13. The Board found in the 10(k) proceeding that the relevant factors historically used in 10(k) proceedings weighed in the Teamsters' favor and it was unlawful for the ILWU to attack the order with a grievance.

In its opinion enforcing the Board's order, the D.C. Circuit cast the ILWU's post-10(k) grievances as a "collateral attack" on the Board's award of the work to employees represented by the Teamsters. *Id.* at 1413. Thus, the court held that the Board's conclusion was not only reasonable, but "[possibly] inevitable." *Id.* at 1414. The court opined that, were it to instead overturn the Board's ruling on the coercive nature of the ILWU's post-10(k) grievances, it would "contraven[e and frustrate] the…very purpose of section10(k) – to authorize the Board to resolve jurisdictional disputes." *Id.* That is: nothing would be "resolved" if the court permitted the ILWU to enforce arbitrations seeking payment in lieu of work that could not lawfully be assigned to ILWU members.

The exact same facts are present in this case. The Board awarded work at Terminal 5 to employees represented by the IAM, which – like the Teamsters in *Sea-Land*, 884 F.2d 1407, work under a bilateral collective bargaining agreement with SSAT. After the 10(k) award, the ILWU filed grievances under the PCLCD, mounting a "collateral attack, on the award." *Id.* at 1413. The Board properly

applied the "controlling legal standard," *Recon*, 424 F.3d at 987-88, and found this collateral attack coercive, and therefore in violation of 8(b)(4)(D). Accordingly, this Court should enforce the Board's order finding the ILWU in violation of 8(b)(4)(D) for filing post-10(k) grievances.

**B.**   **THE BOARD'S FAILURE TO PROVIDE ADDITIONAL REMEDIES DOES NOT EFFECTUATE THE STATUTORY PURPOSE OF SECTION 10(K), OR THE ACT MORE BROADLY.**

When Congress passed section 10(k), it conferred on the Board a unique mandate: to resolve jurisdictional disputes with a sense of finality.[10]  Congress established this unique duty due to the singularly destabilizing nature of jurisdictional disputes. The Board's remedies in this case are insufficient because they do not resolve this dispute with a sense of finality.  As a threshold matter, the Board failed to make IAM whole for the costs associated with the ILWU's unfair labor practice. Though the Board found such grievances unlawful the Board failed to recompense IAM for the costs it incurred to seek judicial vacatur of the ILWU's unlawfully obtained arbitration award in the district court. Failing to effectuate this clear statutory mandate represents an abuse of discretion. It is inconsistent with other cases where the Board has awarded such litigation costs.  It is inconsistent with the Board's recent decision in *Thryv, Inc*, 371 N.L.R.B. No. 37 (Nov. 10, 2021), and *Spike Enter., Inc.*, 373 N.L.R.B. No. 41 (Apr. 10, 2024) (ordering payment of direct and pecuniary harm, including expenses, to union).  The litigation expense was a direct and pecuniary harm.

The Board further abused its discretion by failing to require a coastwide notice posting of the ILWU's violations of subsection (D). IAM requested a notice posting throughout the West Coast, but the Board ordered posting only in Seattle.

---

[10] *ACG*, 529 F.2d at 1397; *CBS*, 364 U.S. at 577-80; *Int'l Longshoremen's Union, Loc. 32 v. Pac. Mar. Ass'n*, 773 F.2d 1012, 1016 (9th Cir. 1985) (*Weyerhauser*), enforcing *Loc. 32, Int'l Longshoremen's Union*, 271 N.L.R.B. 759 (1984); *Sea-Land*, 884 F.2d at 1414.

155739\1461864

Failing to require ILWU to post notices throughout the West Coast fails to protect section 7 rights, because it leaves in place a tactic – post-10(k) pay in lieu grievances – that no court has sanctioned as lawful. The ILWU operates from San Diego to the Canadian border. Its headquarters are in San Francisco. Its affiliate, Local 19, is in Seattle. Notice posting by the International Longshore and Warehouse Union should be commensurate with its geographic scope, particularly where it enforces one coastwide agreement. Notice reading likewise should be co-extensive.

Indeed, pay-in-lieu grievances are practically a per se violation of subsection (D). *Int'l Union of Operating Eng'rs Loc. 18*, 365 N.L.R.B. No. 18 (Jan. 25, 2017); *see also Operative Plasterers' Int'l Ass'n Loc. 200*, 357 N.L.R.B. 1921 (2011) (*Standard Drywall*) (summarizing the six years of post-10(k) grievance warfare excluded from the Board's factual summary in *Operative Plasterers' Int'l Ass'n Loc. 200*, 357 N.L.R.B. 2212 (2011)), *enforced sub nom. Standard Drywall, Inc. v. NLRB*, 547 F.App'x 809 (9th Cir. 2013). The ILWU knows this, given its role in developing this doctrine in the case law through its unlawful conduct. *See* n.11 *infra*. Accordingly, the failure to post notices throughout the ILWU's jurisdiction is an abuse of discretion. This is also true of the Board's failure to require the ILWU to post and read notices at IAM union halls.

