CASE NO 23-632; 23-658; 23-780; 23-793

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

INTERNATIONAL LONGSHORE AND WAREHOUSE UNION AND
INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 19,

*Petitioners/Cross-Respondents,*

and

PACIFIC MARITIME ASSOCIATION

*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner,*

and

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS, DISTRICT 160, LODGE 289

*Intervenor,*

---

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS, DISTRICT 160, LODGE 289

*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD

*Respondent.*

---

**PETITIONERS INTERNATIONAL LONGSHORE AND WAREHOUSE
UNION AND INTERNATIONAL LONGSHORE AND WAREHOUSE
UNION, LOCAL 19's MOTION TO TAKE JUDICIAL NOTICE**

---

18 W Mercer St, Suite 400
Seattle, WA 98119
(206) 257-6003
(206) 257-6038

BARNARD IGLITZIN & LAVITT LLP
Robert H. Lavitt, WSBA No. 27758
Julian Gonzalez, WSBA No. 59351
Travis Lavenski, WSBA No. 61507

*Counsel for Petitioners ILWU and
ILWU Local 19*

## I. MOTION TO TAKE JUDICIAL NOTICE

Under Federal Rule of Evidence 201 and in connection with the reply brief filed concurrently with this motion, Petitioners/Cross-Respondents International Longshore and Warehouse Union and International Longshore and Warehouse Union, Local 19 (collectively "ILWU") move the Court to take judicial notice of a court record from *International Longshore and Warehouse Union and International Longshore and Warehouse Union, Local 4 v. National Labor Relations Board, et al. (Kinder Morgan),* Case Nos. 19-70297, 19-70604, 19-71471, Dkt. 55 (9th Circuit) (filed February 18, 2020).

ILWU requests judicial notice of the following document, attached as Exhibit 1 to this motion:

**Brief of the National Labor Relations Board, filed February 18, 2020, 9th Cir. Court of Appeals Case Nos. 19-70297, 19-70604, and 19-71471, at Dkt. 55.**

## II. DISCUSSION

**A.    The material to be noticed and its relevance to this appeal.**

ILWU petitions for review from the NLRB's Section 8(b)(4)(D) and Section 10(k) decisions. In its accompanying reply brief, ILWU shows that one of the central arguments the Board advances in the instant matter was previously argued by the

Board and rejected by this Court in a case involving Kinder Morgan. *ILWU v. NLRB (Kinder Morgan),* 978 F.3d 625 (2020). The Board in that case disputed the applicability of the work preservation doctrine rooted in the U.S. Supreme Court decisions in *ILA I* and *II*.[1] In its reply brief, ILWU quotes the Board's brief in *Kinder Morgan* to illustrate the point.

*Kinder Morgan*, like the instant matter, also involved an ILWU petition for review of adverse Board decisions under Section 8(b)(4)(D) and Section 10(k), and involved the application of the same work preservation/automation agreement as a defense to those violations. This Court granted review in *Kinder Morgan* and vacated the underlying Board decisions.

## B. Judicial notice is appropriate under Rule 201 of the Federal Rules of Evidence.

Rule 201 states in relevant part that the court "may judicially notice a fact that is not subject to reasonable dispute because it…(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Rule 201(b). With respect to timing, a court may take judicial notice when a matter is on appeal because "[t]he court may take judicial notice at any stage of the proceeding." Rule 201(d). See *Dahlia v. Stehr*, 491 F. App'x 799, 800, n.1 (9th Cir. 2012)(granting

---

[1] *NLRB v. Int'l Longshoremen's Ass'n, AFL-CIO*, 447 U.S. 490 (1980)(*ILA I*) and *NLRB v. Int'l Longshoremen's Ass'n, AFL-CIO*, 473 U.S. 61 (1985)(*ILA II*).

request for judicial notice of pleadings from a different appeal "because those documents are judicial records), *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir.2001), they relate to proceedings that involve the same parties reflected in those documents, *Egan v. Teets,* 251 F.2d 571, 577–79 (9th Cir.1957), and those judicial developments 'affect our consideration of the various issues presented,' *Bryant v. Carleson*, 444 F.2d 353, 357 (9th Cir.1971).)"

ILWU seeks judicial notice of a court filing in a prior Ninth Circuit case, one involving the Board, and the ILWU, and PMA—all of which are parties in the instant case. The fact the Board filed the brief in question, and the arguments therein, can be readily and accurately determined. The brief for which the ILWU seeks judicial notice relates to the instant proceedings not only based upon the parties involved in *Kinder Morgan,* but also because the arguments made by the Board (and rejected by the Court) mirror those the Board makes in the instant matter.

### III. CONCLUSION

For these reasons, the Court should grant this motion to take judicial notice.

/ /

/ /

/ /

- 3 -

Dated this 8th day of August, 2024.

Respectfully submitted,

*/s/ Robert H. Lavitt*

Robert H. Lavitt, WSBA No. 27758
Julian Gonzalez, WSBA No. 59351
Travis Lavenski, WSBA No. 61507
**BARNARD IGLITZIN & LAVITT LLP**
18 W. Mercer St., Ste. 400
Seattle, WA 98119
Lavitt@workerlaw.com
Gonzalez@workerlaw.com
Lavenski@workerlaw.com

*Counsel for Petitioners ILWU and ILWU Local 19*

## IV. CERTIFICATE OF COMPLIANCE

I am one of the attorneys of record in this case. This motion complies with the length limits permitted by Ninth Circuit Rule 27(d); it contains 576 words. The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

DATED: August 8, 2024.

*/s/ Robert H. Lavitt*
Robert H. Lavitt, WSBA No. 27758
Barnard Iglitzin & Lavitt LLP
18 W. Mercer St., Ste. 400
Seattle, WA 98119
Lavitt@workerlaw.com

*Counsel for Petitioners ILWU and ILWU Local 19*

# V. CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2024, I electronically filed the foregoing Motion To Take Judicial Notice with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF filing system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

DATED: August 8, 2024.

*/s/ Robert H. Lavitt*
Robert H. Lavitt, WSBA No. 27758
Barnard Iglitzin & Lavitt LLP
18 W. Mercer St., Ste. 400
Seattle, WA 98119
Lavitt@workerlaw.com

*Counsel for Petitioners ILWU and ILWU Local 19*

# EXHIBIT 1

Oral Argument Not Yet Scheduled

## Nos. 19-70297, 19-70604, 19-71471

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 4**

**Petitioners/Cross-Respondents**

v.

**NATIONAL LABOR RELATIONS BOARD**

**Respondent/Cross-Petitioner**

and

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 48; KINDER MORGAN TERMINALS**

**Intervenors**

---

**PACIFIC MARITIME ASSOCIATION**

**Petitioner**

v.

**NATIONAL LABOR RELATIONS BOARD**

**Respondent**

---

## ON PETITIONS FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

---

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

**KIRA DELLINGER VOL**
*Supervisory Attorney*

**PETER B. ROBB**
*General Counsel*

**HEATHER S. BEARD**
*Attorney*

**ALICE B. STOCK**
*Deputy General Counsel*

**MEREDITH JASON**
*Acting Deputy Associate General Counsel*

**DAVID HABENSTREIT**
*Assistant General Counsel*

**National Labor Relations Board**

**National Labor Relations Board**
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-0656**
**(202) 273-1788**

# TABLE OF CONTENTS

**Headings**                                                                    **Page(s)**

Jurisdictional statement.................................................................................2

Statement of the issues presented ...............................................................3

Statutory addendum ....................................................................................3

Concise statement of the case .....................................................................4

   I.  The Board's findings of fact....................................................................5

       A.  Kinder's operations: ILWU-represented employees perform Kinder's mechanical work; IBEW-represented employees perform Kinder's electrical work ........................................................................5

       B.  Collective-bargaining agreement governing Kinder's ILWU-represented employees accomodates future introduction of new cargo-handling technologies.......................................................................7

       C.  ILWU files grievances to obtain electrical M&R work performed by IBEW-represented employees at Kinder; IBEW threatens to strike if Kinder reassigns the work ..........................................................9

       D.  The Board issues a Section 10(k) decision awarding Kinder's electrical M&R work to the IBEW-represented employees ....................................10

       E.  ILWU continued to pursue grievances seeking the work the Board had awarded to IBEW-represented employees ................................................12

       F.  ILWU-represented employees prevent IBEW-represented employees dispatched by Accurate from performing work for Kinder ....................13

   II.  Procedural history ................................................................................14

   III. The Board's conclusions and order ...............................................14

Summary of argument.................................................................................16

Argument.....................................................................................................17

# TABLE OF CONTENTS

**Headings**                                                    **Page(s)**

I.  The Board reasonably found that ILWU violated section 8(b)(4)(ii)(D) of the Act by continuing to pursue electrical M&R work that the Board had awarded to IBEW .........................................................................18

   A.  ILWU continued to pursue grievances to obtain work the Board had awarded to IBEW, and to physically interfere with IBEW-represented employees trying to perform that work ...................................................23

   B.  ILWU failed to prove its work-preservation defense.............................24

      1.  ILWU-represented employees did not historically perform electrical M&R work for Kinder or in the coastwide unit...................................27

      2.  The disputed electrical M&R work is not within ILWU's contractual scope of work ...............................................................................36

      3.  The Board's finding that ILWU failed to prove a work-preservation objective is consistent with the Supreme Court's decisions in *ILA I* and *II*................................................................................42

   C.  The Board did not err in precluding ILWU from re-litigating collusion; in any event, ILWU and PMA have not shown prejudice ..........................47

II. The Board reasonably found that ILWU violated section 8(b)(4)(ii)(B) of the Act by trying to force Kinder to cease doing business with Accurate ..........54

Conclusion ........................................................................................58

Statement of related cases.......................................................................58

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Am. Pres. Lines, Ltd. v. Int'l Longshore and Warehouse Union*,
   997 F. Supp. 2d 1037 (D. Ak. 2014), *affirmed*,
   611 F. App'x 908 (9th Cir. 2015) .................................................................30

*Berm. Container Line Ltd. v. Int'l Longshoremen's Ass'n*,
   192 F.3d 250 (2nd Cir. 1999).................................................................30

*Bldg. Materials and Constr. Teamsters Local 216 (Granite Rock Co.)*,
   296 NLRB 250 (1989), *enforced*,
   940 F.2d 667 (9th Cir. 1991)  ...............................................................25

*Bonnell/Tredegar Indus., Inc. v. NLRB*,
   46 F.3d 339 (4th Cir. 1995) .................................................................40

*Cal. Cartage Co. v. NLRB*,
   822 F.2d 1203 (D.C. Cir. 1987) ...........................................................30

*Carey v. Westinghouse*,
   375 U.S. 261 (1964)..................................................................... 21, 23

*Chicago Web Printing Pressmen's Union No. 7*,
   209 NLRB 320 (1974) .........................................................................36

*Constr. & Gen. Laborers Local 190 v. NLRB*,
   998 F.2d 1064 (D.C. Cir. 1993).................................................... 50, 51

*Geske & Sons Inc.*,
   317 NLRB 28 (1995), *enforced*,
   103 F.3d 1366 (7th Cir. 1997) .............................................................30

*Int'l Brotherhood of Elec. Workers, Local 48*,
   357 NLRB 2217 (2011) .......................................................................11

*Int'l Brotherhood of Elec. Workers, Local 103 (Buffalo Elec.)*,
   298 NLRB 937 (1990) .........................................................................36

*Int'l Longshore and Warehouse Union Local 4*,
   367 NLRB No. 64 (Jan. 31, 2019)........................................................2

*Int'l Longshore and Warehouse Union Local 19 (Seattle Tunnel)*,
   361 NLRB 1031 (2014) ................................................................ 28, 29

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Int'l Longshoremen's & Warehousemen's Union v. NLRB,*
   884 F.2d 1407 (D.C. Cir. 1989) ...................................................................23

*Int'l Longshoremen's & Warehousemen's Union, Local 32 v. Pac. Maritime Assn.,*
   773 F.2d 1012 (9th Cir. 1985) ..............................................................21

*Int'l Tel. & Tel. Corp. v. Local 134,*
   419 U.S. 428 (1975)...................................................................................50

*Int'l Union of Bricklayers and Allied Craftworkers (Cretex),*
   343 NLRB 1030 (2004) ............................................................... 48, 51

*Int'l Union of Operating Eng'rs Local 17 (Arby Constr.),*
   324 NLRB 454  (1997) ..........................................................................18

*Int'l Union of Operating Eng'rs Local 18 (Nerone)*
   365 NLRB No. 18 (2017)*, enforced,*
   2018 WL 2220248 (D.C. Cir. Apr. 24, 2018)................................ 29, 50

*Int'l Union of Operating Eng'rs Local 18 v. NLRB (Donley's),*
   712 F. App'x 511 (6th Cir. 2017) ..................................... 23, 29, 31, 50

*Int'l Union of Operating Eng'rs Local 18 (Donley's),*
   363 NLRB No. 184 (2016), *enforced,*
   712 F. App'x 511 (6th Cir. 2017) ............................................... 29, 50