Broader geographic orders are inarguably necessary in this case because the limited orders of the past have failed.[11]  Specifically, ILWU's unlawful grievances throughout 1981 and 1983 prompted the Board to order limited notice postings in Everett, Washington, *Loc. 32, Int'l Longshoremen's Union*, 271 N.L.R.B. 759,

---

[11] *Sea-Land*, 884 F.2d at 1407; *Weyerhauser*, 773 F.2d at 1012; *Int'l Longshore & Warehouse Union, Loc. 4*, 367 N.L.R.B. No. 64; *Int'l Ass'n of Machinists Dist. Lodge 160*, 360 N.L.R.B. 520 (2014); *Int'l Longshore & Warehouse Union, Loc. 8*, 363 N.L.R.B. 121 (2015) (*ICTSI*), *enforced*, 705 F.App'x 3 (D.C. Cir. 2017); *Int'l Longshoremen's Union, Loc. 14*, 318 N.L.R.B. 462 (1995), *enforced sub nom. Int'l Longshoremen's Union, Loc. 14 v. NLRB*, 85 F.3d 646, 653 (D.C. Cir. 1996) (*Sierra Pacific*).

18

Long Beach, California, *Int'l Longshoremen's Union Loc. 13*, 290 N.L.R.B. 616, and Bellingham, Washington, *Loc. Union No. 7, Int'l Longshoremen's Union*, 291 N.L.R.B. 89 (1988).[12] Those limited postings did nothing to stop the ILWU from using the same tactic in Portland, Oregon in 2012, *ICTSI*, 363 N.L.R.B. 121, or in the present case in Seattle in 2020. With geographically limited orders obviously failing, the Board should seek to fulfill its duties under 10(k) differently as it relates to the ILWU.

A coastwide notice posting will, therefore, deter the ILWU from using pay-in-lieu grievances in the future, when jurisdictional disputes arise elsewhere. A coastwide notice will thus protect against ILWU recidivism via pay-in-lieu grievances.

**C.    THE BOARD ERRED IN NOT REJECTING THE ILWU'S WORK PRESERVATION DEFENSE WHEN THE ILWU STIPULATED THAT THIS DISPUTE WAS A TRADITIONAL JURISDICTIONAL DISPUTE AT THE OUTSET OF THE 10(K) HEARING.**

The Board should not have entertained the ILWU's work preservation defense, because the ILWU stipulated that this dispute is a "classic jurisdictional dispute." The ILWU was prohibited from relitigating this issue because, in subsection (D) cases, work preservation is a threshold inquiry that assesses whether the dispute is jurisdictional, or whether the employer instigated the dispute. *Recon*, 424 F.3d at 988-89; *Warehouse Union Loc. 6*, 275 N.L.R.B. 1128, 1129 (1985) (*Golden Grain I*); *Int'l Longshoremen's Union, Loc. 14*, 318 N.L.R.B. at 464; *see also Int'l Longshore & Warehouse Union, Loc. 19*, 361 N.L.R.B. 1031, 1034 (2014).  Here, SSAT instigated nothing; and ILWU stipulated as much: this is a classic jurisdictional dispute.  Accordingly, the Board erred when it allowed the ILWU to raise this defense.

---

[12] *Sea-Land*, 884 F.2d at 1407; *Weyerhauser*, 773 F.2d at 1012.

Indeed, ILWU stipulated that this is a "classic jurisdictional dispute" because this stipulation purported to support the ILWU's efforts to obtain the disputed work through the 10(k) proceeding. (1-MER-13; 1-MER-21-22.)  When the ILWU failed to obtain the work and refused to comply with the order awarding the work to mechanics represented by IAM, "further proceedings [were] necessitated . . . under 8(b)(4)(D), not 10(k)." *Loc. 134, Int'l Bhd. of Elec. Workers*, 419 U.S. at 446-47 (quoting *Plasterers Loc. Union No. 79*, 404 U.S. at 122 n.10).  At that stage, the ILWU was permitted to relitigate factual issues from earlier in the 10(k) proceeding, but it could not relitigate threshold issues such as whether this was a "classic jurisdictional dispute." *Warehouse Union Loc. 6*, 289 N.L.R.B. 1, 2 (1988) (*Golden Grain II*). Still, ILWU could only offer those facts to prove, or negate, an element of the 8(b)(4)(D) violation. *Id.*  And unlike the "reasonable cause" standard used by the Board to issue a 10(k) award, *id.*, the Board uses a preponderance of the evidence standard at 8(b)(4)(D) trials, *id.*, and on summary judgment.  The legal inquiry does not change.  The meaning of work preservation does not change. Thus, because the ILWU stipulated that this was a classic jurisdictional dispute, the Board had no basis to consider the ILWU's work preservation defense.