*Int'l Union of Operating Eng'rs Local 18, Laborers Local 310 (Donley's Inc.)*
   360 NLRB 903 (2014) ......................................................... 28, 29, 34

*Int'l Union of Operating Eng'rs Local 150 (R&D Thiel),*
   345 NLRB 1137 (2005) ..........................................................................52

*Laborers' Int'l Union of N. Am., Local 265 (Henkels & McCoy),*
   360 NLRB 819 (2014) ......................................................... 20, 25, 52

*Local 3, Int'l Brotherhood of Elec. Workers (Slattery Skanska),*
   342 NLRB 173 (2004) ............................................................................20

*Local 32B-32J, Serv. Emps. Int'l Union v. NLRB,*
   68 F.3d 490 (D.C. Cir. 1995) ..................................................................55

iv

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Local Joint Exec. Bd. of Las Vegas v. NLRB*,
   540 F.3d 1072 (9th Cir. 2008) ...........................................................36

*Loomis Courier Serv. Inc v. NLRB*,
   595 F.2d 491 (9th Cir. 1979) ............................................................35

*Marble Polishers-Local 47-T (Grazzini Bros.)*,
   315 NLRB 520 (1994) ................................................................ 25, 50

*Maui Trucking, Inc. v. Operating Eng'rs Local Union No. 3*,
   37 F.3d 436 (9th Cir. 1994) .............................................................30

*Meat & Highway Drivers, Dockmen, Helpers & Miscellaneous Truck Terminal*
   *Emp., Local Union No. 710 v. NLRB*,
   335 F.2d 709 (D.C. Cir. 1964) .........................................................30

*Motion Picture, Television and Exhibition Emps. Local Union No. 39 (Shepard*
   *Exposition Serv.)*,
   337 NLRB 721 (2002) ........................................................ 20, 25, 28

*Nat'l Woodworker Mfrs. Ass'n v. NLRB*,
   386 U.S. 612 (1967).......................................................... 18, 25, 54

*NLRB v. Denver Bldg. & Constr. Trades Council*,
   341 U.S. 675 (1951).........................................................................18

*NLRB v. Health TEC Div.*,
   566 F.2d 1367 (9th Cir. 1978) .........................................................51

*NLRB v. Int'l Longshoremen's & Warehousemen's Union, Locals 6*,
   378 F.2d 33 (9th Cir. 1967) .............................................................21

*NLRB v. Int'l Longshoremen's Ass'n*,
   447 U.S. 490 (1980)........................................... 15, 26, 30, 43, 46, 55

*NLRB v. Int'l Longshoremen's Ass'n*,
   473 U.S. 61 (1985)............................................... 15, 26, 43, 46, 47

*NLRB v. Millwrights Local 1102*,
   779 F.2d 349 (6th Cir. 1985) ...........................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*NLRB v. Plasterers' Local Union No. 79,*
    404 U.S. 116 (1971) ............................................................................53

*NLRB v. Plumbers Local No. 741,*
    704 F.2d 1164 (9th Cir. 1983) .......................................................22

*NLRB v. Radio & Television Broad. Eng'rs,*
    364 U.S. 573 (1961)............................................................... 19, 21, 23

*Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200, (Standard
    Drywall),* 357 NLRB 1921 (2011), *enforced Standard Drywall, Inc. v. NLRB,*
    547 F. App'x 809 (9th Cir. 2013) ........................................ 22, 23, 49

*Pac. Mar. Ass'n v. NLRB,*
    827 F.3d 1203 (9th Cir. 2016) .......................................................50

*Recon Refractory & Constr. Inc. v. NLRB,*
    424 F.3d 980 (9th Cir. 2005) ........................................ 18, 20, 25, 36

*Retlaw Broad. Co. v. NLRB,*
    53 F.3d 1002 (9th Cir. 1995) .........................................................55

*Sheet Metal Workers Union Local 162,*
    207 NLRB 741 (1973) ............................................................ 30, 34

*Sheet Metal Workers' Int'l Ass'n, Local 27,*
    357 NLRB 1577 (2011), *enforced,*
    737 F.3d 879 (3d Cir. 2013)...........................................................23

*Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200,*
    611 F.3d 483 (9th Cir. 2010) .........................................................23

*StaffCo of Brooklyn, LLC v. NLRB,*
    888 F.3d 1297 (D.C. Cir. 2018).....................................................40

*Teamsters Local 578 (USCP-WESCO),*
    280 NLRB 818 (1986), *enforced,*
    *USCP-WESCO v. NLRB,* 827 F.2d 581 (9th Cir. 1987) .............. 25, 36

*United Brotherhood of Carpenters and Joiners of America, Local 275 (Lymo)*
    334 NLRB 422 (2001) ..................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*United Food & Commercial Workers Union, Local 367 (Quality Food)*,
   333 NLRB 771 (2001) ................................................................... 38, 55

*Warehouse Union Local 6, Int'l Longshoremen and Warehousemen's Union
   (Golden Grain)*,
   289 NLRB 1 (1988) ...................................................................... 49, 50

**Statutes**

National Labor Relations Act, as amended
   (29 U.S.C. §§ 151, et seq.)

29 U.S.C. § 151 ........................................................................................3
29 U.S.C. § 158(b)(4) .............................................................................17
29 U.S.C. § 158(b)(4)(ii)(B) ......................................................... 14, 30, 54
29 U.S.C. § 158(b)(4)(ii)(D) ......................................................... 14, 18, 19
29 U.S.C. § 158(e) ..................................................................................30
29 U.S.C. § 160(a) ....................................................................................3
29 U.S.C. § 160(e) .................................................................................3, 41
29 U.S.C. § 160(f) .....................................................................................3
29 U.S.C. § 160(k) ......................................................................... 11, 18, 19

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

## Nos. 19-70297, 19-70604, 19-71471

————————————

## INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 4
### Petitioners/Cross-Respondents

v.

## NATIONAL LABOR RELATIONS BOARD
### Respondent/Cross-Petitioner

and

## INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 48; KINDER MORGAN TERMINALS
### Intervenors

————————————

## PACIFIC MARITIME ASSOCIATION
### Petitioner

v.

## NATIONAL LABOR RELATIONS BOARD
### Respondent

————————————

## ON PETITIONS FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

————————————

# BRIEF FOR
# THE NATIONAL LABOR RELATIONS BOARD

2

## JURISDICTIONAL STATEMENT

This case is before the Court on two petitions for review, and the National Labor Relations Board's cross-application for enforcement, of the same Board Decision and Order, which issued on January 31, 2019, and is reported at 367 NLRB No. 64. International Longshore and Warehouse Union and its Local 4 (collectively, "ILWU") petitioned for review, and the Board cross-applied for enforcement, of the Order, which runs against ILWU. Pacific Maritime Association ("PMA") also filed a petition for review of the Order.[1] Kinder Morgan Terminals, Inc. ("Kinder") and International Brotherhood of Electrical Workers, Local 48 ("IBEW") have intervened on the side of the Board.[2] The petitions and the cross-application are timely because the Act imposes no time limitation for such filings.

---

[1] PMA did not participate in the underlying Board proceedings. The Board filed a motion to dismiss PMA's petition for review on September 24, 2019, arguing that PMA did not have standing to participate in this court proceeding. The Court denied the Board's motion without prejudice. The Board does not renew its motion because PMA makes essentially the same arguments as ILWU, which undisputedly has standing.

[2] Before the Board, ILWU and its Local 4 were Respondents, IBEW was the Charging Party, and Kinder was a party-in-interest. Maritime Union of Australia and the International Transport Workers Federation ("MUA") and International Longshoremen's Association, AFL-CIO ("ILA") have filed amicus briefs in support of ILWU's petition.

3

The Board had jurisdiction over this unfair-labor-practice case pursuant to Section 10(a) of the National Labor Relations Act, as amended ("the Act") (29 U.S.C. §§ 151, 160(a)), which authorizes the Board to prevent unfair labor practices affecting commerce. This Court has jurisdiction under Section 10(e) and (f) of the Act (29 U.S.C. §§ 160(e) and (f)), because the Order is final and the unfair labor practices took place in Washington State.

## STATEMENT OF THE ISSUES PRESENTED

1.    Whether the Board reasonably found that ILWU violated Section 8(b)(4)(ii)(D) of the Act by continuing to pursue grievances, and physically interfering with IBEW-represented employees, in order to acquire electrical work that the Board had awarded to IBEW-represented employees.

2.    Whether the Board reasonably found that ILWU's actions also violated Section 8(b)(4)(ii)(B) of the Act because ILWU sought to force Kinder to cease doing business with the company employing the IBEW-represented employees performing the work ILWU sought.

## STATUTORY ADDENDUM

Pertinent statutes, regulations, and rules are included in the Addendum bound with this brief.

4

## CONCISE STATEMENT OF THE CASE

This case arose out of a dispute between two unions regarding the assignment of work at a port in Washington State.  ILWU claimed work that IBEW-represented employees, working for an electrical contractor, were then performing for Kinder.  That "jurisdictional" dispute came before the Board, which resolved the conflict by awarding the work to IBEW.  ILWU refused to accept that resolution and persisted in pursuing the work, and IBEW filed unfair-labor-practice charges.

The Board ultimately found that ILWU's continued pursuit of the work—through grievances against Kinder and by physically blocking IBEW electricians—violated the Act in two respects.  First, because ILWU acted with an object of forcing Kinder to assign work to ILWU members rather than IBEW members, it violated Section 8(b)(4)(ii)(D).  Second, because ILWU acted with an object of forcing Kinder to stop doing business with the contractor employing the IBEW electricians, it violated Section 8(b)(4)(ii)(B).  The Board rejected ILWU's asserted defense that it sought only to preserve its own traditional scope of work.

The facts supporting the Board's findings are outlined below, followed by the procedural history of the case.

5

# I.    THE BOARD'S FINDINGS OF FACT

## A.    Kinder's Operations: ILWU-Represented Employees Perform Kinder's Mechanical Work; IBEW-Represented Employees Perform Kinder's Electrical Work

In 1982, the Port of Vancouver ("Port") opened the Vancouver Bulk

Terminal ("Terminal") in Vancouver, Washington to handle bulk cargo.  (D&O 8

n.2, 10(k) Decision at 2217; SER 3-4, 8-9.)[3]  Since then, the Terminal has been

operated by a series of companies in partnership, or under contract, with the Port

or, for a handful of years, by the Port itself.  (D&O 1, 8; SER 6, 9.)  Kinder

operates nearly 150 terminals in North America.  (D&O 8; (SER 8.)  In 1998,

Kinder assumed control of the bulk cargo-handling facility at the Terminal when it

acquired the company which had been operating the facility.  (D&O 1, 8; SER 6;

59, 60, 63.)

Kinder's operation at the Terminal is the loading and unloading of bulk

(unpackaged) materials, such as copper concentrate or bentonite clay, which are

shipped to the terminal in railcars.  (D&O 1, 8; SER 1, 14, 49-50.)  When the

-------

[3] "ER" refers to ILWU's Excerpts of Record, "PMA ER" refers to those filed by PMA, and "SER" refers to those filed by the Board.  "D&O" refers to the Board's Decision and Order before the Court, available at ER 1-19, and "10(k) Decision" refers to the Board's underlying Decision and Determination of Dispute, available at ER 20-24.  References preceding a semicolon are to the Board's findings; those following are to the supporting evidence.

6

railcars arrive, Kinder's employees advance them to an unloading position by
operating programmable logic controllers ("PLCs").  Kinder's employees then
scoop the bulk materials by hand onto a conveyor system, which moves the
materials into a warehouse.  The employees later load the warehoused materials
onto ocean-going vessels for export.  (D&O 8; SER 14, 16, 51-54.)  Since it
assumed its Terminal operations in 1998, Kinder has—like its predecessor—
utilized its own ILWU-represented workers (longshoremen) to perform its cargo-
handling duties, as well as the mechanical maintenance and repair ("M&R") work
on its equipment and vehicles at the facility.  (D&O 1; SER 14.)

Kinder's operations also require occasional electrical work.  (D&O 1, 10(k)
Decision at 2217).  Examples of such work include:  wiring a motor; replacing a
starter; installing an air compressor; conduit and wire repair; and troubleshooting
problems with motors, switches, and rewiring.  (SER 19, 65-66, 125-29).
Kinder—like its predecessor—has always used a subcontractor with an electrical
license, and whose employees have electrical licenses, rather than its own ILWU-
represented employees, to perform the electrical M&R work on its cargo-handling
equipment.  (10(k) Decision at 2217; SER 48, 64, 65.) That equipment includes the
PLCs, conveyor equipment, ship-loading spouts, railcar-advancement equipment,
and air compressors.  (D&O 1, 8; SER 19, 65-66.)

7

Kinder's current subcontractor, Accurate Electric ("Accurate"), has

performed Kinder's electrical M&R work on an as-needed basis since 2004.

(D&O 8; SER 7, 19, 24, 25-26.)  Accurate's employees are represented by IBEW

and work under a collective-bargaining agreement between IBEW and Accurate.

(D&O 1, 8, 10(k) Decision at 2217; SER 7, 19, 24, 25-26.)