In any event, the ILWU waived this argument by stipulating that this dispute was a "classic jurisdictional dispute." (1-MER-13; 2-MER-152-153.)  No work preservation defense or argument was made at any time. [13]

At the 10(k) hearing, the following exchange occurred when counsel for the ILWU agreed on the record that this is a classic jurisdictional dispute.

---

[13] This Court agrees that the threshold matters are not subject to re-litigation in the 8(b)(4)(D) proceeding. *See Standard Drywall*, 357 N.L.R.B. at 1923 n.12. *See also Int'l Union of Operating Eng'rs Loc. 18*, 365 N.L.R.B. No. 18, slip op. at 1 n.1 (citing *Standard Drywall* with approval); *Int'l Union of Operating Eng'rs Loc. 18*, 363 N.L.R.B. 1784, 1785 (2016) (same), *enforced sub nom. Int'l Union of Operating Eng'rs, Loc. 18 v. NLRB*, 712 F.App'x 511 (6th Cir. 2017). *Standard Drywall* remains good law.

> Mr. McMullen: I will withdraw the question. But the purpose of this was simply to give some background and explain why things have evolved the way they did, and to indicate that, you know, we have a classic jurisdictional dispute that certainly didn't arise out of any conduct on their [SSAT's] part in any way.
>
> Ms. Morton (Counsel for ILWU): We'll stipulate that this is a classic jurisdictional dispute.

(1-MER-13; 2-MER-152-153.)

Furthermore, counsel for the ILWU stipulated the disputed work was the "maintenance and repair work at Terminal 5 at the Port of Seattle." (1-MER-22; 2-MER-149.)[14] Since the ILWU did not raise a dispute about work other than at Terminal 5, it is prohibited from raising a defense that work asserted to be preserved elsewhere is at issue in this proceeding. On this ground, also, the work preservation argument was waived or not preserved. *See* also, (1-MER-13). (finding of classic dispute to which the ILWU). Because the ILWU failed to raise this issue as a threshold issue in the 10(k) proceeding by way of a motion to quash the Notice of Hearing, it has waived the argument to the Board and this Court.

**D.    THE BOARD ERRED BY NOT EXPRESSLY REAFFIRMING THE ALJ'S FINDING THAT M&R WORK IS NOT THE FUNCTIONAL EQUIVALENT OF STEVEDORING WORK.**

The "work preservation defense" assesses two factors. *See NLRB v. Int'l Longshoremen's Ass'n*, 447 U.S. 490 (1980) (*ILA I*), and *NLRB v. Int'l*

---

[14] The parties stipulated as to the work in dispute. (1-MER-22.) The Board always narrowly specifies the exact work in dispute. E.g., *Sw. Reg'l Council of Carpenters*, 354 N.L.R.B. 935, 936 (2009) (floor covering at specific job). Each 10(k) award carefully delineates the work so as not to expand an assignment unnecessarily. The Board does not expand its determinations beyond the specific work involved. *See, e.g.*, *Auto. Trades Dist. Lodge No. 190*, 322 N.L.R.B. 830, 835-36, & n.21 (1997).

*Longshoremen's Ass'n*, 473 U.S. 61 (1985) (*ILA II*) (collectively "*ILA Cases*").[15] The first question – and the only relevant question in this dispute – is whether the Union seeking the work had traditionally performed the work in dispute. *Id.* The second question is whether the struck Employer has the right to control the work in dispute. This question is not at issue in this dispute over M&R work at Terminal 5. Assuming the ILWU did not stipulate that this dispute is a "classic jurisdictional dispute," its "work preservation defense" fails at the first step.

In *ILA II*, for example, the Court emphasized that because stevedores have traditionally loaded and unloaded cargo from ships, the ILA could lawfully take action to obtain the work of stuffing and unstuffing of containers, and the related movement of the containers on and off the ships. That holding expresses the factual finding that mechanized loading and unloading is just a newer method of moving cargo. *See ILA II*, 473 U.S. at 81 n.21; *see also Int'l Longshoremen's Union*, 278 N.L.R.B. 220, 223 (1986) ("initial loading and unloading of cargo into and out of containers is the functional equivalent of the traditional and historical work performed by longshoremen at the pier"), *enforced sub nom. Cal. Cartage Co. v. NLRB*, 822 F.2d 1203, 1207 (D.C. Cir. 1987). In this case, however, ILWU members continue to perform their traditional work at Terminal 5 of loading and unloading the container ships. There is no dispute over this work. The dispute is only over the M&R work.

Relatedly, in the *ILA Cases*, the Court emphasized that the lawful object of preserving work must follow from rules bargained for between the union and

---

[15] The IAM recognizes that the *ILA Cases* are related to secondary boycott charges filed under subsection (B). The ILWU relies upon the work preservation defense from these cases under the secondary boycott laws. The IAM will explain more fully in the Intervenor and Reply Briefs, if necessary, why the doctrine developed under section 8(b)(4)(B) is different than the doctrine applicable under section 8(b)(4)(D). Here, however, we demonstrate that because the ILWU cannot demonstrate any functional equivalence, the Board should have rejected the application of the doctrine to this case *ab initio*.