## B. Collective-Bargaining Agreement Governing Kinder's ILWU-Represented Employees Accomodates Future Introduction of New Cargo-Handling Technologies

Kinder is a member of PMA, a multiemployer bargaining association

representing 70 employers in ports along the Pacific Coast for the purposes of

collective bargaining with their employees.  (D&O 8; SER 16.)  PMA and ILWU

are parties to the Pacific Coast Longshore Contract Document ("PCLCD"), which

applies to a multiemployer, coastwide unit and governs the terms and conditions of

employment of over 20 thousand employees, including those at Kinder.  (D&O 1,

8; SER 56, 67.)

The most recent applicable PCLCD was effective from July 1, 2008, through

June 30, 2014.  The 2008 PCLCD, like its predecessor agreement, states in Section

(24 of 82), Page 24 of 82    Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 24 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 16 of 74

8

1.71 that it applies to "the maintenance and repair of all stevedore cargo handling equipment." (D&O 1; ER 134-35.)[4]

During negotiations for the 2008 PCLCD, the parties discussed anticipated increasing automation of ports and negotiated how to handle potential effects on longshoremen's work. As a result, they added Sections 1.72 and 1.73. (D&O 1; ER 134-35.) Section 1.72 acknowledges that "the introduction of new technologies, including fully mechanized and robotic-operated marine terminals, necessarily displaces traditional longshore work." (D&O 8; ER 135.) And it defines "traditional longshore work" as the operation, maintenance and repair, and cleaning of cargo-handling equipment. (D&O 10; ER 135.) Section 1.72 further provides, in pertinent part:

> The parties recognize robotics and other technologies will replace a certain number of equipment operators and other traditional longshore classifications. It is agreed that the jurisdiction of the ILWU shall apply to the maintenance and repair of all present and forthcoming stevedore cargo handling equipment in accordance with Sections 1.7 and 1.71 and shall constitute the functional equivalent of such traditional ILWU work.[5]

(ER 135, Sec. 1.72.) Implementing Section 1.72, Section 1.73 specifies that the scope of ILWU work "shall include . . . maintenance and repair, and associated

---

[4] Section 1.71 references Section 1.81, which incorporates two letters of understanding exempting certain facilities from the requirements of Section 1.71 and the other sections discussed below. (ER 134.)

[5] Section 1.7 is inapplicable here as it addresses M&R work at container terminals. (D&O 9 n.5.)

(25 of 82), Page 25 of 82    Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 25 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 17 of 74

9

cleaning of all present and forthcoming technological equipment related to the operation of stevedore cargo handling equipment . . . and its electronics that are controlled or interchanged by PMA companies."  (D&O 1-2, 10; ER 135, Sec. 1.73).

### C.    ILWU Files Grievances To Obtain Electrical M&R Work Performed By IBEW-Represented Employees at Kinder; IBEW Threatens to Strike If Kinder Reassigns the Work

Between July 15 and September 1, 2010, ILWU filed six grievances against Kinder under provisions 1.71 and 1.73 of the PCLCD.  (D&O 2, 10(k) Decision at 2218; SER 17, 116-122.)  In those grievances, ILWU claimed that its members should have performed recent electrical M&R work for Kinder that had been performed by Accurate's IBEW-represented employees.  All of the work specified in the grievances required a journeyman electrician license.  (10(k) Decision at 2218; SER 27.)  ILWU's local president also wrote to Kinder, on July 2, 2010, demanding that Kinder hire ILWU-represented employees qualified to perform such work.  (D&O 9; SER 32).

On December 9, 2010, after learning of the grievances, IBEW wrote to Kinder, pointing out that the electrical work at the Port had been performed by IBEW-represented employees since the Terminal opened.  IBEW asserted that it "intend[ed] to ensure that it will continue to be performed by [IBEW] until [the Terminal] shuts down" and warned that it would not "sit idly by and allow

10

[Kinder] to hand over our work to another union." (D&O 11; PMA ER 104.)  The

letter ended by expressing IBEW's hope that Kinder would "reconsider before

[IBEW] begins making picket signs." (PMA ER 104.)  In a subsequent letter to

Kinder, IBEW acknowledged that ILWU was pressuring Kinder to reassign the

electrical M&R work; asserted that IBEW would not tolerate such reassignment;

and again warned that it would take whatever action was necessary—including

picketing—to protect its members' work.  (10(k) Decision at 2218; PMA ER 106.)

Under the PCLCD grievance-and-arbitration procedures, ILWU's grievances

made their way to the contractually designated Area Arbitrator.  On May 31, 2011,

the Area Arbitrator determined that Kinder was exempt from the provisions of the

PCLCD cited by ILWU and that the grievances were thus without merit.

(D&O 11; SER 139-155.)  ILWU appealed that determination to the contractually

designated Coast Arbitrator, who vacated the award on December 28, 2011, and

remanded the case back to the Area Arbitrator for proceedings consistent with his

contract interpretation.  (D&O 2; ER 270.)

### D.   The Board Issues a Section 10(k) Decision Awarding Kinder's Electrical M&R Work to the IBEW-Represented Employees

Meanwhile, on March 23, 2011, Kinder filed an unfair-labor-practice charge

with the Board's Regional Office alleging that IBEW had violated the Act by

threatening to strike if Kinder assigned its electrical M&R work to employees

represented by ILWU.  (10(k) Decision at 2217; SER 46, 130.)  Pursuant to

11

Section 10(k) of the Act (29 U.S.C. § 160(k)), the Region held the charge in abeyance while the Board convened proceedings to determine if the two unions had a bona fide jurisdictional dispute and, if so, to determine the proper assignment of the contested work.[6]

On December 31, 2011, after an evidentiary hearing, the Board (Chairman Pearce, Members Becker and Hayes) issued a Section 10(k) Decision and Determination of Dispute awarding Kinder's electrical M&R work performed on cargo-handling equipment to employees represented by IBEW.[7]  (10(k) Decision at 2217-21.)  First, the Board made the required threshold determination that reasonable cause existed to believe there was a jurisdictional dispute between ILWU and IBEW.  Specifically, it found that:  (1) the two unions had competing claims to the disputed work; (2) IBEW had used proscribed means by threatening to strike to enforce its claim to the work; and (3) the parties did not have an agreed-upon method for voluntary adjustment of the dispute.  The Board rejected ILWU's contention that there was no genuine dispute, either because ILWU had acted

---

[6]  Section 10(k) of the Act provides that "[w]henever it is charged that any person has engaged in an unfair labor practice within the meaning of [Section 8(b)(4)(ii)(D)], the Board is empowered to hear and determine the [work] dispute out of which such unfair labor practice has arisen . . . ."

[7]  *Int'l Bhd. of Elec. Workers, Local 48,* 357 NLRB 2217 (2011) ("10(k) Decision").

12

lawfully to preserve its own work or because IBEW had colluded with Kinder to make a sham strike threat.

The Board then considered the five relevant factors and found that three favored IBEW—(1) employer preference, assignment, and practice; (2) relative, relevant skills (electrical training and licensing) of the two union's members; and (3) efficiency of operations—whereas the remaining two did not favor either union.[8]  Accordingly, the Board awarded the work in dispute to IBEW and dismissed Kinder's charge against IBEW.  (10(k) Decision at 2219-21.)

### E.    ILWU Continued To Pursue Grievances Seeking the Work the Board Had Awarded to IBEW-Represented Employees

Following the Board's 10(k) work assignment, ILWU continued to pursue its lost-work grievances against Kinder.  On February 21, 2012, the Area Arbitrator concluded, on remand, that the work at issue was rightfully ILWU's under the terms of the PCLCD and referred the case to the contractual Coast Labor Relations Committee ("CLRC") for implementation.  (D&O 2; ER 260.)  On May 10, the CLRC ordered Kinder to "take the necessary steps to assign the work in dispute" to ILWU employees.  From May through November, the parties engaged in a variety of actions to implement the Area Arbitrator's decision, including preparing a

---

[8] The five relevant factors are:  certification and collective-bargaining agreements; employer preference, current assignment and past practice; area and industry practice; relative skills and training; and economy and efficiency of operations. (10(k) Decision at 2219-20).

(29 of 82), Page 29 of 82    Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 29 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 21 of 74

13

general journeyman-electrician job description for posting at ILWU's union hall and interviewing ILWU-represented candidates. (D&O 2, 5; SER 47, 55, 57, 132-38.) During that period, Kinder continued to use Accurate to perform its electrical M&R work. (D&O 4.)

### F. ILWU-Represented Employees Prevent IBEW-Represented Employees Dispatched by Accurate from Performing Work for Kinder

In the early afternoon of October 18, 2013, Accurate dispatched electrician Jeff Andrews to perform work for Kinder. When Andrews arrived at one of Kinder's electrical rooms, a crowd of about 20 ILWU-represented employees refused to permit him to enter. One individual touched Andrews to prevent him from entering. ILWU local's vice president told Andrews that they would not let him perform the repairs, which they considered longshoremen's work. Andrews was not able to perform his work until four hours later. (D&O 2, 12; SER 82-101.)

On October 21, 2013, Accurate electrician Ken Sweo arrived to perform work for Kinder. About 15 longshoremen, including two ILWU local Labor Relations Committeemen, physically interfered with Sweo's efforts to get material from his van and prevented him from entering the pit building to replace an electrical switch. Eventually, Sweo was forced to leave without completing any work. (D&O 2, 12; SER 102-112, 113-15.)

14

## II. PROCEDURAL HISTORY

Acting on unfair-labor-practice charges filed by IBEW, the General Counsel issued a complaint alleging that ILWU violated the Act by pursuing grievances to perform Kinder's electrical M&R work, coercing Kinder to hire ILWU-represented employees for that work, and physically interfering with IBEW-represented employees attempting to perform the work. The complaint alleged that ILWU's actions violated Section 8(b)(4)(ii)(D) of the Act (29 U.S.C. § 158(b)(4)(ii)(D)) because they were inconsistent with the Board's Section 10(k) decision, and also violated Section 8(b)(4)(ii)(B) of the Act (29 U.S.C. § 158(b)(4)(ii)(B)) because one of ILWU's aims was to force Kinder to cease doing business with Accurate.

On August 13, 2014, after an evidentiary hearing, an administrative law judge issued a decision and recommendation to dismiss the complaint. (D&O 7-19.) In doing so, the judge rejected portions of the analysis in the Board's Section 10(k) work-assignment decision. (D&O 16.) All parties excepted to the judge's decision before the Board. (D&O 1.)

## III. THE BOARD'S CONCLUSIONS AND ORDER

On January 31, 2019, the Board (Members McFerran, Kaplan, and Emanuel) issued a decision reversing the judge and finding that ILWU violated Section 8(b)(4)(ii)(D) and (B) of the Act by continuing to pursue lost-work grievances, and by physically preventing Accurate's IBEW-represented employees from

15

performing work, after the Board issued its Section 10(k) determination.  (D&O 5.)

In finding those violations, the Board specifically reaffirmed the conclusions in its

earlier Section 10(k) determination.

In particular, relying on the full record in both the Section 10(k) and unfair-

labor-practice proceedings, the Board reversed the judge's finding that ILWU had

proven its claim to the electrical M&R work was a lawful attempt to preserve

bargaining-unit work at Kinder or, in the alternative, in the coastwide unit.

(D&O 4-5.)  In doing so, it distinguished the Supreme Court's decisions in *NLRB*

*v. Longshoreman ILA*, 447 U.S. 490 (1980) ("*ILA I*"), and *NLRB v. Longshoreman*

*ILA*, 473 U.S. 61 (1985) ("*ILA II*").  The Board explained that, unlike those cases,

this one does not present "a situation involving technological displacement, and

existing electrical M&R work is not work that ILWU can 'preserve' from the

assault of technological change."  (D&O 5.)  The Board also reaffirmed its Section

10(k) finding that the 2008 PCLCD did not include electrical M&R work within

ILWU's scope of work, rejecting the judge's contrary finding.  (D&O 4.)

The Board's Order requires ILWU to cease and desist from the unfair labor

practices found; notify the CLRC in writing that it has withdrawn its lost-work

grievances against Kinder; and request, in writing, that the Area Arbitrator vacate

her award on those grievances.  (D&O 6.)  In addition, the Board ordered ILWU to

post a remedial notice.  (D&O 6.)

16

## SUMMARY OF ARGUMENT

The Board reasonably found that ILWU violated Section 8(b)(4)(ii)(D) of the Act. It is undisputed ILWU pursued grievances seeking electrical M&R work that the Board had awarded under Section 10(k) of the Act to IBEW's members, and that ILWU physically blocked IBEW-represented Accurate employees from performing that work for Kinder. Under well-settled law, such coercive actions by a union in contravention of a Board Section 10(k) award are unlawful unless the union can establish, as a defense, that it acted to preserve bargaining unit work.