155739\1461864

employer that were "narrowly tailored," *ILA II*, 473 U.S. at 69-71, to preserve only the work which was lost of loading and unloading cargo. *Int'l Longshoremen's Union*, 278 N.L.R.B. at 223. No such facts exist in this case – the evidence is entirely the opposite. Mechanics have been separately represented by the IAM up and down the coast for decades – in fact, for a longer period of time than the ILWU has sought to represent them. They have a separate apprenticeship program. They work in shops maintaining and repairing equipment. They do not operate the cranes, bombcarts, transtainers and other equipment used to load and unload. The ILWU has separate training for mechanics whom they represent. (2-MER-192.) (separate item for mechanic training). The employers who perform M&R are separate contractors such as PCMC and Harbor Industrial. (2- MER-154-158.) Longshore workers and mechanics are separate occupation codes. The ILWU's expert considered them irrelevant such that he did not investigate the effect of automation on M&R. (2-MER-64, 67.) Mechanics constitute a separate craft unit.[16] In factual, legal, and logical terms, there is simply no "functional equivalence" between stevedoring work and M&R work – and the ILWU failed to present any evidence that would establish otherwise, or that the M&R work displaces stevedoring work.

Indeed, bargaining history supports the fact that the ILWU accepts this much more limited understanding of what work would be the functional equivalent of the automation of cargo handling equipment – and thus what work they could claim to be preserving. In its 2008 negotiations with the PMA, the ILWU proposed (2-MER-143.) tying the use of the new robotic equipment to the creation of operator jobs for the ILWU members displaced by automation – thereby asserting that these jobs are functionally equivalent. The proposal does not claim that *all* M&R work is the functional equivalent of equipment operators and other traditional longshore

---

[16]*Dodge City of Wauwatosa, Inc.*, 282 N.L.R.B. 459, 460 (1986).

jobs. This undermines the assertion that any operators' jobs which are lost due to automation are transformed into M&R functions. As in the *ILA Cases*, automation of stevedoring allows the ILWU to claim operator jobs – not M&R jobs.

If there is one clear lesson from the *ILA Cases*, it is that "the inquiry must be carefully focused: to determine whether an agreement seeks no more than to preserve the work of bargaining unit members, [and] the Board must focus on the work of the bargaining unit employees, not on the work of other employees who may be doing the same or similar work, and examine the relationship between the work as it existed before the innovation and as the agreement proposes to preserve it." *ILA I*, 447 U.S. at 507. The burden is squarely on the ILWU to prove functional equivalence between loading and unloading cargo and the M&R work within the meaning of the *ILA* cases. The ILWU has failed to do so. The record demonstrates to the contrary; and a work preservation claim can *only* arise based on automation of stevedoring jobs, which is the only purpose for which work is sought to be preserved under the ILWU agreement. The Board concluded that the M&R work "is not the functional equivalent of traditional stevedoring work." (1-MER-18.)

The Board did not disturb this essential finding of a lack of functional equivalence; but it did not expressly state as much. This was an error because the Board has held that under subsection 8(b)(4)(D), that if there is any unlawful purpose behind the union's conduct, then such conduct is unlawful. The ILWU must show "that it is not attempting to expand its work jurisdiction." *Int'l Union of Operating Eng'rs, Loc. 18*, 360 N.L.R.B. 903, 906 (2014). The Board has restated this in a recent case involving the ILWU:

> But even assuming that the picketing had a lawful objective, it is well settled that a union may violate Section 8(b)(4)(D) if *another* object of the conduct is prohibited.

155739\1461864

*ILWU, Alaska Longshore Div*, 369 N.L.R.B. No. 63 (Apr. 28, 2020).
*See NLRB v. Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler,*
*Pneumatic Tube, Ice Mach. & Gen. Pipefitters*, 429 U.S. 507, 530
n.17 (1977).

Given that this principle is established in a 10(k) hearing, with which
charges under subsection (D) are "interlocked," *Plasterer's Loc. Union No. 79*, 404
U.S. at 123, this rule inarguably applies to proceedings under section 8(b)(4)(D).
As we noted above in the Section on the Standard of Review, this Court has agreed
with this principle.