ILWU and PMA assert such a defense—they insist that the work dispute was not a jurisdictional conflict between ILWU and IBEW but, rather, a contractual dispute between ILWU and Kinder, in which ILWU sought to preserve its traditional work. But the Board reasonably rejected that argument, finding that ILWU did not have a work-preservation objective under any recognized standard. ILWU and PMA have failed to meet their burden of establishing that ILWU-represented employees had regularly performed the disputed work at Kinder or in the coastwide unit of employers represented by PMA. Moreover, the Board properly found that the 2008 PCLCD did not include electrical M&R work within ILWU's scope of work. Nor do the Supreme Court decisions in *ILA I* and *II* require a different result. Those cases support a finding of work preservation where a union facing technological changes strikes a bargain to acquire the

17

functional equivalent of its displaced unit work. Unlike in those cases, the Board reasonably found that ILWU has not demonstrated that traditional ILWU work has been displaced, much less by electrical M&R work, or that the disputed work is the functional equivalent of work that ILWU members have traditionally performed.

The Board also reasonably relied on well-settled precedent to find that ILWU could not relitigate in this case the threshold findings that triggered the underlying Section 10(k) proceedings. Those threshold findings are not elements of the violation before the Court. In any event, ILWU and PMA have failed to show prejudice from the Board's ruling for they have not established that they could have established improper collusion that would have called those threshold findings into question.

Finally, the Board reasonably found that ILWU's actions also violated Section 8(b)(4)(ii)(B) of the Act. As the Board reasonably found, one of ILWU's aims in pressuring Kinder was an unlawful secondary object under that provision—to force Kinder to stop doing business with Accurate. And, again, ILWU did not have a valid work-preservation objective to justify its otherwise unlawful conduct.

## ARGUMENT

Section 8(b)(4) of the Act (29 U.S.C. § 158(b)(4)) prohibits a union from taking threatening or coercive action with an unlawful secondary object; the

18

unlawful object need not be the union's sole object. *NLRB v. Denver Bldg. &*
*Constr. Trades Council*, 341 U.S. 675, 689 (1951); *accord Int'l Union of*
*Operating Eng'rs Local 17* (*Arby Constr.*), 324 NLRB 454 n. 2 (1997). A union
violates Section 8(b)(4)(ii)(D) when it acts with an object of forcing assignment of
work to its members rather than to those of another union. A union violates
Section 8(b)(4)(ii)(B) when it acts with an object of forcing one company to stop
doing business with another. In either case, a union may defend its actions by
establishing that it acted pursuant to the permissible motive of preserving its own
bargaining-unit work. *Recon Refractory & Constr. Inc. v. NLRB*, 424 F.3d 980,
988-89 (9th Cir. 2005); *Nat'l Woodwork*er *Mfrs. Assn. v. NLRB*, 386 U.S. 612, 635
(1967). The Board reasonably found that, in its efforts to procure electrical M&R
work that the Board had assigned to IBEW, ILWU violated the above provisions of
Section 8(b)(4).

## I.   THE BOARD REASONABLY FOUND THAT ILWU VIOLATED SECTION 8(b)(4)(ii)(D) OF THE ACT BY CONTINUING TO PURSUE ELECTRICAL M&R WORK THAT THE BOARD HAD AWARDED TO IBEW

A violation of Section 8(b)(4)(ii)(D) of the Act (29 U.S.C.
§ 158(b)(4)(ii)(D)) arises in the context of a dispute between two unions over
whose members are entitled to perform particular work. That provision operates in
tandem with Section 10(k) of the Act (29 U.S.C. § 160(k)) to identify and resolve
such jurisdictional disputes and to protect interstate commerce by relieving

19

employers trapped between the claims of rival unions from costly disruptions of their businesses occasioned by such disputes. *NLRB v. Radio & Television Broad. Eng'rs*, 364 U.S. 573, 574-75, 579-82 (1961).

Section 8(b)(4)(ii)(D) makes it an unfair labor practice for a union to threaten, coerce, or restrain any person where an object is to force an employer to "assign particular work to employees in a particular labor organization . . . rather than to employees in another labor organization unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing the work." 29 U.S.C. § 158(b)(4)(ii)(D). In other words, Section 8(b)(4)(ii)(D) prohibits a union from acting coercively with an object of forcing an employer to assign work to the union's own members rather than to employees in another union, unless the work rightfully belongs to the union seeking to force reassignment. Typically, that unlawful, "secondary" objective is established by showing that the Board has, in a prior Section 10(k) proceeding, awarded the work at issue to the other union. If there has not already been a Section 10(k) award when a Section 8(b)(4)(ii)(D) charge is filed, and there is reasonable cause to believe that a violation has occurred, the Board is authorized to suspend proceedings on the charge and to conclusively resolve, pursuant to Section 10(k), the underlying dispute between the unions. 29 U.S.C. §160(k).

20

Before the Board may award work to a particular union under Section

10(k)—and eventually adjudicate charges under Section 8(b)(4)(ii)(D) against any

non-compliant union—it must first determine that there is a bona fide jurisdictional

dispute warranting a Section 10(k) proceeding.  To do so, the Board must find

reasonable cause to believe that:  (1) there are competing claims for the disputed

work; (2) a union used proscribed means to enforce its claim to the work; and (3)

the parties have no agreed-upon method for the voluntary adjustment of the

dispute.  *See Local 3, Int'l Brotherhood of Elec. Workers* (*Slattery Skanska*), 342

NLRB 173, 174 (2004) (competing claims and proscribed means); *United*

*Brotherhood of Carpenters and Joiners of Am., Local 275* (*Lymo*), 334 NLRB 422,

423 (2001) (no agreed-upon method for voluntary adjustment of the dispute).

Even if those threshold elements have been established, however, the Board may

quash Section 10(k) proceedings if a union demonstrates that the dispute is not

jurisdictional because that union's objective is to preserve bargaining-unit work

rather than "attempt[] to expand its work jurisdiction."  *Recon*, 424 F.3d at 988-89;

*see also Laborers Int'l Union of N. Am., Local 265* (*Henkels & McCoy*), 360

NLRB  819, 822-23 (2014); *Motion Picture, Television and Exhibition Emps.*

*Local Union No. 39 (Shepard Exposition Servs.)*, 337 NLRB 721, 723 (2002).

Once the Board has determined that a jurisdictional dispute exists, it will—

pursuant to its Section 10(k) authority—award the contested work to one union.

21

While parties may initially attempt to resolve jurisdictional disputes in other forms, such as arbitration or the courts, the Board's work assignment takes precedence over, and precludes enforcement of, a contrary decision. *See*, *e.g.*, *Carey v. Westinghouse*, 375 U.S. 261, 272 (1964) (Board's ruling takes precedence over arbitration award). Indeed, as this Court has recognized, "Congress intended to make the Section 10(k) proceeding the 'peaceful and binding' final determination of a disputed work assignment." *Int'l Longshoremen & Warehousemen's Union, Local 32, v. Pacific Maritime Assn.*, 773 F.2d 1012, 1020-21 (9th Cir. 1985) ("*ILA Local 32*"), quoting *Radio & Television Broad. Eng'rs*, 364 U.S. 573, 580 (1961). Accordingly, if a union fails to accede to the Board's jurisdictional award, and continues to pursue the assigned work through proscribed means, its actions will violate Section 8(b)(4)(ii)(D). Because the Act does not provide for independent judicial review of Section 10(k) determinations, the only stage at which the losing party can challenge the award is in conjunction with judicial review of a subsequent, related 8(b)(4)(ii)(D) finding. *NLRB v. Int'l Longshoremen's & Warehouse's Union, Locals 6*, 378 F.2d 33, 35-36 (9th Cir. 1967).

The Board's Section 8(b)(4)(ii)(D) findings are subject to limited review. Courts will affirm the violation if the Board's underlying factual findings are supported by substantial evidence and its legal conclusions are not arbitrary or

22

capricious. *Standard Drywall, Inc. v. NLRB*, 547 F. App'x 809, 810 (9th Cir.

2013); *NLRB v. Plumbers Local No. 741*, 704 F.2d 1164, 1166 (9th Cir. 1983).

Judicial review of a Section 10(k) determination is similarly circumscribed. *See*

*Plumbers Local 741*, 704 F.2d at 1166 (applying same standard to review Section

10(k) determination); *accord NLRB v. Millwrights Local 1102*, 779 F.2d 349, 350

(6th Cir. 1985) (recognizing courts of appeal give great deference to Section 10(k)

determinations).

In the instant case, ILWU and PMA do not challenge the basic elements or

supporting evidence of the Board's Section 8(b)(4)(ii)(D) findings, i.e., that ILWU

took coercive actions contrary to the Board's Section 10(k) award by pursuing

grievances seeking, and blocking IBEW-represented employees from performing,

electrical M&R work at Kinder. Instead, they primarily assert that ILWU has a

work-preservation defense that should have prevented the Section 10(k)

proceedings in the first place and should now defeat the unfair-labor-practice

finding. In addition, ILWU and PMA challenge the Board's well-settled precedent

that ILWU was not entitled to relitigate in the unfair-labor-practice proceeding its

argument that IBEW and Kinder improperly colluded to invoke the Board's

Section 10(k) authority. After demonstrating that ILWU's conduct satisfied the

elements of an unfair-labor-practice in violation of Section 8(b)(4)(ii)(D) (Section

23

A below), we will address ILWU's and PMA's failure to establish either a work-preservation defense or improper collusion (Sections B and C below).

### A.    ILWU Continued To Pursue Grievances To Obtain Work the Board Had Awarded to IBEW, and To Physically Interfere with IBEW-Represented Employees Trying To Perform That Work

Substantial evidence supports the Board's finding (D&O 5) that ILWU's continued pursuit of grievances against Kinder to obtain electrical M&R work, after the Board had awarded that work to IBEW, satisfied the elements of a Section 8(b)(4)(ii)(D) violation.  It is well-settled, and virtually undisputed by ILWU and PMA, that pursuit of legal claims to obtain such work, including through grievances, qualifies as prohibited conduct with an illegal objective within the meaning of that provision.  *Standard Drywall, Inc. v. NLRB*, 547 F. App'x 809, 810 (9th Cir. 2013); *Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200,* 611 F.3d 483, 492 (9th Cir. 2010).[9]

---

[9] ILWU's and PMA's arguments regarding national labor policy encouraging arbitration (ILWU Br. 32-33, PMA Br. 43) are irrelevant in this context.  Indeed, the Supreme Court has held that Section 10(k) requires the Board to resolve jurisdictional disputes between two unions.  *Radio & Television Broad. Eng'rs*, 364 U.S. 573, 580.  And as the Board explained, the "Board's 10(k) award takes precedence over contrary claims and determinations."  D&O 5 at n.11; *see also Carey*, *supra* p. 21.  Other courts have taken the same approach as this one.  *See IUOE Local 18 v. NLRB (Donley's)*, 712 F. App'x 511 (6th Cir. 2017); *Sheet Metal Workers, Local 27* (*E.P. Donnelly*), 357 NLRB 1577, 1578 (2011), and cases cited therein, *enforced*, 737 F.3d 879 (3d Cir. 2013); *Int'l Longshoremen's & Warehousemen's Union v. NLRB*, 884 F.2d 1407, 1414 (D.C. Cir. 1989).

24

Likewise, substantial evidence supports the Board's finding (D&O 5) that ILWU also satisfied the elements of a Section 8(b)(4)(ii)(D) violation by physically preventing Accurate electricians from performing electrical M&R work at Kinder with the objective of forcing reassignment of that work to employees ILWU represents.  It is undisputed that the ILWU-represented longshoremen physically prevented electrician Andrews from getting to the designated location to perform his work and prevented electrician Sweo from accessing the tools needed to perform his work.  It is also undisputed that the longshoremen articulated that they took those actions because the electricians were seeking to perform the disputed electrical M&R work.  Therefore, ILWU violated the Act unless it establishes a defense, and as shown below, it failed to do that.

## B.    ILWU Failed To Prove Its Work-Preservation Defense

It is largely undisputed that, for many years, ILWU-represented employees performed virtually no electrical M&R work for Kinder.  Then, beginning in 2010, ILWU conducted a campaign to force Kinder to re-assign that disputed work to its members.  When charged with unlawful coercion before the Board, ILWU failed to prove its defense that it undertook that campaign to achieve a permissible work-preservation objective.[10]

---

[10]  ILWU and PMA spill a lot of ink (ILWU Br. 33-41, PMA Br. 31-39) arguing that the Board erred in barring re-litigation of the work-preservation defense,

25

When a union can show that an employer has unilaterally transferred away from the union's members work that they have historically performed, the resulting dispute involves work-preservation claims not appropriate for resolution under Sections 10(k) and 8(b)(4)(ii)(D). *Recon*, 424 F.3d at 988-89; *Teamsters Local 578* (*USCP-WESCO*), 280 NLRB 818, 821 (1986), *enforced*, *USCP-WESCO v. NLRB*, 827 F.2d 581 (9th Cir. 1987). When, however, a union claims particular work for its members, who have not previously performed that work, the union's objective is not work preservation but work acquisition. *Nat'l Woodwork*, 386 U.S. at 635; *Recon*, 424 F.3d at 988-89; *Henkels & McCoy*, 360 NLRB at 823. The union asserting a work-preservation defense has the burden of proof. *Henkels & McCoy*, 360 NLRB at 822.