In sum, the ILWU's work preservation defense fails at the first step. The
work at issue is M&R work Terminal 5 at the Port of Seattle. The ILWU did not
perform any M&R work at Terminal 5 until 2018, and at that time for SSAT's
subcontractor. (1-MER-18.) Other than that brief period, ILWU mechanics had
only started performing M&R work at Terminal 5 during the pendency of the 10(k)
proceedings. The Machinists, by contrast, have been performing M&R work at the
Port of Seattle since the 1940s. (1-MER-6-7, 12.) This historical performance of
M&R work shows also in IAM's operation of a unique apprenticeship program for
M&R at marine terminals. IAM mechanics also work in shops maintaining and
repairing equipment. Unlike ILWU stevedores, IAM mechanics do not operate the
cranes, bombcarts, transtainers and other equipment used to load and unload.
Lastly, the employers who perform M&R are separate contractors such as PCMC
and Harbor Industrial. (2-MER-154-158.) These facts alone suffice to reject the
ILWU's work preservation defense: its members had never traditionally performed
the work in dispute at Terminal 5, so there was nothing for the ILWU to preserve
with its post-10(k) pay-in-lieu grievances.

///

///

///

### E.   THE BOARD SHOULD HAVE REJECTED ILWU'S WORK PRESERVATION DEFENSE BECAUSE THE ILWU IS GAINING, NOT LOSING, M&R, AND STEVEDORING JOBS.

As discussed *supra*, the only work relevant to this dispute is M&R work at Terminal 5 – and the record shows that ILWU mechanics only performed this work during the pendency of the 10(k) hearing.  Even if other M&R work were relevant, the record shows that the "number of ILWU-represented mechanics at West Coast ports increased by [more than one-third]" since 2007.  (1-MER-12.)

Indeed, it is undisputed that the ILWU workforce has grown 42% since the agreement in 2002.  (2-MER-189.)  It is undisputed from the PMA published figures that stevedore worker numbers have grown, and the number of marine clerks has increased since 2000. (*Compare* 2-MER-190 (1683 registered clerks) with 2-MER-181 (1595 registered clerks).)  The number of mechanics hours has also dramatically increased. (See 2-MER-124-125; 2-MER-160 (showing an increase of mechanic shifts).)  The amount of pay received from PMA has increased by $1,136,000,000 from 2000 to 2020. (*Compare* 2-MER-180 with 2-MER-191 ( the dollar figure has more than doubled).) This does not represent a loss of work; it represents exponential growth.  Every indicator shows the workforce has grown.

This increase in work is dramatically illustrated by the increase in Seattle, the port at issue in this case.  The Seattle Port, where SSAT is the dominant terminal operator, has grown from zero to roughly 15,000 shifts since 2000.  The ILWU's members perform thousands of hours of work in the Seattle Port and figures show an additional large number of registered longshore workers members. This is not work preservation; this is plainly work acquisition.  (2-MER-126.) (increase in Seattle).  The Supreme Court made it clear that work preservation was permissible "to preserve jobs against 'the steady dwindling volume' of cargo work at the pier."  *ILA II*, 473 U.S. at 79.  Here, cargo is increasing, and this effort

26

cannot be valid work preservation. The ILWU is, therefore, not seeking to preserve work, it is seeking to expand its work force and acquire more work.

**F. THE BOARD SHOULD HAVE REJECTED THE ILWU'S WORK PRESERVATION ARGUMENT BECAUSE AUTOMATION IS NOT THE CAUSE OF ILWU'S JOB LOSSES.**

A work preservation defense arises only when a union's members lose jobs due to technological innovation. *See ILA Cases.* ILWU mechanics are not threatened by "technological displacement." (1-MER-18.) To the extent that automation impacts the ILWU membership, the record shows that they are gaining M&R work – but the M&R work in dispute is traditionally the Machinists' work in many places. Moreover, to the extent that ILWU members are losing work, it is not caused by automation. Notwithstanding the record developed during trial, the ILWU claims that it has a valid work preservation defense based on automation on a global scale. Even if this were true, global automation has only a speculative and attenuated impact on work at Terminal 5.

For example, the ILWU points at Rotterdam and to the Port of Vancouver and other ports around the world. Indeed, it's clear that the foreign ports are mostly automated. (2-MER-206-207.) In addition to the foreign ports, there are some ports on the East Coast as well as in Los Angeles/Long Beach that have either partially or fully automated. The ILWU's expert explained that trade policies and trade politics – not automation – have a substantial influence upon job loss or job gain. Automation was relevant to this testimony only to the extent that the expert referenced foreign ports like Rotterdam, Vancouver and Chinese ports that have already automated. Work preservation claims cannot be speculative, it must be established that there is an immediate or current threat of job loss which supports a work preservation object at Terminal 5. There is no evidence in the record showing any actual effort to automate stevedoring jobs in Seattle.

27

Moreover, work preservation claims must be based upon the right of SSAT to control the automation itself. SSAT and other terminal operators have no control over automation at the Panama Canal. Nor does SSAT control trade policies with China, or the effect of pandemics – and the litany of other factors which will have an impact upon work and either work gain or work loss and therefore work preservation. They have no control over automation at other ports. Since the ILWU relies upon its expert's analysis, which includes the effect of these factors not protected or governed by the PCLCD, the work preservation claim fails.