To meet that burden, a union must typically show regular performance of the disputed work, or a clear practice; it is insufficient to demonstrate performance on isolated occasions. *See Shepard Exposition Servs.*, 337 NLRB at 723 (isolated

---

which the Board had rejected in the 10(k) proceedings. The Board, however, reasonably relied (D&O 3) on precedent precluding such re-litigation. *See* D&O 3, citing, *e.g.*, *Marble Polishers Local 47-T* (*Grazzini Bros.*), 315 NLRB 520, 522 (1994); *Bldg. Materials and Constr. Teamsters Local 216* (*Granite Rock Co.*), 296 NLRB 250, 250 (1989), *enforced*, 940 F.2d 667 (9th Cir. 1991). In any event, the question is largely immaterial. The Board nonetheless allowed re-litigation, expressly reconsidering its prior analysis of the work-preservation defense in light of the "expanded record," which included both additional evidence from the unfair-labor-practice hearing and the judge's contrary rationale. (D&O 3, 4-5.)

(42 of 82), Page 42 of 82     Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 42 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 34 of 74

26

work assignments insufficient to establish work-preservation defense).  In rare instances, such as where technological advances or other changing circumstances displace bargaining-unit work, a union may negotiate to perform new work that is the "functional equivalent" of the displaced work.  *NLRB v. Longshoremen's Ass'n*, 447 U.S. 490, 510-11 (1980) ("*ILA I*").  In such cases, the union may demonstrate, despite seeking to acquire work, that its objective is nonetheless the "preservation of work traditionally performed by employees represented by the union."  447 U.S. at 504.  In other words, a union cannot establish a work-preservation defense if it seeks to claim work that is not—and is functionally distinct from—"that [work] traditionally performed by the bargaining unit employees."  *NLRB v. Longshoremen's Ass'n*, 473 U.S. 61, 81 (1985) ("*ILA II*").

The Board applied those well-settled guidelines to reject ILWU's work-preservation defense, and that determination is both grounded in substantial evidence and far from arbitrary.  As discussed below, ILWU failed to demonstrate that its members historically performed electrical M&R work, either for Kinder or across the coastwide bargaining unit.  In addition, the disputed electrical M&R work is not within the scope of ILWU's contractual jurisdiction as defined in the PCLCD.  And, finally, ILWU failed to establish that, in seeking electrical M&R work, it acted to preserve the functional equivalent of bargaining-unit work displaced by technological change.

27

### 1. ILWU-represented employees did not historically perform electrical M&R work for Kinder or in the coastwide unit

The record amply supports the Board's finding (D&O 1, 4 n.7) that ILWU did not prove its members historically performed the disputed electrical M&R work (on cargo-handling equipment) for Kinder. Indeed, as the Board stated, it is "undisputed that employees represented by ILWU have never performed electrical M&R work for Kinder since Kinder began operations at the [Terminal] in 1998." (D&O 4 n.7, *see also* D&O 8; Tr. 340-44.)[11]

ILWU does not challenge that finding, but asserts (ILWU Br. 8) that it proved its defense by showing that its members "had performed the electrical M&R" at the Terminal *before* Kinder began operations. In doing so, however, it grossly overstates the evidence presented, which consists of a single, retired ILWU mechanic's testimony that he performed some electrical work at the Terminal during a "timeframe I don't know," before 1997. (PMA ER 31-39). Even taken at face value, that isolated assertion was contradicted, as the judge recognized, by evidence that local electrical contractors, with IBEW-represented employees, performed the disputed work at the Terminal since at least as early as 1996.

---

[11] Despite the Board's finding, ILWU greatly exaggerates (ILWU Br. 8) evidence that ILWU performed "all electrical and mechanical M&R on the vehicles" at Kinder, relying solely on vague testimony from one employee that he performed some electrical work that did not require electrical licenses on vehicles. (SER 31.)

(D&O 8; Tr. 368.)  In any event, as the Board found (D&O 4), isolated examples
cannot establish a historical practice.  *Shepard Exposition Servs.*, 337 NLRB at
723.[12]

ILWU and PMA also contend that, when examining whether electrical M&R
was part of ILWU's traditional or historically performed work, the Board erred by
focusing only on work performed for Kinder.  They argue that the Board was
required to consider the historical practice throughout the coastwide unit, asserting
that the proper standard is whether ILWU had a "fairly claimable" right to the
work based on that assessment.  (ILWU Br. 4, 47, 48, 53-56, PMA Br. 41-50.)  As
the Board explained in rejecting the judge's coastwide analysis, however, the
proper inquiry in assessing a work-preservation defense is limited to the practices
of the specific employer involved.  (D&O 4, citing, *e.g.*, *Longshoremen Int'l
Longshore Union Local 19* (*Seattle Tunnel*), 361 NLRB 1031, 1035, 1036 (2014),
and *Int'l Union of Operating Eng'rs Local 18 Laborers Local 310* (*Donley's, Inc.*),
360 NLRB 903, 907, 908-09 (2014).)

PMA complains (PMA Br. 51) that the Board's rationale in support of its
employer-specific inquiry is circular because the cases cited by the Board rely on

---

[12] Given ILWU's failure to prove that its members ever regularly performed the
disputed work at the Terminal, its arguments (ILWU Br. 51-53) regarding the legal
effects of "abandoning" unit work are irrelevant.

the underlying Section 10(k) determination in the instant case for that legal principle.[13] But subsequent, court-enforced decisions stand for the same principle. *See Int'l Union of Operating Eng'rs Local 18 (Donley's IV)*, 363 NLRB No. 184 at *5 (2016) (not work preservation when union attempted to expand jurisdiction to employers for whom it had not performed disputed work), *enforced*, 712 F. App'x at 514 (no work preservation where union sought work it never did for charging-party employers; work performed for other employers in multiemployer unit, or signatory to contract, was irrelevant); *Int'l Union of Operating Eng'rs Local 18 (Nerone)*, 365 NLRB No. 18 (2017) (relevant inquiry is whether union attempts to expand jurisdiction to employers where union members had never performed disputed work), *enforced*, *IUOE Local 18 v. NLRB*, 2018 WL 2220248 (D.C. Cir. April 24, 2018).

By contrast, ILWU and PMA point to no Board precedent applying a "fairly claimable" coastwide analysis to work-preservation defenses in a case involving violations of Sections 8(b)(4)(ii)(D).  *See Int'l Union of Operating Eng'rs Local 18 v. NLRB (Donley's)*, 712 F. App'x at 515 (recognizing Board has not applied this

---

[13]  ILWU asserts (ILWU Br. 56-57) that *Seattle Tunnel* is not relevant because it does not involve a multi-employer unit, but that case still supports considering traditional work by looking at the particular employer involved.  361 NLRB at 1035.  And ILWU is wrong (ILWU Br. 5) that *Laborers Local 310* undermines the Board's position:  like here, the Board in that case focused solely on work done for the charging-party employers.  360 NLRB at 907.

30

theory in Section 8(b)(4)(ii)(D) cases).  All of the cases they cite (ILWU Br. 54-56, PMA Br. 49-51, 62) involve violations of different statutory provisions—namely, Sections 8(b)(4)(ii)(B) or 8(e) (29 U.S.C. § 158(b)(4)(ii)(B) and 158(e)).[14]  To be sure, the Board in this case also separately found that ILWU's actions violated Section 8(b)(4)(ii)(B), *see* Part II, below.  However, ILWU and PMA have not shown that in a case involving Section 8(b)(4)(ii)(D) *and* (B), the Board is required to adhere to a standard it has only ever applied in cases arising solely under Section 8(b)(4)(ii)(B).

In any event, and contrary to ILWU (ILWU Br. 53), PMA (PMA Br. 49), and amicus ILA (ILA Br. 8-16), substantial evidence supports the Board's alternative finding (D&O 4) that ILWU failed to establish a work-preservation defense even under the "fairly claimable" standard assessed in the coastwide unit.  Like the single-employer inquiry, that standard requires ILWU to show that it has

---

[14]  *ILA I*, 447 U.S. 490 (1980) (8(b)(4)(ii)(B); *Am. Pres. Lines*, *Ltd. v. Int'l Longshore and Warehouse Union*, 997 F. Supp. 2d 1037, 1046 (D. Ak. 2014), *aff'd* 611 F. App'x 908 (9th Cir. 2015) (same); *Berm. Container Line Ltd. v. Int'l Longshoremen's Ass'n*, 192 F.3d 250, 256-57 (2nd Cir. 1999) (same); *Maui Trucking, Inc. v. Operating Eng'rs Local Union No. 3*, 37 F.3d 436, 439 (9th Cir. 1994) (8(e)); *Cal. Cartage Co. v. NLRB*, 822 F.2d 1203, 1206 (D.C. Cir. 1987) (8(b)(4)(ii)(B)); *Meat & Highway Drivers, Dockmen, Helpers & Miscellaneous Truck Terminal Emp., Local Union No. 710 v. NLRB*, 335 F.2d 709, 714 (D.C. Cir. 1964) (8(b)(4)(ii)(B)).  The same is true for the the General Counsel's advice memoranda which, in any event, are not Board law or precedent.  *Geske & Sons Inc.*, 317 NLRB 28, 56 (1995), *enforced*, 103 F.3d 1366 (7th Cir. 1997).

31

regularly performed the work—or has at least done so on more than an isolated or sporadic basis. *See Sheet Metal Workers Union Local 162*, 207 NLRB 741, 748-50 (1973) (work not fairly claimable where union showed, at best, that multi-employer bargaining-unit employees performed the work for 12 of 35 member contractors); *Donley's*, 712 F. App'x at 515 (even under fairly claimable standard, union must show company has practice of assigning work to union's members). Here, the Board reasonably found (D&O 4) that ILWU and PMA have not presented sufficient evidence "to establish that [ILWU-represented] employees in the coastwide unit have traditionally performed electrical M&R work."

In their effort to prove that electrical M&R work in the coastwide unit is fairly claimable or traditionally performed by ILWU members, ILWU and PMA cite testimony from ILWU's Coastal Committee Officer and PMA's Coast Director of Contract Administration and Arbitration, who made broad claims that ILWU members generally had performed unspecified amounts of electrical M&R work, as well as testimony from a handful of ILWU members claiming to have done so. (ILWU Br. 6, 8, 24, 57-59, PMA Br. 52-53.) They also point to postings in ILWU hiring halls for jobs including some electrical work. That evidence is insufficient in several respects to establish that the disputed work here has historically been performed by ILWU members.

(48 of 82), Page 48 of 82    Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 48 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 40 of 74

32

First, it is unclear how much of the electrical work referenced in the

testimony was the type of work disputed in this case, which is performed on cargo-

handling equipment, and most or all of which requires an electrical license.[15]  That

ILWU's Coastal Committee Officer was not limiting his testimony to the disputed

work is suggested by his declaration that "Just about anything you do nowadays is

electrical depending on how you define 'electrical.'"  (ER 102-03.)  And one of the

employees who testified to performing "electrical" work admitted that he did not

have an electrical license.  (SER 74-76.)[16]

Second, even assuming all of the electrical work discussed in the cited

testimony qualified as disputed electrical M&R work, the testimony falls far short

of showing that the incidence of ILWU members' electrical M&R work was

---

[15]  All of the work sought in the six ILWU grievances that precipitated this dispute requires a journeyman electrical license (10(k) Decision at 2218; SER 27, 116-122), and constitutes the bulk, if not the entirety, of the disputed work (D&O 8).  *See* 10(k) Decision at 2220-21 (discussing inadequate licensure of most ILWU-represented employees to perform disputed work and potential liability for Kinder should unlicensed employees perform work); SER 32 (insisting Kinder hire ILWU members qualified to perform disputed work).

[16]  Similarly, to the extent ILWU suggests (ILWU Br. 58) that any electrical M&R its members may have performed on Kinder's *vehicles* falls within the scope of the disputed work, that is far from clear.  The Board limited its work assignment to electrical M&R on cargo-handling equipment, *see* D&O 8, 10(k) Decision at 2218, and discussed the importance of electrical licenses for employees performing that work, *see* supra note 15.  In any event, the single employee's testimony ILWU cites is insufficient to establish a regular practice of ILWU members performing electrical work on vehicles.

(49 of 82), Page 49 of 82    Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 49 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 41 of 74

33

widespread among PMA's member employers or, when it occurred, was consistent enough to constitute a regular practice. For example, one of the ILWU-represented employees testified that he did undefined electrical M&R work with unspecified frequency for a period of about two and half years for one member employer. (SER 68-73.) And another employee claimed to have done an unquantified amount of "electrical" work as part of his job, but also stated that he called in outside electrical contractors (like Accurate) to do it. (SER 128-29.)[17]

The account of ILWU members calling in electrical contractors is, of course, corroborated by other record evidence that belies ILWU's and PMA's assertions. For example, Kinder's Director of West Coast operations stated that Kinder subcontracted electrical M&R work not only at the Terminal but also at its other current operations along the Pacific Coast. (SER 58, 62.) And an IBEW-represented Accurate electrician who performed work for Kinder testified to working in the same capacity for various electrical contractors and at another Pacific Coast terminals. (SER 63.) In other words, contrary to ILWU's (ILWU Br. 52) and PMA's (PMA Br. 59) assertions, and as the Board found (D&O 4), any performance of electrical M&R work by ILWU members has historically been

---

[17] ILWU does not dispute that its own members typically call in Accurate's electricians to perform the electrical work at the terminal. (10(k) determination at 2220).