Additionally, all the major ports are publicly owned.[17] To the extent the automation is controlled by those public entities, the PCLCD does not protect against the decision by those public entities to allow automation. The effort to impose a work preservation object on work over which there is no control is an invalid work preservation object.[18] It may be the case that PMA members control the assignment of M&R work; but the ILWU failed to present any evidence showing that PMA members possess the right of control over *automation decisions* by any PMA member let alone a PMA member which employs bargaining unit members or third parties.

Here, furthermore, SSAT had made it clear that it has no intention to automate. There will be no automation as to work controlled by SSAT which will cause job loss. To the contrary, jobs for ILWU represented employees have been continuously increased by SSAT.  (2-MER-71-72.)  Mr. DeNike was emphatic that SSAT has neither reason nor intention to automate and explained the practical reasons why SSAT as a terminal operator will not automate.  The terminal operators don't have guaranteed customers, so they can't invest the hundreds of

---

[17] See Port of Long Beach, https://polb.com; Port of Los Angeles, https://www.portoflosangeles.org; Port of Oakland, https://www.portofoakland.com; Port of Seattle, https://www.portseattle.org.

[18] It also violates section 8(b)(4)(B).

28

millions of dollars involved in automation. Only ocean carriers can do it. (2-MER-68, 69-71, 73.) And the ocean carriers do not directly employ anyone in bargaining unit. (2-MER-74-80.) Only ocean carriers or public entities have been involved in automating any ports and only in Southern California.[19] There is no likelihood whatsoever of any partial or total automation in Seattle, Tacoma or Oakland. The terminals are too small, and no entity, including the public ports, has expressed any interest in doing so.

We conclude this discussion by quoting Mr. O'Grady, the ILWU's expert:

> Q [Mr. Rosenfeld] Fair enough. And – and you would agree that if – if the terminals in the Seattle labor market area don't automate there'll be no loss of longshore jobs, lifting and moving of the cargo – cargo equipment in the Seattle labor market due to automation, correct?
>
> A [Mr. O'Grady] If Seattle does not automate, then by definition, there will be no job losses attributable to automation. There may be job losses if cargo diversion occurs.
>
> Q     And cargo diversion, as you indicated, could occur for many reasons, correct?
>
> A     Yeah. It's complex.

(2-MER-63.)

The PCLCD protects only against automation engaged in by PMA member companies. See Section 1.72 of the PCLCD (2-MER-138-139.) The provisions in the contract were repeatedly described as a "quid pro quo." The PMA members could automate and in return would expand the ILWU's jurisdiction. But because it was a quid pro quo, it is exclusively automation by PMA members that supports any expanded jurisdictional claim. (2-MER-51, 55; 2-MER-105-110; 2-MER-113-123.) There is no evidence work jurisdiction was expanded by the parties in the

---

[19] The fact that SSAT is not the owner of any terminal, including Terminal 5, but only a lessee or operator, forecloses any expensive modernization without the owner's financing and approval.

155739\1461864

PCLCD because of competition from other ports, competition from other modes of transportation or trade policy or any other factor.

Here, the ILWU is manifestly attempting to go well beyond automation covered by the PCLCD and to protect from "trade diversion" beyond the control of the PMA or any members. Mr. O'Grady explained in his report that competition from automated ports, including in Virginia, will affect West Coast ports. (2-MER-215-216.) This analysis goes beyond the scope of contractual protection and is indisputably work acquisition.

This is grounds alone to reject the work preservation argument.

## G.     THE ASSERTED WORK PRESERVATION MUST BE LIMITED TO THE PERIOD OF THE THEN CURRENT AGREEMENT.

The work preservation object that the ILWU seeks to establish occurred when it pursued the grievance in early 2020 at the time of the Kagel Decision. There can only be a valid work preservation object during the life of the agreement because no party can predict what provisions will be negotiated by the parties after the agreement expires, and neither party can be bound in perpetuity.[20] The Board found long ago that the PCLCD "ran for a fixed term" and thus did not waive its rights beyond the term of the agreement. *Int'l Longshoremen's Union*, 278 N.L.R.B. at 224. In so ruling, the Board adopted the position of the ILWU. It cannot reverse position here and argue that it can assert work preservation in perpetuity. This case expressly rejects the assertion that the ILWU can claim a work preservation claim sometime in the future well past the expiration of the PCLCD, which expired on July 1, 2022. Nor did the ILWU offer any evidence that the parties agreed that the work preservation object was to survive the expiration of the PCLCD. (2-MER-129.)

---

[20] The insistence to impasse on an agreement in perpetuity is a non-mandatory subject.