34

relatively isolated—certainly insufficient to qualify as a practice or otherwise regular in the context of a coastwide unit comprising at least 70 employers and over 20,000 longshoremen.

Third, ILWU presented no systemic or documentary evidence to reinforce its ambiguous anecdotal evidence—or counter the evidence of Kinder's consistent practice at its various operations. Notably, ILWU did not provide direct evidence or employer testimony showing that any (much less many or most) PMA member-employers have regularly used their own ILWU-represented employees to perform the equivalent of the disputed work. *See, e.g., Sheet Metal Workers Union Local 162*, 207 NLRB 741, 749 (1973) (individual employee's testimony insufficient to establish industry practice because he testified only in general terms and regarding few employers he knew; documentary and testimonial evidence from employers far more probative). ILWU's only documentary evidence—the job postings (ER 119-183))—proves very little. One of ILWU's own witnesses admitted that he did not know if the posted jobs involved work requiring an electrical license, and that he had no idea whether any ILWU-represented employees actually filled those positions or, if they did, whether they performed any electrical work. (Tr. 515, 570-77.) *See Laborers Local 310* (*Donley's Inc.*), 360 NLRB at 907 (3600 work orders for referrals of union-represented employees did not establish that dispatched individuals actually performed work on disputed equipment).

35

Moreover, one longshoreman who testified admitted that his employer was fined for not having the proper electrical license. (SER 77.)

For the foregoing reasons, the Board reasonably found (D&O 4) that ILWU did not make the requisite showing that its employees had traditionally performed electrical M&R work for Kinder, at the Terminal, or in the coastwide unit.[18] As noted, that factor weighs heavily against finding that ILWU's objective, in pressuring Kinder to assign such work to its members, was to preserve bargaining-unit work. It also helps contextualize the Board's contract construction and explain why this case presents a jurisdictional, not a contractual dispute. A union may have a contractual work-preservation objective when it protests an employer's decision to subcontract work within the contractual scope of work *which unit members previously performed*. But that is not the case here: as just discussed, Kinder (and, for that matter, other PMA-member employers) historically have not

---

[18] The substantial evidence test does not change simply because the Board has disagreed with the judge. *Loomis Courier Serv., Inc. v. NLRB*, 595 F.2d 491, 495 (9th Cir. 1979). However, even under "more searching review" standard cited by ILWU and PMA (ILWU Br. 19, PMA Br. 30, ILA Br. 10), ample evidence supports the Board's findings regarding ILWU members' historical performance of the disputed work. Moreover, as *Loomis* explains, a judge's conclusions "assume added importance" because a judge is responsible for evaluating witnesses' credibility and according proper weight to their testimony. *See Loomis*, 595 F.2d at 495-96 (added importance of judge's credibility findings). Here, the Board's differing assessment of the record did not reverse any of the judge's credibility findings.

36

regularly assigned electrical M&R work to ILWU-represented employees; and as detailed below, that work is not within ILWU's longstanding contractual jurisdiction. Those circumstances stand in stark contrast to the circumstances in the cases ILWU cites (ILWU Br. 10, 31-32), in which the Board found valid work-preservation claims when employers sparked disputes by reassigning work away from employees who had been performing it.[19]

## 2. The disputed electrical M&R work is not within ILWU's contractual scope of work

ILWU and PMA argue (ILWU Br. 31-32, PMA Br. 53-61) that their contract explicitly includes the disputed work in the scope of the bargaining-unit work. Therefore, they claim, this case does not present a proper jurisdictional dispute; instead, Kinder subcontracted contractual bargaining-unit work. But their effort to leverage the PCLCD to recharacterize a work-acquisition objective as work preservation fails. The Board correctly interpreted the PCLCD, like the parties' predecessor contract, as not covering electrical M&R work. *Local Joint Exec. Bd. of Las Vegas v. NLRB*, 540 F.3d 1072, 1078 (9th Cir. 2008) (court reviews Board's contract interpretation de novo.) To the extent new provisions of the PCLCD were

---

[19] *See Recon*, 424 F.3d at 990; *USCP-WESCO*, 827 F.2d at 583-84; *Int'l Brotherhood of Elec. Workers, Local 103* (*Buffalo Elec.*), 298 NLRB 937, 939-40 (1990); *Chicago Web Printing Pressmen's Union No. 7*, 209 NLRB 320, 322 (1974).

(53 of 82), Page 53 of 82     Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 53 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 45 of 74

37

meant to expand the contractual scope of work to encompass future work due to predicted loss of work, the disputed work here does not fit that bill.

Section 1.71 of the 2008 PCLCD, which is unchanged from the preceding PCLCD, defines the scope of ILWU's work as "maintenance and repair of all stevedore cargo handling equipment." (ER 134.) As the Board explained (D&O 4, 10(k) Decision at 2219-20), that provision contains no specific reference to any electrical M&R work or "any similar work arguably described in ILWU's contractual grievances." (10(k) Decision at 2219; SER 27.)[20]

The Board then acknowledged the more specific language in Sections 1.72 and 1.73 (including M&R of "stevedore handling equipment . . . and its electronics"), invoked by ILWU and PMA to argue that the provisions cover the disputed work (ILWU Br. 24, 26, PMA Br. 57). But it reasonably concluded that those provisions did not alter the scope of ILWU work to include the disputed electrical M&R. (D&O 4, 10(k) Decision at 2219 & n.2). That work has long existed in its current form—while the exact same operative contractual provision, Section 1.71, governed ILWU's scope of work. And, as shown above, ILWU

---

[20] ILWU asserts that the reference to "maintenance and repair" in Section 1.71 must include the disputed electrical M&R work, citing the judge's invocation of the general interpretative canon that the "greater includes the lesser." (ILWU Br. 23.) But, as described, the Board reasonably rejected that interpretation in light of the parties' own practice under that contractual language.

(54 of 82), Page 54 of 82     Case: 23-632  08/08/2024, DktEntry: 83.1, Page 54 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 46 of 74

38

members did not historically perform the disputed work during that time.[21]  *See*

*Food & Commercial Workers Union, Local 367* (*Quality Food*), 333 NLRB 771,

772 (2001) (contractual scope of work included all handling and selling of

merchandise but Board found disputed baked-good-preparation duties, which had

not been performed, were not covered by that general language).  In support of its

interpretation, the Board relied in particular on the language of Section 1.72 and on

the parties' bargaining history, which bolstered the Board's understanding of the

PCLCD.

    With respect to the contractual language, the Board explained (10(k)

Decision at 2219) that Sections 1.72 and 1.73 were new additions to the 2008

PCLCD and were explicitly intended to address the effects on bargaining-unit

work of the anticipated introduction of "robotics and other technologies."  *See*

---

[21]  PMA also argues that the Board improperly discounted the Letters of
Understanding grounded in Section 1.81 of the PCLCD, finding that the Letters
"are not part of the PCLCD."  (PMA Br. 59-60.)  In fact, the Board acknowledged
that the Letters were part of the 2008 PCLCD but found, as detailed above, that
Sections 1.71, 1.72, and 1.73 define ILWU's scope of work, which does not
include the disputed electrical M&R.  (10(k) Decision at 2219).  Because the
contested work is not within ILWU's contractual jurisdiction, and given that
Kinder indisputably does not qualify for an exemption based on the Letters, the
Board properly found them irrelevant to its analysis.  By the same token, the
assertion of ILWU's contract negotiator that the parties did not intend to "carve
out" electrical work (ILWU Br. 25) does not go to whether that work was within
the Section 1.71 contractual scope of work the parties intended to protect from
subcontracting in the first place.

39

Section 1.72 (noting technologies "will replace" unit employees). Section 1.72 thus includes in ILWU's jurisdiction all M&R work that "shall constitute the functional equivalent of such traditional ILWU work," explicitly referencing the longstanding scope of work defined in Section 1.71.[22] In light of that stated purpose, and Section 1.72's reference back to Section 1.71's definition, the Board reasonably found that the new scope-of-work provisions in the PCLCD "were directed at new work to be based on the introduction of new technologies," rather than the disputed work which has been unchanged since well before they executed the contract.

In other words, nothing in the PCLCD states, nor does the record show, that the disputed electrical M&R work was either traditional longshoremen work or the functional equivalent of work to be displaced by new technology and captured in Sections 1.72 and 1.73. Accordingly, the Board reasonably concluded (D&O 4, 10(k) Decision at 2219-20) that the text of the PCLCD does not clearly award electrical M&R work to ILWU-represented employees. That interpretation of the PCLCD's language is not only logical but is also informed by the Board's expertise in interpreting collective-bargaining agreements, particularly in a case like this one, which implicates the complex background labor-law issue of

---

[22] ILWU conveniently omits these key parts of Section 1.72 when it sets forth the "relevant" provisions (ILWU Br. 23) of the PCLCD.

(56 of 82), Page 56 of 82    Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 56 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 48 of 74

40

permissible work-preservation clauses. *See Bonnell/Tredegar Indus., Inc. v. NLRB*, 46 F.3d 339, 343 (4th Cir. 1995) (courts are "mindful of the Board's considerable experience in interpreting collective bargaining agreements").

The bargaining history also supports the Board's analysis of the purpose and meaning of Sections 1.72 and 1.73. It makes clear that the parties intended those provisions to compensate for future erosion of ILWU's scope of work, not to add new work without regard to ILWU's traditional work or technological developments.[23] *See StaffCo of Brooklyn, LLC v. NLRB*, 888 F.3d 1297, 1302 (D.C. Cir. 2018) (deference to Board's factual findings "extends to findings related to the contract, including evidence of intent from 'bargaining history,' and other 'factual findings on matters bearing on the intent of the parties'") (citations omitted). As the Board noted (D&O 4, n.9), PMA's Coast Director of Contract Administration and Arbitration, Richard Marzano, testified about the parties' bargain: "the contract is specific, to the extent that longshore workers are necessarily replaced through automation . . . longshoremen would be brought along

---

[23] ILWU argues (ILWU Br. 25) that its contract interpretation is bolstered by extrinsic evidence that PMA-member employers demonstrated their agreement by assigning electrical M&R work to ILWU-represented employees after the 2008 PCLCD went into effect. Like the purported evidence of traditional performance of that work, however, the cited evidence of such assignments falls far short of showing any regular practice or common understanding. And, of course, PMA initially opposed ILWU's grievances claiming the disputed work at Kinder. *See also* note 24, below.

41

to perform maintenance and repair work on this new equipment that would exist in 2014, 2024, 2034 . . . ." (PMA ER 58-59.)  In other words, to the extent the parties contemplated adding any new electrical M&R work to ILWU's jurisdiction, it was years in the future, not in 2008 as an immediate expansion of Section 1.71.[24]  As PMA itself argues, any expanded jurisdiction in the PCLCD "went 'hand in hand' with employers' proposals for increased automation:  'It was *maintenance and repair in the future* with future automation for employer operations.'" (PMA Br. 16 (quoting Marzano) (emphasis added).)[25]

As just demonstrated, the Board correctly interpreted the longstanding contractual scope of traditional ILWU work, set forth in Section 1.71, as excluding

---

[24]  Indeed, Marzano testified that at the time ILWU filed the grievances seeking preexisting electrical M&R work—after the 2008 PCLCD went into effect—PMA did *not* consider such work to be within the scope of ILWU's contractual jurisdiction.  Only after conceding that, did he explain that the Coast Arbitrator had decided otherwise and later Marzano had changed his position on this "tough question."  PMA ER 61.  That PMA now supports ILWU's position does not undercut the Board's assessment of the parties' intent during negotiations.

[25]  The Board did not err, as PMA now contends (PMA Br. 60), in disregarding PMA's position in the contractual arbitration proceeding as irrelevant.  As an initial matter, PMA was not a party to proceedings before the Board, much less did it challenge the Board's holding on that point.  This Court is therefore barred by Section 10(e) of the Act from entertaining this argument.  29 U.S.C. § 160(e) ("no objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances").  In any event, nothing required the Board to consider PMA's position in a separate proceeding when it contradicted the contractual language in Section 1.72 and when the Board had the benefit of PMA official Marzano's testimony on the subject in this very case.

(58 of 82), Page 58 of 82    Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 58 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 50 of 74

42

the disputed electrical M&R.  It further properly found that Sections 1.72 and 1.73 did not alter the ILWU's contractual jurisdiction to immediately incorporate that work and ostensibly confer on ILWU a work-preservation objective.  Should the Court disagree with the Board's construction of the parties' agreement, the Board would need to consider the effect of ILWU's contractual acquisition of the electrical M&R work on ILWU's work-preservation defense on remand.