It is far too speculative and interferes with the collective bargaining rights of the ILWU and the PMA to impose a work preservation object far in the future.  In this case, the ILWU doesn't limit its work preservation object to the life of the agreement. The ILWU expert concedes that he cannot state when and in what form automation may occur, potentially five to ten years or longer in the future. (2-MER-61.)  He also concedes that some terminals may never automate.  (2-MER-62.)  A work preservation object now for something even the expert cannot establish will ever happen in the future does not establish a present or valid work preservation object.

Such speculation is undermined not only by Mr. DeNike's testimony but external factors. For example, a railroad invested money in a new railroad connection in Seattle.  (2-MER-188.)  The modernization of Terminal 5 will accommodate the largest ships.  The ship-to-shore cranes are the largest on the West Coast of the United States.  (2-MER-58.)  This refutes any suggestion that there will ever be an automated terminal in Seattle.  The PMA touts how the ports which are not automated are modernizing to receive the largest ships.  (2-MER-186-188.)  All of this undercuts the assertion that SSAT and all ports will fully or even partially automate.

**H. THE BOARD ERRED BECAUSE THE FINDING OF THE COAST ARBITRATOR THAT THE WORK IN DISPUTE COULD NOT BE AWARDED TO THE ILWU FORECLOSED THE ILWU'S CLAIM TO THE WORK.**

After the ILWU presented its case to Coast Arbitrator Kagel, the ILWU filed a Motion seeking to have Arbitrator Kagel modify the remedy and award the work to it prior to the issuance of the Decision.[21]  (2-MER-161; 2-MER-177.)  The

---

[21] (2-MER-177.)  The ILWU sought in point 1 to have the arbitrator order SSAT "to assign the M&R work at Terminal 5 to the ILWU workforce consistent with the PCLCD." He declined that remedy. He imposed the penalty because SSAT did not state a preference at the 10(k) hearing. Kagel stated, "The record showed that SSAT did not provide the required defense."  (2-MER-175).

155739\1461864

Decision rejected any such relief that would award the disputed work to ILWU members. Since the collective bargaining agreement of the parties has been conclusively interpreted to foreclose reassignment of the work to ILWU represented employes, its efforts to penalize SSAT for abiding by the 10(k) Determination are unlawful.

**I.     INTERNATIONAL CARRIERS, WHICH ARE NOT EMPLOYERS, CONTROL THE PMA AND IT IS NOT A VALID EMPLOYER ASSOCIATION.**

Mr. DeNike identified the representatives of the ocean carriers on the Board of Directors.  (2-MER-78.)  It is self-evident that the PMA is controlled by international carriers.[22]  *See also* 2-MER-184-185.  Mr. DeNike identified those with no employees.  (2-MER-80.)  Some have wholly owned subsidiaries which operate terminals in some locations, but the ocean carriers themselves control the PMA and are not employers. They were described as indirect employers in *Ship Owners Ass'n of the Pacific Coast*, 7 N.L.R.B. 1002 (1938), *aff'd sub nom. American Federation of Labor v. NLRB*, 308 U.S. 401 (1940), a concept which the Board has now squarely rejected.  19 C.F.R. § 103.40.

The controlling entities of the PMA can assert no work preservation object because they employ no one.[23]  (2-MER-69-70, 76-77, 80.)   The assertion of work preservation on behalf of entities which employ no one is irreconcilable with the doctrine.

Additionally, the public entities who operate all of the ports or the international carriers which lease terminals control the decision whether to automate.  (2-MER-69.)  SSAT has no intention of automating any of the terminals

---

[22] See also IAM Exh. 6, Art I, Section 4. (2-MER-219.)

[23] In *Ship Owners*, 7 N.L.R.B. 1002 (1938), there were two classes of members, the shipping companies, few of whom employed any longshore workers, and stevedoring companies who employed the longshore workers. *Id.* at 1017. The PCLCD reflects the continuing control by the shipping companies.

155739\1461864

which it operates. It has no control over automation, and work preservation cannot be asserted against an employer such as SSAT which does not control automation at a terminal.  Nor do the PMA members control automation since the ports are all publicly owned and the ports would control automation.

The Court cannot allow the Board to sanction an unlawful agreement between non-employers and the ILWU to set wages and conditions of employment.

**J.      IN ITS INTERVENOR AND REPLY BRIEFS, THE IAM WILL MORE FULLY URGE THE COURT TO RECOGNIZE THE DISTINCTION BETWEEN THE DIFFERENT "WORK PRESERVATION" CONCEPTS IN 29 U.S.C. § 158(B)(4)(B) AND (D).**

Despite reaching the correct conclusion in this case, the Board's reasoning does not fully explain the difference between a "work preservation defense" and a "true work preservation dispute." *See Alaska Timber*, 781 F.2d at 922, and cases cited therein (the theoretical bases for charges under subsection (B) and subsection (D) are distinct); *see also Sierra Pacific*, 85 F.3d at 653-54 n.4 (rejecting the applicability of the work preservation defense to charges under subsection (D)); *accord Nat'l Woodwork Mfrs. Ass'n*, 386 U.S. at 625-27 (explaining the differences among the different subsections of 8(b)(4)). A true "work preservation dispute" refers to instances when an employer instigates a jurisdictional dispute by transferring existing work from one group of workers to another. When this happens, the Board quashes the notice of a 10(k) hearing. *Recon*, 424 F.3d at 985 (citing *Seafarers*, 339 N.L.R.B. at 828). The "work preservation defense," exculpates unions from charges of unlawful secondary strikes. *See ILA Cases*; *see also Sierra Pacific*, 85 F.3d 646.