### 3.    The Board's finding that ILWU failed to prove a work-preservation objective is consistent with the Supreme Court's decisions in *ILA I* and *II*

Finally, the Board's rejection of ILWU's work-preservation defense is consistent with the Supreme Court's *ILA* cases governing work-preservation agreements in the face of technological or other substantial change.  ILWU and PMA assert that the PCLCD is a permissible work-preservation agreement under those cases—that they permissibly exchanged ILWU's assumption of current electrical M&R work for PMA's future implementation of robotics that could eventually displace nearly all traditional longshoremen's work.  (ILWU Br. 16, 32-33, 44-50, PMA Br. 4, 27, 44-50.)  The Board reasonably rejected that assertion, which is both factually and legally flawed.

As discussed (p. 26), a union may, in the face of technological or other changes displacing its traditional work, negotiate a work-preservation agreement to perform work that is the "functional equivalent" of the work being displaced.  *ILA*

43

*I*, 447 U.S. at 510-11.  To assess a claimed work-preservation agreement, the

Board must examine "the work of the bargaining unit employees, not . . . the work

of other employees who may be doing the same or similar work." *ILA I*, 447 U.S.

at 507; *see also ILA II*, 473 U.S. at 63-64.  And it must compare the unit work

before and *after* the advent of the innovation triggering the need for work

preservation.  *ILA I*, 447 U.S. at 507-08.  In other words, as the Board explained

(D&O 5), in the Supreme Court's own language, assessment of a claimed work-

preservation agreement under the *ILA* cases requires a "careful analysis of the

traditional work patterns that the parties are allegedly seeking to preserve, and of

how the agreement seeks to accomplish that result under the changed

circumstances."  *ILA I*, 447 U.S. at 507, *see also ILA II*, 473 U.S. at 77 (work-

preservation analysis must consider whether agreement is "tailored . . . to the

objective of preserving the essence of the traditional work patterns").

   In the instant case, substantial evidence supports the Board's finding that

ILWU-represented employees did not regularly or traditionally perform the

disputed electrical M&R work, either at Kinder or throughout the coastwide unit.

*See* Part I.C.1.  The Board also correctly found that the PCLCD does not confer

contractual jurisdiction over such work on ILWU.  *See* Part I.C.2.  Moreover, in its

underlying Section 10(k) determination, the Board discussed the specialized nature

of, and the particular skills and licenses required to perform, the disputed electrical

44

M&R work.  Together, the Board's analyses on each of those points provide the

foundation for its subsequent determination that the relevant provisions of the

parties' contract do not establish a work-preservation objective.

First, as a practical matter, because the ILWU's work jurisdiction, even

under Sections 1.72 and 1.73 of the PCLCD, does not encompass present electrical

M&R work, there is not technically an applicable work-preservation agreement

upon which to hang ILWU's and PMA's *ILA* argument.[26]  Second, even assuming

that ILWU and PMA correctly interpret the 2008 PCLCD bargain—as giving

ILWU jurisdiction over *current* electrical M&R work in anticipation of *future*

displacement of other ILWU work—the Board reasonably found that such a

bargain does not constitute work preservation within the meaning of *ILA I* and *II*.

The disputed work is not traditional ILWU work, nor the functional equivalent,

---

[26]  As discussed above (Part I.C.2), the Board found that the parties, in negotiating
the 2008 PCLCD intended to, and did, provide for additional work—including
future "electronics" (which is not defined)—in exchange for work to be displaced
by future "robotics and other technologies."  Because that bargain did not affect
the electrical M&R work disputed in this case, the Board did not reach the question
of whether it constitutes a permissible work-preservation agreement under the *ILA*
cases.  For that reason, PMA and the amici overstate the effect of the Board's
decision on future bargaining.  (PMA Br. 61-62, ILA Br. 20-24, MUA Br. 4-20,
24-28, 34-37.)  Contrary to their claims, the Board did not preclude the parties
from making *ILA*-type deals—or even annul the agreement it found they made in
the 2008 PCLCD.  The Board simply found no *ILA* agreement covering the
disputed (current, preexisting) electrical M&R work.

45

and the bargain ILWU and PMA claim they struck is not tailored to preserve

traditional work patterns as existing work erodes.

As the Board stated (D&O 5), the electrical M&R work ILWU seeks to

"preserve" as bargaining-unit work has never been part of ILWU's traditional

work. In citing that fact, the Board did not disregard the *ILA* cases' admonition

that work taken to compensate for technological change need not be identical to the

work displaced, contrary to ILWU. (ILWU Br. 45.) Instead, that finding, the

Board's contract interpretation, and the Section 10(k) decision make clear that

electrical M&R work also is not the functional equivalent of traditional ILWU

work, contrary to ILWU and PMA's assertion. (ILWU Br. 45, PMA Br. 46-47.)[27]

There is no dispute that longshoremen have long performed "maintenance

and repair" work on cargo-handling equipment, but they have not done the type of

specialized electrical work claimed here, despite the shared "maintenance and

repair" label. That longstanding division of work prevailed under Section 1.71

even before the 2008 PCLCD. The traditional exclusion of electrical M&R from

ILWU work is unsurprising given the significant differences between the

longshoremen's traditional M&R work and the disputed electrical M&R work. As

---

[27] Accordingly, PMA is wrong (PMA Br. 46-47) that the Board "never doubted
that electrical maintenance and repair work on cargo-handling equipment is the
same or functionally equivalent to other sorts of maintenance and repair work
performed by the ILWU."

46

the Board discussed in its Section 10(k) determination, the electrical M&R work

requires skills, training, and licenses that ILWU did not prove its members

typically possess.

As the Board further found (D&O 5), the claimed electrical M&R work did

not arise as the result of the technologies whose advent the parties' purported

bargain addresses.[28]  Nor has any traditional work been displaced by those

technologies.  Those facts not only undermine any argument that the electrical

M&R is the equivalent of displaced work, but also belie the argument that the

agreement was intended to "preserve" work.

The *ILA* cases may not strictly limit work-preservation agreements to

situations where unit work has already been displaced, as PMA and ILWU insist

(PMA Br. 47-48, ILWU Br. 50).  But those cases involved the careful tailoring of

the parties' bargain to compensate for traditional work that had actually been

displaced.  *ILA II*, 473 U.S. at 77, citing *ILA I*, 447 U.S. at 505 (discussing

---

[28]  To the extent ILWU claims (ILWU Br. 50) that some electrical work arose as
part of *past* technological displacement (before Kinder assumed operations at the
terminal), that is irrelevant to assessing the bargain struck in the 2008 PCLCD.
That current electrical M&R work may have displaced then-traditional
longshoremen's work when it first appeared does not mean that electrical M&R
work *is* traditional longshoremen's work.  That is particularly true given the
decades of historical division of M&R work between traditional ILWU work and
electrical M&R work outside the scope of ILWU's jurisdiction even after such
displacement began.

evolution of parties' work-preservation provisions to increasingly compensate unit for work as it was increasingly "displaced"); *ILA II*, 473 U.S. at 69-71 (rules "narrowly tailored" to preserve only the work loading and unloading containers). The lack of a similar causal link here suggests that ILWU seeks instead to acquire existing non-traditional work because of anticipated displacement of traditional work, which may or may not correspond qualitatively or quantitatively to the displaced work. *ILA II*, 473 U.S. at 65-66 & n.3 (noting that new container-unloading work claimed was defined so as to rationally limit it to geographic area where displaced cargo-unloading work had been performed, and that claim extended only to about 20% of container work). That is not the same as the parties' bargain in the *ILA* cases—the "preservation" of displaced traditional work by acquiring some of the new (functionally equivalent) work that caused the displacement. Whether ILWU could strike a bargain for such comparable future work—or already has—is a different question not presented here.

## C.    The Board Did Not Err in Precluding ILWU from Re-Litigating Collusion; In Any Event, ILWU and PMA Have Not Shown Prejudice

As discussed above (p. 20), before awarding the electrical M&R work to IBEW, the Board made the three threshold findings necessary to determine that there was a jurisdictional dispute subject to resolution in a Section 10(k) proceeding. It was uncontested that both IBEW and ILWU claimed the work at issue and that they had no agreed-upon method to resolve their dispute voluntarily.

(64 of 82), Page 64 of 82    Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 64 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 56 of 74

48

And the Board found reasonable cause to believe that IBEW's March 18, 2011 threat to picket Kinder constituted a proscribed means of asserting its claim. (10(k) Decision at 2218; PMA ER 106.) *See Int'l Union of Bricklayers and Allied Craftworkers* (*Cretex*), 343 NLRB 1030, 1032 (2004) (reasonable cause to believe prohibited conduct absent direct evidence of a sham, where party used language facially threatening economic action). In doing so, the Board rejected ILWU's contention that IBEW's threat was a sham contrived in collusion with Kinder. (10(k) Decision at 2218.)

In the instant unfair-labor-practice case, ILWU sought to adduce additional evidence and relitigate its collusion argument. The judge ruled that it could not and denied a motion to reconsider supported by a proffer of newly subpoenaed evidence. (SER 56, 78, 80, 81-84, ILWU ER 254-55). In its decision, the Board rejected (D&O 4 n.6) ILWU's argument that the judge erred. ILWU and PMA now assert that the Board erred by not considering ILWU's proffered evidence, and reevaluating ILWU's collusion argument, at the unfair-labor-practice hearing. (ILWU Br. 34, 41-42, PMA Br. 63-66.) As shown below, however, the Board reasonably applied its precedent barring re-litigation, at the unfair-labor-practice stage, of a collusion argument rejected at the Section 10(k) stage. And, in any event, ILWU and PMA have not established that the Board's ruling was

(65 of 82), Page 65 of 82     Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 65 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 57 of 74

49

prejudicial, for the additional evidence would not have changed the Board's
original finding that IBEW's threat was not a sham.

First, in affirming the judge's ruling, the Board relied on its well-established
precedent, upheld by this Court, that a collusion claim is a "threshold issue" in
Section 10(k) proceedings, and is therefore not susceptible to re-litigation in a
subsequent, related Section 8(b)(4)(ii)(D) proceeding. *See Standard Drywall*, 357
NLRB 1921, 1923 n. 12 (2011), *enforced*, 547 F. App'x 809 (9th Cir. 2013). As
discussed above, collusion is relevant in a Section 10(k) proceeding to determine
whether a jurisdictional dispute exists that the Board must referee. But resolving
the collusion issue is not necessary to prove the violation of Section 8(b)(4)(ii)(D).
That is particularly true in a case like this one, where IBEW's allegedly collusive
picketing threat prior to the Section 10(k) proceeding is not implicated in the
instant unfair-labor-practice case. Rather, *ILWU's* grievances and physical
interference are the coercive actions that instigated the Section 8(b)(4)(ii)(D)
allegations now before the Court.

ILWU critiques *Standard Drywall* (ILWU Br. 42), pointing out that decision
relies on *Warehouse Union Local 6, Int'l Longshoremen and Warehousemen's
Union, Local 6* (*Golden Grain*), 289 NLRB 1, 2, n.4 (1988). *Golden Grain*, it
asserts, does not say anything specifically about collusion and allowed a party to
offer new evidence in an unfair-labor-practice proceeding to challenge a finding

50

from a related Section 10(k) decision. But *Standard Drywall* remains good law.

*See Int'l Union of Operating Eng'rs Local 18* (*Nerone*), 365 NLRB No. 18 at n.1

(citing *Standard Drywall* with approval)*, enforced, Int'l Union of Operating

Eng'rs Local 18* (*Nerone*), 2018 WL 2220248 at *3 (D.C. Cir. 2018); *Donley's IV*,

363 NLRB No. 184 at *3 (2016) (same), *enforced*, *Donley's*, 712 F. App'x 511.

And *Golden Grain* stands for the supportive, converse proposition that an issue

from a Section 10(k) proceeding may be relitigated in the related unfair-labor-

practice proceeding only to the extent that it goes to "an element of the

8(b)(4)(ii)(D) violation." 289 NLRB at 2, n.4. [29]  That uncontroversial

proposition—that a party may offer (additional) evidence in an unfair-labor-

practice proceeding that goes to an element of the alleged violation—is reaffirmed

by PMA's cases (PMA Br. 65 (citing *Int'l Tel. & Tel. Corp. v. Local 134*, 419 U.S.

428, 446-47 (1975); *Pac. Mar. Ass'n v. NLRB*, 827 F.3d 1203, 1210-11 (9th Cir.

2016).)  Neither of those cases specifically addresses re-litigation of collusion.[30]

---

[29]  Nor does ILWU advance its case (ILWU Br. 42) by citing *Marble Polishers Local 47-T* (*Grazzini Bros.*), 315 NLRB 520 (1994).  In that case, the Board did not squarely address the question of whether a Section 10(k) collusion claim could be relitigated in an unfair-labor-practice case, merely noting on summary judgment that there could be no genuine issue of material fact as to collusion because no evidence had been proffered in support of the claim in either proceeding.  *Id*. at 522 n.7.