In its Intervenor and Reply Briefs, the IAM will urge the Court to correctly apply any work preservation argument.

33

The Board has explained this in another way in one of the leading cases:

> The instant case is a true work preservation case, as UFCW-represented employees had been performing the disputed work for approximately 20 years when Safeway's violation of the parties' subcontracting clause caused the work to be taken away from Safeway's own UFCW-represented employees and given to employees of another employer. No new work is involved here. This case merely involves the preservation within the unit of long-existing work covered by the agreement between Safeway and UFCW.

*Steel, Paper House, Chem. Drivers Loc. No. 578*, 280 N.L.R.B. 818, 821-22 (1986), *aff'd sub nom. USCP-WESCO, Inc. v. NLRB*, 827 F.2d 581 (9th Cir. 1987).

The touchstone is whether the union had previously performed the disputed work: "The Board nevertheless will examine the nature and origins of the dispute to determine whether it is actually jurisdictional. Where a dispute is fundamentally one between an employer and a union and concerns the union's attempt merely to preserve the work it previously had performed," it will find no jurisdictional dispute subject to 10(k) or 8(b)(4)(D). *Seafarers*, 339 N.L.R.B. at 827. *See also Int'l Bhd. of Teamsters, Loc. 107*, 336 N.L.R.B. 518, 521 (2001) ("previously performed the work in dispute"). See *Int'l Longshoremen's Union, Loc. 14*, 314 N.L.R.B. 834, 835-36 (1994) (no work preservation dispute where disputed work involved the employer's "original assignment of new work at a new location"), *subsequent order*, 318 N.L.R.B. 462; *Int'l Longshore & Warehouse Union, Loc. 19*, 361 N.L.R.B. at 1035.

Inarguably that is not the case here since this is in the words of ILWU counsel a "classic jurisdictional dispute." (1-MER-13).

///

///

///

34

## IX.   **CONCLUSION**

The Court should enforce the Board's Decision and Order except to the extent that it should remand to the Board for reconsideration of the remedies. Should the Court remand or decline to enforce the Board's decision, it should remand the Board to reconsider its decision based on the arguments which it did not consider or address in rejecting the work preservation argument.

DATED:  April 18, 2024                 Respectfully Submitted


                                       /S/ *DAVID A. ROSENFELD*
                               By:     David A. Rosenfeld
                                       WEINBERG, ROGER & ROSENFELD
                                       A Professional Corporation

                                       Attorneys for Petitioner/Intervenor
                                       INTERNATIONAL ASSOCIATION OF
                                       MACHINSTS & AEROSPACE
                                       WORKERS DISTRICT LODGE 160,
                                       LOCAL LODGE 289

35

155739\1461864

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 23-632; 23-658; 23-780; 23-793

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[  ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** _s/ David A. Rosenfeld_          **Date** April 18, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

36

155739\1461864

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), Petitioner International Association of Machinists and Aerospace Workers, District 160, Local Lodge 289 certifies that its non-opposition contains 9,784 words of proportionally spaced, 14-point type, and the word-processing system used was Microsoft Word for Office 365.

Dated:  April 18, 2024                    RESPECTFULLY SUBMITTED,

WEINBERG, ROGER & ROSENFELD
A Professional Corporation

By:       /s/  *DAVID A. ROSENFELD*
          DAVID A. ROSENFELD
          WEINBERG, ROGER & ROSENFELD
          A Professional Corporation
          1375 55th Street
          Emeryville, California 94608
          Telephone (510) 337-1001
          Fax (510) 337-1023

          Attorneys for Petitioner/Intervenor
          INTERNATIONAL ASSOCIATION OF
          MACHINSTS & AEROSPACE
          WORKERS DISTRICT LODGE 160,
          LOCAL LODGE 289

37

155739\1461864

## CERTIFICATE OF SERVICE

I am a citizen of the United States and an employee in the County of Alameda, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 1375 55th Street, Emeryville, California 94608.

I hereby certify that on April 18, 2024, I electronically filed the foregoing **PETITIONER/INTERVENOR'S OPENING BRIEF** with the United States Court of Appeals, for the Ninth Circuit, by using the Court's CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Notice of Electronic Filing by the Court's CM/ECF system.

I certify under penalty of perjury that the above is true and correct. Executed at Emeryville, California, on April 18, 2024

*/s/ Denise Taylor*
Denise Taylor

155739\1461864