[30]  PMA also cites (PMA Br. 66) *Constr. & Gen. Laborers Local 190 v. NLRB*, 998 F.2d 1064, 1066-67 (D.C. Cir. 1993), in which the court remanded for the Board to

51

In any event, the Board's refusal to consider additional evidence or arguments regarding collusion in the unfair-labor-practice proceeding did not prejudice ILWU. *NLRB v. Health TEC Div.*, 566 F.2d 1367, 1371 (9th Cir. 1978) (burden of showing prejudice on party claiming injury from erroneous ruling). In the Section 10(k) proceeding, the Board rejected ILWU's claim that IBEW's threat was a sham contrived by collusion between IBEW and Kinder. (10(k) Decision at 2218.) It did so based on its finding that there was "no evidence that [IBEW] would not follow through with the threats." (10(k) Decision at 2218.) *See Bricklayers* (*Cretex Constr. Servs.*), 343 NLRB 1030, 1032 (2004) (reasonable cause to believe prohibited conduct absent direct evidence of a sham, where party used language facially threatening economic action). Even considering the proffered evidence, that dispositive finding remains true: ILWU still has not shown that IBEW did not seriously intend to picket (in other words, that the threat was a sham) if Kinder reassigned the work to ILWU-represented employees.

ILWU's proffered evidence consists of correspondence between counsel for IBEW and counsel for Kinder discussing ILWU's grievances over the work in

---

examine a proffer of evidence regarding collusion in an unfair-labor-practice case. While the court in that case deviated from the Board's position on re-litigation, the proffered evidence concerned ostensibly illicit financial transactions between a union trust fund and an employer, which were of a different nature than the evidence at issue here. *Id*. 1066-67.

52

dispute and possible ways to maintain Kinder's use of IBEW-represented

employees to perform that work.  (ER 409-95.)  Their messages indicate that

IBEW and Kinder coordinated to achieve their mutual interest in having the Board

resolve the jurisdictional dispute—nothing in any of the proffered evidence

suggests that IBEW would not in fact picket should Kinder reassign the work.

Mere cooperation between an employer and union regarding a Section 10(k)

proceeding does not, however, demonstrate that the union's threat to claim its work

is a sham.  *Laborers Int'l Union of N. Am., Local 265* (*Henkels & McCoy*), 360

NLRB at 823; *see also Int'l Union of Operating Eng'rs, Local 150* (*R&D Thiel*),

345 NLRB 1137, 1140 (2005) (no evidence of improper collusion where one union

told employer's president it wanted him "to file a 10(k)" because of claims for

disputed work made by another union).  In the instant unfair-labor-practice

proceeding, the judge found that IBEW acted with genuine intent "after word

spread to IBEW about the nature of ILWU's six grievances," finding that it was

"obvious" IBEW had reacted with "alarm" when it "perceived the impact the

grievances could have on the workers it represents should the ILWU succeed."

(D&O 11.)

Fundamentally, PMA and ILWU assert that Kinder's and IBEW's actions

indicate that work-assignment proceedings were not appropriate because Kinder

was not an "innocent" employer (ILWU Br. 41) or "the helpless victim of

53

quarrels" (PMA Br. 66) that Sections 10(k) and 8(b)(4)(ii)(D) were designed to
protect. But that argument misconceives the thrust of the statutory policy, which in
fact supports resort to Section 10(k) to address this jurisdictional dispute over
Kinder's work. That Kinder may have a preference regarding the work assignment
does not mean that it is not caught in a dispute between two unions that it cannot
resolve without the Board's assistance.

As the Supreme Court has recognized, some employers "are not neutral and
have substantial economic interests in the outcome of the [Section] 10(k)
proceeding. . . . [A] change in work assignment may result in different terms or
conditions of employment, a new union to bargain with, higher wages or costs, and
lower efficiency or quality of work." *NLRB v. Plasterers' Local Union No. 79*,
404 U.S. 116, 124-25 (1971). Nonetheless, the Court made clear that Sections
10(k) and 8(b)(4)(ii)(D) "were enacted to protect employers who are partisan in a
jurisdictional dispute as well as those who are neutral." *Id.* at 130. Indeed, one of
the factors the Board considers in making a work assignment under Section 10(k)
is employer preference. In sum, as discussed above (p. 24-32), Kinder did not
make a change in the almost two-decades-long status quo regarding assignment of
electrical M&R work; ILWU sought that change, and precipitated this dispute,
through grievances claiming the work long performed by IBEW-represented
employees. Kinder—which could not resolve the dispute without the Board's

Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 62 of 74

54

intervention—became caught between the two unions, the very situation Section 10(k) is designed to address. By the same token, IBEW was faced with loss of the disputed work, which all evidence indicates it sincerely wanted and would, if necessary, take action to retain. Therefore, that Kinder and IBEW shared their frustrations, and a belief that a Section 10(k) proceeding was the best route to a final resolution of the work dispute, did not render IBEW's threat a sham or transform this jurisdictional dispute into a contractual disagreement between Kinder and ILWU.

## II. THE BOARD REASONABLY FOUND THAT ILWU VIOLATED SECTION 8(b)(4)(ii)(B) OF THE ACT BY TRYING TO FORCE KINDER TO CEASE DOING BUSINESS WITH ACCURATE

Section 8(b)(4)(ii)(B) of the Act provides, in relevant part, that it is an unfair labor practice to threaten, coerce, or restrain any person . . . where the object is forcing or requiring any person to . . . cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B). As with Section 8(b)(4)(ii)(D), a union may defend its actions by establishing that it acted pursuant to the permissible motive of preserving work traditionally performed by employees represented by the union. *See Nat'l Woodwork*, 368 U.S. at 635. Once a union so demonstrates, however, it must still show that the targeted employer had the power to give employees the work in question (i.e., was the "primary" employer or had the "right of control" over the work) in order to avoid unfair-labor-practice liability under Section

55

8(b)(4)(ii)(B).  *See ILA I*, 447 U.S. at 504.  In other words, even a union acting to

preserve its bargaining-unit work cannot pressure a "neutral" employer that does

not control the work at issue, *id*., and a union acting to acquire new work cannot

pressure even its primary employer to cease doing business with another company,

*see Quality Food*, 333 NLRB 771, 772-73 & n.12 (2001) (finding violation where

union pressured primary employer to stop doing business with another company

and failed to prove work-preservation objective); *Local 32B-32J, Serv. Empls. Int'l

Union v. NLRB*, 68 F.3d 490, 495 (D.C. Cir. 1995) (same).

As described in Part I.A. above, ILWU undisputedly acted coercively in

pursuing grievances to claim the electrical M&R work being performed by

Accurate's IBEW-represented employees at Kinder and physically preventing two

of Accurate's electricians from working.  And there can be no serious question

that, as the Board found (D&O 5), one of ILWU's aims in taking those prohibited

actions was an unlawful secondary object under that provision, i.e., "to force

Kinder to cease doing business with Accurate."  Finally, ILWU and PMA failed to

establish that ILWU's actions had a valid work-preservation objective under any

recognized standard, as established in Part I.C., above.  Accordingly, substantial

evidence supports the Board's reasonable finding (D&O 5) that, under the legal

principles just described, ILWU's conduct violated Section 8(b)(4)(ii)(B).  *See

Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1005 (9th Cir. 1995) (Court will uphold

56

Board's findings of fact if supported by substantial evidence and interpretation of Act if reasonably defensible).

Neither ILWU nor PMA seriously argues that ILWU's conduct fails to satisfy the elements of Section 8(b)(4)(ii)(B) in the absence of a work-preservation defense. However, their presentation of the legal principles and the thrust of their briefs suggest that they believe there can be no such violation because ILWU's actions were directed at Kinder, its "primary" employer. *See, e.g.*, ILWU Br. 15 (asserting that Section 8(b)(4)(ii)(B) prohibits only "secondary" activity, directed "against a neutral party (a 'secondary') to obtain leverage in the union's real dispute with a 'primary' employer"); *see also* ILWU Br. 16, 45, PMA Br. 9. But as described, Section 8(b)(4) prohibits a union's coercion to achieve a "secondary" object, regardless of the status of the employer against whom the union's action is taken; under Section 8(b)(4)(ii)(B), the prohibited secondary object is seeking to force one company to cease doing business with another. Indeed, PMA acknowledges as much in its brief, stating "[f]or this sort of work preservation agreement to be lawful, the union must have a valid work preservation objective *and* the employer must have the "right of control" over the assignment of the work in question. (PMA Br. 10 (emphasis added).) Thus whether an employer is primary or neutral—or controls the disputed work—is relevant only *after* the union

(73 of 82), Page 73 of 82    Case: 23-632, 08/08/2024, DktEntry: 83.1, Page 73 of 82
Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 65 of 74

57

establishes that its objective was permissible work preservation.[31]  Accordingly,

ILWU's failed work-preservation defense to the Section 8(b)(4)(ii)(D) violation

also dooms its defense to the Section 8(b)(4)(ii)(B) violation.

---

[31]  Because the Board found no work preservation, it did not reach the right-of-control issue (D&O 5 & n.10), so it would have to assess that question on remand should the Court find a work-preservation objective.

58

## CONCLUSION

For the foregoing reasons, the Board respectfully submits that this Court should enter judgment denying the petitions for review and enforcing the Board's Order in full.

## STATEMENT OF RELATED CASES

The Board is not aware of any related cases pending in this court.

/s/ Kira Dellinger Vol
KIRA DELLINGER VOL
*Supervisory Attorney*

/s/ Heather S. Beard
HEATHER S. BEARD
*Attorney*

National Labor Relations Board
1015 Half St. SE
Washington, D.C. 20570
(202) 273-0656
(202) 273-1788

PETER B. ROBB
    *General Counsel*

ALICE B. STOCK
    *Deputy General Counsel*

MEREDITH JASON
    *Acting Deputy Associate General Counsel*

DAVID HABENSTREIT
    *Assistant General Counsel*

National Labor Relations Board
February 2020

Case: 19-70297, 02/18/2020, ID: 11600518, DktEntry: 55, Page 67 of 74

# ADDENDUM

# STATUTORY ADDENDUM

## TABLE OF CONTENTS

**National Labor Relations Act, 29 U.S.C. § 151, et seq.**

Section 8(b)(4)(ii)(B) ............................................................... ii
Section 8(b)(4)(ii)(D) ............................................................... ii
Section 10(a) ............................................................................ iii
Section 10(e) ............................................................................ iii
Section 10(f) ............................................................................. iv
Section 10(k) ............................................................................ iv

# STATUTES

Relevant sections of the National Labor Relations Act (NLRA) (29 U.S.C. § 151, et seq.) are as follows:

## Section 8(b)(4)(ii)(B) (29 U.S.C. § 158(b)(4)(ii)(B)):

**8(b) Unfair labor practices by labor organization**
It shall be an unfair labor practice for a labor organization or its agents--

**(4)(ii)** to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--

**(B)** forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

## Section 8(b)(4)(ii)(D) (29 U.S.C. § 158(b)(4)(ii)(D)):

**(b) Unfair labor practices by labor organization**
It shall be an unfair labor practice for a labor organization or its agents--

**(4)(ii)** to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--

**(D)** forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

*Provided*, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other

ii

than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: *Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;

## Section 10(a) (29 USC § 160(a)):

Sec. 10. [§ 160.] (a) [Powers of Board generally] The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8 [section 158 of this title]) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: Provided, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominately local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this Act [subchapter] or has received a construction inconsistent therewith.

## Section 10(e) (29 U.S.C. § 160(e)):

The Board shall have power to petition any court of appeals of the United States…wherein the unfair labor practice occurred or wherein such person resides or transacts business, for the enforcement of such order…. No objection that has not been urged before the Board…shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.  The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive….

**Section 10(f) (29 U.S.C. § 160(f))**:

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia….

**Section 10(k) (29 U.S.C. § 160(k))**:

**(k)** Hearings on jurisdictional strikes
Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 19-70297, 19-70604, 19-71471 |

I am the attorney or self-represented party.

**This brief contains** | 13,383 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

　　○ it is a joint brief submitted by separately represented parties;

　　○ a party or parties are filing a single brief in response to multiple briefs; or

　　○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/David Habenstreit |　**Date** | February 18, 2020 |
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**　　　　　　　　　　　　　　　　　　　　　　　　*Rev. 12/01/2018*

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; )
INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, )
LOCAL 4                                                                   )
                Petitioners/Cross-Respondents )
                                            )
              v.                                              )
                                              )
NATIONAL LABOR RELATIONS BOARD                      )
                                            )
            Respondent/Cross-Petitioner          )
                                              )
              and                                            ) Docket Nos.
                                            ) 19-70297
INTERNATIONAL BROTHERHOOD OF ELECTRICAL     ) 19-70604
WORKERS, LOCAL 48; KINDER MORGAN TERMINALS  ) 19-71471
                                            )
                  Intervenors                          )
      _____     )
                                            )
PACIFIC MARITIME ASSOCIATION                          )
                                            )
              Petitioner                         )
               v.                                              )
                                              )
NATIONAL LABOR RELATIONS BOARD                      )
                                            )
              Respondent                        )

CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2020, I electronically filed the

foregoing document with the Clerk of the Court for the United States Court of

Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further

certify that the foregoing document was served on all the parties or their counsel of

record through the CM/ECF system.

 /s/ David Habenstreit
David Habenstreit
Assistant General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 18th day of February 2020