CASE NO. 23-632; 23-658; 23-780; 23-793

————————

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

————————

INTERNATIONAL LONGSHORE AND WAREHOUSE UNION AND
INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 19,

Petitioner/Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Petitioner/Respondent,

PACIFIC MARITIME ASSOCIATION,

Petitioner,

v.

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS, DISTRICT 160, LODGE 289,

Petitioner/Intervenor.

————————

ON APPEAL FROM NATIONAL LABOR RELATIONS BOARD
CASE NO. 19-CD-269624; 19-CD-269637; 372 NLRB NO. 66

————————

**PETITION FOR REHEARING EN BANC**

————————

David A. Rosenfeld, Bar No. 058163
WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1375 55th Street
Emeryville, California 94608
Telephone (510) 337-1001
Fax (510) 337-1023

**TABLE OF CONTENTS**

Contents

I.     INTRODUCTION .................................................................... 1

II.    STATEMENT OF THE CASE ............................................... 4

     A.    STATEMENT OF THE ISSUE .................................... 4

     B.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND .......................................................... 5

III.   ARGUMENT ........................................................................ 6

     A.    This Court Should Grant Rehearing En Banc Because Each of the Grounds Enumerated in Fed. R. App. P. 40(b)(2) Exists to Overrule *Kinder* Morgan's Application to Jurisdictional Disputes ................................................................... 6

          1.    *Kinder Morgan* Conflicts with the Decisions of Multiple Circuit Courts Concerning Sections 8(b)(4)(D) and 8(b)(4)(B) ............................................................ 6

          2.    The Decision Conflicts with the Principles Established in Jurisdictional Disputes by the Supreme Court ................ 7

          3.    *Kinder Morgan* Conflicts with Decisions of this Court. 10

          4.    Continued Application of *Kinder Morgan* Would Disrupt Almost all Future Work Assignments ............................ 11

          5.    Applying *Kinder Morgan*, would Create the Opportunity for Unions for Work Acquisition Rather than Work Preservation .................................................... 13

          6.    *Kinder Morgan* never addressed the Section 8(b)(4)(D) Analysis ........................................................ 14

IV.   CONCLUSION .................................................................. 14

     CERTIFICATE OF SERVICE ...................................................... 16

**TABLE OF AUTHORITIES**

**Page**

**Federal Cases**

*Advance Cast Stone Co. v. Bridge, Structural & Reinforcing Iron
    Workers, Loc. Union No. 1*,
    376 F.3d 734 (7th Cir. 2004) ...................................................7

*Associated Gen. Contractors of America, Inc. v. Int'l Union of
    Operating Eng'rs, Loc. 701*,
    529 F.2d 1395 (9th Cir. 1976) ...............................................10

*Associated General Contractors of California, Inc. v. NLRB*,
    514 F.2d 433 (9th Cir. 1975) .............................................3, 10

*Chamber of Commerce ex rel. Boise Cascade Corp. v. NLRB*,
    574 F.2d 457 (9th Cir. 1978) .................................................13

*Int'l Longshoremen's & Warehousemen's Union, Loc. 14 v. NLRB*,
    85 F.3d 646 (D.C. Cir. 1995) (*Sierra Pacific Indus.*)..........................2

*Int'l Longshoremen's Union, Loc. 32 v. Pac. Mar. Ass'n*,
    773 F.2d 1012 (9th Cir. 1985) ...............................................10

*Int'l Union of Operating Eng'rs, Loc. 18 v. NLRB*,
    No. 17-1122, 2018 U.S. App. LEXIS 10844 (D.C. Cir. Apr. 24,
    2018) .................................................................................12

*International Longshore & Warehouse Union v. NLRB*,
    978 F.3d 625 (9th Cir. 2020) (*Kinder Morgan*) ..........................passim

*International Longshoremen's & Warehousemen's Union v. NLRB*,
    884 F.2d 1407 (D.C. Cir. 1989) (*Sea-Land*)................................2, 6, 7

*International Union of Operating Engineers, Local 18 v. NLRB*,
    712 F. App'x 511 (6th Cir. 2017) ........................................7, 12

*J.F. White Contracting Co. v. Loc. 103 Int'l Bhd. of Elec. Workers*,
    890 F.2d 528 (1st Cir.1989).....................................................7

*Local 30, United Slate, Tile & Composition Roofers v. NLRB*,
    1 F.3d 1419 (3d Cir. 1993) .....................................................7

**TABLE OF AUTHORITIES (CONT'D)**

*National Woodwork Manufacturers Association v. NLRB*,
    386 U.S. 612 (1967)..................................................................10

*NLRB v. International Longshoremen's Association*,
    447 U.S. 490 (1980)..................................................................10

*Small ex rel. NLRB v. Operative Plasterers' Int'l Ass'n Loc. 200*,
    611 F.3d 483 (9th Cir. 2010) ...................................................10

*NLRB v. Plasterers' Local Union No. 79*,
    404 U.S. 116 (1971)..............................................................2, 3, 9

*NLRB. v. Radio & Television Broadcast Engineers Union*,
    364 U.S. 573 (1961) (*CBS*)..............................................*passim*

*Orrand v. Hunt Constr. Grp., Inc.*,
    852 F.3d 592 (6th Cir. 2017) .......................................................7

*Recon Refractory & Construction Inc. v NLRB*,
    424 F.3d 980 (9th Cir. 2005) ....................................................11

*Sea-Land Serv., Inc. v. Int'l Longshoremen's Union, Locs. 13, 63, & 94*,
    939 F.2d 866 (9th Cir. 1991) .............................................2, 6, 10

**NLRB Cases**

*Highway Rd. & St. Constr. Laborers Loc. 1010*,
    366 NLRB No. 174 (Aug. 24, 2018), *enforced sub nom. N.Y. Paving, Inc. v. NLRB*, No. 20-1469, 2021 U.S. App. LEXIS 36626
    (D.C. Cir. Dec. 10, 2021)..........................................................12

*International Association of Machinists, District 190*,
    344 NLRB 1018 (2005), *aff'd*, 253 F.App'x 625 (9th Cir. 2007).....................11

*Operative Plasterers' Int'l Ass'n Loc. 200 (Standard Drywall, Inc.)*,
    357 NLRB 2212 (2011), *enforced*, 547 F. App'x 812 (9th Cir. 2013) .....................................................................................12

*Tile, Marble, Terrazzo Finishers, Loc. 47-T*, 315 NLRB 520 (1994)..............................................................12

**TABLE OF AUTHORITIES (CONT'D)**

**Page**

**Federal Statutes**

29 U.S.C. § 158(b)(4)(B) ................................................................passim

29 U.S.C. § 158(b)(4)(D) ................................................................passim

29 U.S.C. § 160(f) .................................................................................2

29 U.S.C. § 160(k) .........................................................................passim

29 U.S.C. § 1145 ...................................................................................7

**.Rules**

Fed. R. App. P. 40(b)(2) ...................................................................1, 6

Fed. R. App. P. 40(b)(2)(A) ...........................................................3, 11

Fed. R. App. P. 40(b)(2)(B) .................................................................3

Fed. R. App. P. 40(b)(2)(C) .................................................................7

Fed. R. App. P. 40(b)(2)(D) ...............................................................13

155739\1584165

## I.    INTRODUCTION

Judge Miller, who authored the panel decision, suggests that the Court rehear this case *en banc*.  This case compels rehearing because the opinion warrants review under each of the reasons identified in Fed. R. App. P. 40(b)(2)(A -D).  The Opinion is attached to this Petition.

This case involves a classic jurisdictional dispute between two rival unions fighting over maintenance and repair work at container Terminal 5 in Seattle.  The Board ruled in a jurisdictional dispute hearing established by 29 U.S.C. § 160(k)((10(k)) that employees represented by the Petitioner/Intervenor, International Association of Machinists, District Lodge 160, Lodge 289 (IAM) were entitled to perform that work, not employees represented by the Respondent International Longshore and Warehouse Union (ILWU).  The ILWU sought to pressure the employer to ignore the Board's determination, and that effort was found by the Board to violate well-established and undisputed principles of the National Labor Relations Act designed to prevent jurisdictional disputes from disrupting employers.  As Judge Miller points out, this Court's decision in *International Longshore & Warehouse Union v. NLRB*, 978 F.3d 625, 637 (9th Cir. 2020) (*Kinder Morgan*), erroneously applied the work preservation doctrine to permit the ILWU to pressure the employer to award the work to its members in contravention of the Board's Determination.  Although *Kinder Morgan* correctly applied the work preservation doctrine to the secondary boycott law, National Labor Relations Act § 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B), it did not correctly apply that doctrine to proceedings under the different provision in 29 U.S.C. § 158(b)(4)(D), governing jurisdictional disputes.

Congress enacted a provision in 1947 to resolve with finality jurisdictional disputes which had plagued labor relations under the original National Labor Relations Act.  Allowing the work preservation argument to control the resolution

1

of jurisdictional disputes will effectively render that process irrelevant because virtually every jurisdictional dispute involves the same paradigm: two unions fighting over the same work performed by one employer.

Judge Miller noted that *Kinder Morgan* directly conflicts with decisions of other circuits and explained that it specifically conflicts with the seminal decision in *International Longshoremen's & Warehousemen's Union v. NLRB*, 884 F.2d 1407 (D.C. Cir. 1989) (*Sea-Land*). As Judge Miller explained, the D.C. Circuit "concluded that the *ILA* work- preservation defense does *not* immunize conduct charged under section 8(b)(4)(D)." Op. at 23, DktEntry 109.1 (Miller, J., concurring) (citing *Sea-Land*, 884 F.2d at 1410-13). The D.C. Circuit later applied *Sea-Land* in rejecting an ILWU work preservation argument in *Int'l Longshoremen's & Warehousemen's Union, Loc. 14 v. NLRB*, 85 F.3d 646 (D.C. Cir. 1995) (*Sierra Pacific Indus.*). Judge Miller summed up the D.C. Circuit's position as: "Permitting a union to raise the work preservation defense to a section 8(b)(4)(D) charge would unravel the mechanism that Congress created to enable the Board to resolve jurisdictional disputes." Op. at 23 (Miller, J., concurring) (citing 884 F.2d at 1413). Any union or employer that disagrees with *Kinder Morgan* could go to the D.C. Circuit. 29 U.S.C. §160(f).

Judge Miller identified two Supreme Court decisions with which *Kinder Morgan* conflicts: *NLRB v. Plasterers' Local Union No. 79*, 404 U.S. 116 (1971), and *NLRB. v. Radio & Television Broadcast Engineers Union*, 364 U.S. 573 (1961) (*CBS*), in which there were competing jurisdictional provisions of rival unions, such as those underlying the claims in the instant case, that the Board considered in a 10(k) proceeding. Op. at 21-22 (Miller, J., concurring). In *CBS*, the Board initially did not resolve the dispute, finding it could do so only if a certification, or an agreement provision like the one on which the petitioner relies in the instant case, covered the disputed work. The Supreme Court rejected the

2

Board's reasons for not deciding the case and emphasized that Congress gave the Board the responsibility to resolve such jurisdictional disputes.

The Supreme Court in *CBS* expressly rejected the position of the Board and the Court of Appeals that jurisdictional disputes should be resolved by private arbitration or other private settlement. That is the course the ILWU took in this case, and that any union could take to enforce an alleged "work preservation" provision in an agreement. As the Supreme Court found in *CBS*, "[i]t might have been better . . . to intrust this matter to arbitrators. But Congress, after discussion and consideration, decided to intrust this decision to the Board." 364 U.S. at 583. Fed. R. App. P. 40(b)(2)(B). In *Plasterers' Local Union No. 79*, 404 U.S. 116, the Court again forced the Board to decide a jurisdictional dispute notwithstanding an arbitration decision which resolved the dispute between the two disputing unions but not the employer on the ground that all three parties had to agree to be found by that decision.

Judge Miller pointed out *Kinder Morgan* is inconsistent with this Court's decision in *Associated General Contractors of California, Inc. v. NLRB*, 514 F.2d 433, 438 (9th Cir. 1975), where this Court rejected the plumber's union's work preservation argument. Op. at 21 (Miller, J., concurring). The Opinion conflicts with other decisions of this Court relying on the same principles.

Rehearing is justified if a case is of "exceptional importance." The points made above and Judge Miller's point in his concurrence demonstrate that this is a case of such importance to labor relations. As explained below, *Kinder Morgan* will effectively eviscerate the section 10(k) process because every union in a classic jurisdictional dispute will involve the same claims. Although the Board can continue to issue 10(k) decisions, they will no longer be enforceable because the union that loses the determination (or employer which disputes the Board's

3

determination) will be able to ignore the determination by asserting a work preservation argument no matter how remote in virtually every case.

The *Kinder Morgan* panel conflated section 8(b)(4)(B) and (D) with respect to the work preservation defense. The panel accurately explained the work preservation defense as it has been developed for section 8(b)(4)(B) but without explanation applied it to section 8(b)(4)(D). Then, in a footnote, the panel concluded that the doctrine applied also to section 8(b)(4)(B) secondary boycotts. *See Kinder Morgan*, 978 F.3d at 633 n.10. This was backwards. The doctrine applies in 8(b)(4)(B) boycott cases and not 8(b)(4)(D) jurisdictional disputes. The panel never explained how it made that leap of logic, nor did it comment in any way on the differences.

## II.     STATEMENT OF THE CASE

### A.     STATEMENT OF THE ISSUE

The panel's opinion accurately describes the nature of this dispute and the litigation. It accurately points out that, except for *Kinder Morgan*, this would have been a different result. Op. at 17-19. Thus, the issue is whether the court should rehear this case to reconsider *Kinder Morgan*, and that decision's holding that when a union raises a work preservation defense, enforcement of that provision supersedes a work assignment award that the National Labor Relations Board issues pursuant to National Labor Relations Act §§ 8(b)(4)(D) and 10(k).

As applied to the specific case, a "classic jurisdictional dispute," the sole question is whether the ILWU, based on the *Kinder Morgan* decision, can assert the same work preservation defense available in secondary boycott cases to a jurisdictional dispute where the ILWU demands that the employer SSA Terminals (SSAT) "pay-in-lieu" until it reassigns the work to its members in admitted contravention of the section 10(k) determination of the Board.

B.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

In summary this case concerns the long-running dispute between the ILWU and the IAM over M&R work at marine terminals throughout the West Coast. This dispute, however, involved one newly renovated and reopened terminal in the Port of Seattle: Terminal 5.

After the Employer SSA Terminals, LLC (SSAT) initially assigned the M&R work to ILWU mechanics, the IAM-threatened job action prompted SSAT to file unfair labor practice charges against IAM for instigating a jurisdictional dispute. Pursuant to section 10(k) of the Act, which authorizes the Board to resolve jurisdictional disputes, Region 19 held hearings in 2019. At the 10(k) hearing, all parties stipulated that the work in dispute was M&R work at Terminal 5 and that this is a classic jurisdictional dispute.

The Board issued its 10(k) Determination and assigned the disputed M&R work to IAM-represented mechanics.

To arrive at this conclusion, the Board applied the traditional factors which have been used in hundreds of 10(k) awards.

Despite the 10(k) award, the ILWU filed grievances against SSAT which sought to impose severe economic penalties on SSAT for the continued assignment of the M&R work to IAM-represented mechanics. The remedy would have required SSAT to pay the wages it paid to IAM-represented employees to ILWU members, thus doubling SSAT's costs.

The coast arbitrator ruled that ILWU was entitled to pay-in-lieu, because SSAT had violated the Pacific Coast Longshore Contract Document (PCLCD), which is the coast-wide collective bargaining agreement between the ILWU and the Pacific Maritime Association (PMA), the multi-employer bargaining group.

SSAT and the IAM filed charges against the ILWU to initiate unfair labor practice proceedings under section 8(b)(4)(D). An Administrative Law Judge

5

found that the ILWU's post-10(k) grievances violated section 8(b)(4)(D). The Board affirmed the ALJ's order but modified his Order regarding a remedial issue.

Within the context of the "classic jurisdictional dispute," the sole question is whether the ILWU can assert the same work preservation defense available in secondary boycott cases to jurisdictional disputes under this Court's *Kinder Morgan* decision.

## III.   ARGUMENT

**A.   This Court Should Grant Rehearing En Banc Because Each of the Grounds Enumerated in Fed. R. App. P. 40(b)(2) Exists to Overrule *Kinder* Morgan's Application to Jurisdictional Disputes**

### 1.   *Kinder Morgan* Conflicts with the Decisions of Multiple Circuit Courts Concerning Sections 8(b)(4)(D) and 8(b)(4)(B)

As Judge Miller pointed out, *Kinder Morgan* and this decision conflict directly with the decision in *Sea-Land*, 884 F.2d 1407. In *Sea-Land*, the D.C. Circuit rejected the ILWU's argument, like the one in the instant case, that the court should reject the Board's award due to an alleged work preservation objective. The D.C. Circuit found that the work assignment dispute in *Sea-Land* (as it is also in the instant case and in *Kinder Morgan*) was a "primary dispute" between two groups of employees each seeking work from an assigning employer. *Id.* at 1412-13. The Court held that when disputes "are, in a sense, primary . . . the Act provides a mechanism (section 10(k)) whereby the Board can resolve the dispute itself rather than merely proscribe coercion and let the dispute continue as it must do in a section 8(b)(4)(B) case." *Id.*

In *Sea-Land*, the court found that the finality of Board 10(k) awards, in contrast to arbitration and other decisions based on agreements, "is indeed reasonable; it may even be inevitable." The court explained that if the ILWU was

"entitled to assert contract claims against Sea-Land, in contravention of the Board's section 10(k) award, the very purpose of section 10(k) - to authorize the Board to resolve the jurisdictional dispute - would be totally frustrated." *Id.* at 1414. Other courts have issued decisions which disagree with *Kinder Morgan*. The Sixth Circuit, in *International Union of Operating Engineers, Local 18 v. NLRB*, 712 F. App'x 511, 514 (6th Cir. 2017), held that when disputed work has been previously assigned to both unions, a union's work preservation argument is defeated by a Board 10(k) award. The Third Circuit, in *Local 30, United Slate, Tile & Composition Roofers v. NLRB*, 1 F.3d 1419 (3d Cir. 1993), rejected the union's argument when it sought to rely on an agreement provision to get the court to rule inconsistently with a Board 10(k) award. In addition, the First and Seventh Circuits have held that when an arbitration decision conflicts with a Board 10(k) award, the Board's award takes precedence. *See Advance Cast Stone Co. v. Bridge, Structural & Reinforcing Iron Workers, Loc. Union No. 1*, 376 F.3d 734, 740 (7th Cir. 2004), and decisions cited therein; *J.F. White Contracting Co. v. Loc. 103 Int'l Bhd. of Elec. Workers*, 890 F.2d 528, 529 (1st Cir.1989) ( "[C]ourts are not to enforce an arbitration award that conflicts with a §10(k) determination."). *See also Orrand v. Hunt Constr. Grp., Inc.*, 852 F.3d 592 (6th Cir. 2017) (Board's §10(k) award precludes an ERISA, 29 U.S.C. § 1145). Rehearing is warranted pursuant to Fed. R. App. P. 40(b)(2)(C).

### 2. The Decision Conflicts with the Principles Established in Jurisdictional Disputes by the Supreme Court

As pointed out by Judge Miller, the Supreme Court in *CBS*, 364 U.S. 573, found that Congress drafted and enacted section 10(k) to empower the National Labor Relations Board ("Board") to resolve work assignments disputes, in which (as in the instant case) two unions have agreements covering the same work, by making a positive award of the disputed work to one of those unions.

The Supreme Court decision in *CBS* extensively discussed the language and purpose of sections 8(b)(4)(D) and 10(k). The Court explained that "Section 10(k) . . . quite plainly emphasizes the belief of Congress that it is more important to industrial peace that jurisdictional disputes be settled permanently than it is that unfair labor practice sanctions for jurisdictional strikes be imposed upon unions." 364 U.S. at 576-77. The Court held that "where no voluntary adjustment is made, 'the Board is empowered and directed,' by §10(k), 'to hear and determine the dispute out of which such unfair labor practice shall have arisen,' and, upon compliance by the disputants with the Board's decision, the unfair labor practice charges must be dismissed." *Id.* at 577. This wording by the Court notes that dismissal of a section 8(b)(4)(D) charge against a union is conditioned on "compliance by the disputants with" the Board's 10(k) award.

The Court next addressed the relationship between jurisdictional/work coverage language in a collective bargaining agreement and section 10(k) because the Board at that time – much like the Ninth Circuit in *Kinder Morgan* – treated agreement language as more important than the Board's authority under section 10(k). The Court in *CBS* clarified and established that this was incorrect, and that the Board's section 10(k) power, and responsibility, was superior to agreement language. The Court found that section 10(k)'s language "indicates a congressional purpose to have the Board do something more than merely look at prior Board orders and certifications *or a collective bargaining contract* to determine whether one or the other union has a clearly defined statutory or contractual right to have the employees it represents perform certain work tasks." 364 U.S. at 579 (emphasis added). The Court held that "[t]he language of §10(k), supplementing §8(b)(4)(D) as it does, sets up a method adopted by Congress to try to get jurisdictional disputes settled" and that "the clause 'the dispute out of which such unfair labor practice shall have arisen' [within 10(k)] can have no other

meaning except a jurisdictional dispute under §8(b)(4)(D) which is a dispute between two or more groups of employees over which is entitled to do certain work for an employer." *Id.* The Supreme Court further ruled that "[t]o determine or settle the dispute as between [disputants] would normally require a decision that one or the other is entitled to do the work in dispute. Any decision short of that would obviously not be conducive to quieting a quarrel between two groups . . . ." *Id.* The Court completed its interpretation of the statutory language by finding that "[i]f this newly granted Board power to hear and determine jurisdictional disputes had meant no more than [interpreting agreements and other preexisting legal sources], Congress certainly would have achieved very little to solve the knotty problem of wasteful work stoppages due to such disputes." *Id.* at 580.

The Court summed up its interpretation of the language of sections 8(b)(4)(D) and 10(k), as supported by the legislative history of those sections, by holding that "[Section 10(k)] was designed to provide precisely what the Board [in that case] has disclaimed the power to provide -- an effective *compulsory method* of getting rid of what were deemed to be the bad consequences of jurisdictional disputes." *Id.* at 582 (emphasis added).

Ten years after its *CBS* decision, the Supreme Court again interpreted section 10(k) in *Plasterers' Local Union No. 79*, 404 U.S. 116. In that decision, the Court held that even if the unions disputing the work agree on a voluntary method of dispute settlement, the Board could hear and decide a section 10(k) case in which the work assigning employer must be allowed to participate. In this case, the IAM did not participate in the arbitration between SSAT and the ILWU and cannot be bound by that decision. *Kinder Morgan* is not reconcilable with those decisions as Judge Miller pointed out. Rehearing is warranted under Fed. R. App. P. 40(b)(2)(B)

9

3. ***Kinder Morgan* Conflicts with Decisions of this Court**

As Judge Miller pointed out, *Kinder Morgan* is inconsistent with the decision of this Court in *Associated General Contractors*, 514 F.2d 433. This Court rejected the plumber's union's work preservation argument, in which the union sought assignment of valve and piping work which was being replaced by prefabricated material installed by a manufacturer's employees. Thus, the facts of *Associated General Contractors* are similar to the facts of the Supreme Court's decisions in *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612 (1967) (carpenters union work replaced by prefabricated doors), and *NLRB v. International Longshoremen's Association*, 447 U.S. 490 (1980) (longshoremen union's unloading work replaced by manufactured containers), the precedents on which *Kinder Morgan* relied. Yet the Ninth Circuit in *Kinder Morgan* did not distinguish or even mention its prior decision in *Associated General Contractors*.

Both panels' decisions conflict with precedent from this Court in which this Court has rejected arbitration decisions as shielding a union from its jurisdictional claims. Although none of the unions asserted the work preservation doctrine developed in section 8(b)(4)(B) cases, it was for good reason because it just did not apply. However, in each case the union used the grievance procedure as a sword to obtain or preserve its work. *See Small ex rel. NLRB v. Operative Plasterers' Int'l Ass'n Loc. 200*, 611 F.3d 483, 492-94 (9th Cir. 2010) (lawsuits and grievances that "would completely undermine a section 10(k) work assignment" violate 8(b)(4)(D)); *Sea-Land Serv., Inc. v. Int'l Longshoremen's Union, Locs. 13, 63, & 94*, 939 F.2d 866, 872-73 (9th Cir. 1991) (same); *Int'l Longshoremen's Union, Loc. 32 v. Pac. Mar. Ass'n*, 773 F.2d 1012, 1020 (9th Cir. 1985) (same); *cf. Associated Gen. Contractors of America, Inc. v. Int'l Union of Operating Eng'rs, Loc. 701*, 529 F.2d 1395 (9th Cir. 1976) (exception where compliance with grievance and 10(k) award do not conflict).

Finally, although the panel was correct that *Recon Refractory & Construction Inc. v NLRB*, 424 F.3d 980, 990 (9th Cir. 2005) did not specifically hold that the work preservation argument could not be applied to resist a classic jurisdictional dispute determination as in the above cases, it also effectively foreclosed that result. It did so by holding that the work preservation argument, if applied correctly, would defeat the entire section 10(k) process because the dispute was caused by the employer's unilateral action. The work preservation doctrine, as applied in jurisdictional disputes, had a different meaning, namely, the employer created the dispute by taking work away from one group and unilaterally assigning it to another group. See also *International Association of Machinists, District 190*, 344 NLRB 1018 (2005), *aff'd*, 253 F.App'x 625 (9th Cir. 2007)(finding that same employer created a dispute by reassigning work historically performed by the ILWU to the IAM and thus no classic jurisdictional dispute existed).

Logically, there cannot be two inconsistent work preservation doctrines governing the 10(k) process. If there is a valid work preservation object, there can be no section 10(k) proceeding, and here all of the parties agreed this is a classic jurisdictional dispute subject to the 10(k) determination. *Recon* is irreconcilable with this Court's importation of a different work preservation regime from section 8(b)(4)(B) cases to section 8(b)(4)(D) cases. Under that analysis, virtually no section 10(k) proceeding would be enforceable because either union (or the employer) could assert work preservation to defeat the proceeding. Rehearing is necessitated under Fed. R. App P 40(b)(2)(A).

### 4. Continued Application of *Kinder Morgan* Would Disrupt Almost all Future Work Assignments

Some decisions illustrate how employer work assignments would have ended with no enforceable decision applying the *Kinder Morgan* approach rather than complying with a Board 10(k) determination.

In a series of decisions involving cases in which contractors assigned work involving forklifts to a union other than the Operating Engineers (often to the Laborers Union), and the Operating Engineers sought to dispute those assignments based on language in an agreement it had with a multiemployer association of which the assigning employers were members (and thus, similar to the facts of the instant case and *Kinder Morgan*), the Board and then appellate courts sided against the Operating Engineers. *See*, *e.g.*, *Int'l Union of Operating Eng'rs, Loc. 18 v. NLRB*, No. 17-1122, 2018 U.S. App. LEXIS 10844 (D.C. Cir. Apr. 24, 2018); *Int'l Union of Operating Eng'rs, Loc. 18 v. NLRB*, 712 F. App'x 511 (6th Cir. 2017). Had the Board and the Court followed the approach of *Kinder Morgan*, then the work assignment to the Laborers would not have been enforceable, and the Operating Engineers would have been free to picket to force a work reassignment in opposition to the core purpose of the 10(k) process

Similarly, the Board issued a series of decisions involving a dispute between the Plasterers union and the Carpenters union over drywall work, which the employers had long assigned to the Carpenters, and the Board, under 10(k), awarded the work to the Carpenters. But the Plasterers had language in a multiemployer agreement that, under the *Kinder Morgan* approach, could have resulted in assignment to the Plasterers union. *See Operative Plasterers' Int'l Ass'n Loc. 200*, 357 NLRB 2212 (2011) (summarizing multiple decisions), *enforced*, 547 F. App'x 812 (9th Cir. 2013). *See also Highway Rd. & St. Constr. Laborers Loc. 1010*, 366 NLRB No. 174 (Aug. 24, 2018) (assigning the work to both unions over competing claims), *enforced sub nom. N.Y. Paving, Inc. v. NLRB*, No. 20-1469, 2021 U.S. App. LEXIS 36626 (D.C. Cir. 2021). In another case, the employer had long assigned ceramic tile finishing work to the Bricklayers and Laborers unions. *See Tile, Marble, Terrazzo Finishers, Loc. 47-T*, 315 NLRB 520 (1994). But the Marble Polishers union pursued such work based on agreement

language, and, under *Kinder Morgan*, that union could have instead obtained it.  As a result, any one of the three unions could have ignored the Board's 10(k) determination in a subsequent section 8(b)(4)(D) proceeding leaving the employer at the mercy of all three.  *See Chamber of Commerce ex rel. Boise Cascade Corp. v. NLRB*, 574 F.2d 457 (9th Cir. 1978) (work assigned to Teamsters even though competing Carpenters union had strong work preservation language in agreement).

It is fair to say that in virtually every jurisdictional dispute the elements exist for competing unions, where both are signatory to the employer caught in the middle, to claim "work preservation."   This renders the 10(k) process and the determination issued by the Board meaningless to settle jurisdictional disputes as in this case. Correcting this error is warranted by Fed. R. App. P. 40(b)(2)(D).

### 5. Applying *Kinder Morgan*, would Create the Opportunity for Unions for Work Acquisition Rather than Work Preservation

The ILWU in *Kinder Morgan* had not previously performed the disputed work – electrical maintenance work – for the assigning employer or in the port at issue.  However, the ILWU argued that a jurisdictional/maintenance provision in its agreement applying to the port in question covered that work.  This Court agreeing with the ILWU's argument that this provision had a "work preservation" objective even when applying to work not previously performed by the union, held that the Board's award of the work to the Electrical Workers rather than the ILWU was unenforceable.  *Kinder Morgan* gives unions the incentive to expand their jurisdictional provisions as broadly as possible.  The unforeseen consequences of the incentives created by *Kinder Morgan* are likely to be enormous as here, where the ILWU had performed some similar work for a different related entity at a cruise ship terminal but not SSAT at any container terminal in Seattle.

### 6. *Kinder Morgan* never addressed the Section 8(b)(4)(D) Analysis

The panel recognized that the court in *Kinder Morgan* just imported the work preservation doctrine from 8(b)(4)(B) cases without comment or analysis to 8(b)(4)(D) cases. The panel agreed that "[i]f we were writing on a blank slate, we might find the Board's argument persuasive." Op. at 15. There was no discussion of the contrary decisions from other courts, inconsistent decisions from this Court, acknowledgement of the Supreme Court cases or the discussion in Board cases of the differences. The Court conflated the two distinct statutory provisions without any analysis or explanation. This explains why rehearing en banc is necessary now that these arguments are clearly before the Court. Judge Miller has it right that there is an irrefutable need to straighten this out and to differentiate jurisdictional dispute doctrine from secondary boycott work preservation doctrine to preserve the meaning of section 10(k).

## IV. CONCLUSION

The Petition for Rehearing en banc should be granted.


DATED: July 14, 2025         Respectfully Submitted


By:    */s/ DAVID A. ROSENFELD*
       David A. Rosenfeld
       WEINBERG, ROGER & ROSENFELD
       A Professional Corporation

       Attorneys for Petitioner/Intervenor
       INTERNATIONAL ASSOCIATION OF
       MACHINISTS AND AEROSPACE
       WORKERS, DISTRICT 160, LODGE
       289

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), Petitioner and Intervenor certifies that its Petition for Hearing En Banc contains 4,189 words of proportionally spaced, 14-point type, and the word-processing system used was Microsoft Word for Office 365.

Dated:  July 14, 2025           RESPECTFULLY SUBMITTED,

WEINBERG, ROGER & ROSENFELD
A Professional Corporation

/s/ DAVID *A. ROSENFELD*

By:   David A. Rosenfeld
Attorneys for Petitioner/Intervenor
INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS, DISTRICT 160, LODGE 289

15

155739\1584165

# ATTACHMENT

## FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 19, | No. 23-632 |
| | NLRB No. 19-CD-269637 |
| *Petitioners*, | |
| v. | OPINION |
| NATIONAL LABOR RELATIONS BOARD, | |
| *Respondent*, | |
| INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, DISTRICT 160, LOCAL LODGE 289, | |
| *Intervenor*. | |

| | |
|---|---|
| PACIFIC MARITIME ASSOCIATION, | No. 23-658 |
| *Petitioner*, | NLRB No. 19-CD-269637 |
| v. | |
| NATIONAL LABOR RELATIONS | |

BOARD,
                *Respondent*,

INTERNATIONAL ASSOCIATION
OF MACHINISTS AND
AEROSPACE WORKERS,
DISTRICT 160, LOCAL LODGE
289,
                *Intervenor.*

NATIONAL LABOR RELATIONS
BOARD,
                *Petitioner*,
   v.

INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION;
INTERNATIONAL LONGSHORE
AND WAREHOUSE UNION,
LOCAL 19,
                *Respondents*,

INTERNATIONAL ASSOCIATION
OF MACHINISTS AND
AEROSPACE WORKERS,
DISTRICT 160, LOCAL LODGE
289,
                *Intervenor.*

No. 23-780

NLRB No.
19-CD-269637

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, DISTRICT 160, LOCAL LODGE 289,<br><br>       *Petitioner*,<br><br> v.<br><br>NATIONAL LABOR RELATIONS BOARD,<br><br>       *Respondent*, | No. 23-793<br><br>NLRB No. 19-CD-269637 |

On Petition for Review of an Order of the
National Labor Relations Board
Argued and Submitted November 15, 2024
San Francisco, California

Filed June 18, 2025

Before: Sidney R. Thomas and Eric D. Miller, Circuit
Judges, and Lee H. Rosenthal, District Judge.[*]

Opinion by Judge Miller;
Concurrence by Judge Miller

---

[*] The Honorable Lee H. Rosenthal, United States District Judge for the
Southern District of Texas, sitting by designation.

# SUMMARY[*]

## National Labor Relations Act

The panel (1) granted petitions for review by the International Longshore and Warehouse Union (ILWU) and the Pacific Maritime Association (PMA), (2) denied a petition for review by the International Association of Machinists and Aerospace Workers (IAM), (3) denied a cross-petition for enforcement by the National Labor Relations Board, and (4) vacated the Board's order directing ILWU to cease and desist from pursuing maintenance work for SSA Terminals at Terminal 5 in the Port of Seattle.

This case arose from a jurisdictional dispute between ILWU and IAM, both of which claimed the right under collective bargaining agreements to perform maintenance work for SSA. Pursuant to section 10(k) of the National Labor Relations Act, SSA asked the Board to decide which union should perform the work. The Board assigned the work to IAM, prompting ILWU to pursue a grievance against SSA under its collective bargaining agreement, seeking the value of the work assigned to IAM.

After an arbitrator found in ILWU's favor, SSA filed an unfair labor practice charge against ILWU, alleging that ILWU violated section 8(b)(4)(D) of the Act because its pursuit of the grievance was intended to coerce SSA into assigning the work to ILWU. ILWU defended itself by invoking the work-preservation defense, which protects "primary" union activity—activity intended to accomplish

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

some goal within the confines of the employer-employee relationship—as opposed to impermissible "secondary" union activity—activity that has the goal of inducing an employer to take action against a third party with which the union has a dispute. *See NLRB v. International Longshoremen's Ass'n (ILA)*, 447 U.S. 490 (1980).

The Board determined that the work-preservation defense is not available in pure jurisdictional disputes, like this one, where multiple unions have valid contractual entitlements to the disputed work directly with the employer. The Board ordered ILWU to cease and desist from pursuing the maintenance work at Terminal 5.

The panel held that the Board's position was foreclosed by *International Longshore and Warehouse Union v. NLRB* (*Kinder Morgan*), 978 F.3d 625, 637 (9th Cir. 2020), which held that "[a] valid work-preservation objective provides a complete defense against alleged violations of section 8(b)(4)(D), as well as against jurisdictional disputes under section 10(k)." Pursuant to *Kinder Morgan*, a union charged with an unfair labor practice under section 8(b)(4)(D) may raise a work-preservation defense even when the union is not alleged to have engaged in illegal secondary activity. The Board erred by refusing to entertain ILWU's work-preservation defense under *Kinder Morgan*. Accordingly, the panel vacated the Board's order and remanded for the Board to evaluate the merits of the defense in the first instance.

Concurring, Judge Miller wrote separately to express his view that *Kinder Morgan* was wrongly decided and should be reconsidered en banc. Because the *ILA* work-preservation defense allows a union to demonstrate that it did not act with an illegal secondary objective, the Board has

historically entertained the defense only when a union is alleged to have engaged in secondary activity in violation of section 8(b)(4)(B). *Kinder Morgan* applied an affirmative defense that the Supreme Court created to cabin the reach of one statutory provision, section 8(b)(4)(B), to cases arising under a separate statutory provision, section 8(b)(4)(D). Grafting the *ILA* work-preservation defense onto section 8(b)(4)(D), as *Kinder Morgan* did, undermines the jurisdictional dispute-resolution scheme enacted by Congress. It is not supported by precedent, creates a circuit conflict, and undermines Congress's decision to empower the Board to resolve jurisdictional disputes.

# COUNSEL

Robert S. Remar (argued), Law Office of Robert Remar, San Francisco, California; Robert H. Lavitt, Travis Lavenski, and Julian Gonzalez, Barnard Iglitzin & Lavitt LLP, Seattle, Washington; Lindsay R. Nicholas, Leonard Carder LLP, Oakland, California; Michael E. Kenneally (argued) and Jonathan C. Fritts, Morgan Lewis & Bockius LLP, Washington, D.C.; Geoffrey J. Rosenthal, Morgan Lewis & Bockius LLP, Philadelphia, Pennsylvania; Gregory Nelson, Morgan Lewis & Bockius LLP, New York, New York; for Petitioners.

Micah P.S. Jost (argued), Attorney; Kira D. Vol, Supervising Attorney; David Habrndtreit, Assistant General Counsel; Ruth E. Burdick, Deputy Associate General Counsel; Peter S. Ohr, Associate General Counsel; Jennifer A. Abruzzo, General Counsel; National Labor Relations Board, Washington, D.C.; for Respondent.

David A. Rosenfeld (argued), Weinberg Roger & Rosenfeld, Emeryville, California, for Intervenor.

---

**OPINION**

MILLER, Circuit Judge:

Sometimes multiple unions have irreconcilable contractual rights to perform the same work for the same employer. The resulting disputes—which the employer cannot resolve without breaching its obligations to one of the unions—are known as "jurisdictional disputes." *See USCP-WESCO, Inc. v. NLRB*, 827 F.2d 581, 583 (9th Cir. 1987).

This case arises out of a jurisdictional dispute between the International Longshore and Warehouse Union (ILWU) and the International Association of Machinists and Aerospace Workers (IAM). Both claim the right under collective bargaining agreements to perform certain work for SSA Terminals. Unable to resolve the dispute itself, SSA asked the National Labor Relations Board to decide which union should perform the work. The Board assigned the work to IAM, prompting ILWU to pursue a grievance under its collective bargaining agreement. The Board then filed an unfair labor practice charge against ILWU, alleging that its pursuit of the grievance was illegal. ILWU defended itself by invoking the work-preservation defense. That defense protects "primary" union activity—that is, activity intended to accomplish some goal within the confines of the employer-employee relationship. *See NLRB v. International Longshoremen's Ass'n* (*ILA*), 447 U.S. 490, 504 (1980). But the Board determined that the defense does not apply in disputes, like this one, where multiple unions have valid

contractual entitlements to the disputed work directly with the employer.

Whatever the merits of the Board's position as a matter of first principles, it is foreclosed by our decision in *International Longshore and Warehouse Union v. NLRB* (*Kinder Morgan*), 978 F.3d 625 (9th Cir. 2020). We therefore grant the petitions challenging the Board's order and deny the Board's cross-petition for enforcement.

I

ILWU represents longshore workers at ports along the Pacific Coast, including the Port of Seattle. It has a longstanding collective-bargaining relationship with the Pacific Maritime Association (PMA), an association of businesses that employ longshore workers. *See Kinder Morgan*, 978 F.3d at 630. ILWU and PMA have negotiated a master collective bargaining agreement, the Pacific Coast Longshore Contract Document (PCLCD), which is binding on all PMA-member employers.

For many decades, ILWU and PMA have quarreled over the extent to which PMA-member employers may use technology to replace the work traditionally performed by union longshore workers. In 2008, ILWU and PMA addressed that issue when they negotiated the current version of the PCLCD. Section 1.72 allows PMA-member employers to introduce automation at their marine terminals. In exchange, it expands ILWU's jurisdiction to cover the "installation, reinstallation, removal, maintenance and repair, and associated cleaning of such new technologies"— which we will refer to simply as "maintenance work"—at certain qualifying ports.

In 2018, SSA Terminals, a PMA-member employer, began operating Terminal 5 of the Port of Seattle as a marine terminal, making Terminal 5 subject to section 1.72. But that presented a conflict. Although section 1.72 required SSA to assign the maintenance work to mechanics represented by ILWU, SSA had a separate bilateral collective bargaining agreement with IAM, guaranteeing IAM-represented mechanics the right to "perform all [maintenance] work . . . at all Puget Sound Region Intermodal, Marine or Container Terminals," including Terminal 5. SSA initially assigned the maintenance work to mechanics represented by ILWU. In response, IAM threatened "economic action" at Terminal 5. Caught in the middle of the jurisdictional dispute between the two unions, SSA turned to the Board for help.

The National Labor Relations Act, ch. 372, 49 Stat. 449 (1935) (29 U.S.C. § 151 *et seq.*), as amended by the Taft-Hartley Act, ch. 120, 61 Stat. 136 (1947), establishes a two-step mechanism to allow the Board to resolve jurisdictional disputes. First, section 8(b)(4)(D) makes it an unfair labor practice to "threaten, coerce, or restrain" an employer with the object of forcing that employer to "assign particular work to employees in a particular labor organization . . . rather than to employees in another labor organization." 29 U.S.C. § 158(b)(4)(D). Second, when the Board finds cause to believe that section 8(b)(4)(D) has been violated, section 10(k) empowers it to hold a hearing and to award the disputed work to one of the competing unions. 29 U.S.C. §160(k). The Board considers a variety of factors at a 10(k) hearing, including the skills of the competing unions, the unions' history of performing the relevant work, the employer's preference, the different collective bargaining agreements, and the economic efficiency of the employer's

business. *See International Ass'n of Machinists, Lodge 1743*, 135 N.L.R.B. 1402, 1410–11 (1962).

SSA invoked that mechanism here. First, it filed an unfair labor practice charge against IAM, alleging that its threat of "economic action" violated section 8(b)(4)(D). That triggered section 10(k), so the Board held a hearing to determine if the disputed work should be awarded to mechanics represented by ILWU or to those represented by IAM. After considering the relevant factors, the Board assigned the work to IAM-represented mechanics.

ILWU refused to accept the Board's decision, instead pursuing a grievance under the PCLCD seeking the value of the work assigned to IAM. ILWU alleged that SSA had violated section 1.76—which requires SSA to "defend" the assignment of work to ILWU-represented mechanics "in any legal proceeding"—by failing to state a preference for ILWU-represented mechanics at the section 10(k) hearing. An arbitrator found that SSA had violated section 1.76 and ordered it to pay ILWU for "lost work opportunity claims for any future [Terminal 5 maintenance] work not performed by ILWU-represented [m]echanics."

From SSA's perspective, the arbitration award made the Board's section 10(k) determination a nullity: SSA could either reassign the work back to ILWU or else be forced to pay twice. So SSA filed another unfair labor practice charge with the Board. This time, SSA, joined by PMA, alleged that ILWU had violated section 8(b)(4)(D) because pursuing the grievance was intended to coerce SSA into assigning the work to mechanics represented by ILWU rather than IAM. *See* 29 U.S.C. § 158(b)(4)(D).

The unfair labor practice charge proceeded to a hearing before an ALJ. ILWU did not dispute that pursuing a

grievance in defiance of a section 10(k) award can violate section 8(b)(4)(D). Rather, it argued that its conduct was immunized by the work-preservation affirmative defense. Specifically, ILWU argued that pursuing the grievance was "primary" activity because it sought to accomplish a goal within the confines of its relationship with SSA—namely, to get SSA to honor its contractual obligations to assign the maintenance work to ILWU workers. The ALJ rejected ILWU's defense, and the Board affirmed. The Board held that the work-preservation defense is unavailable in pure jurisdictional disputes. Permitting a union to raise that defense, it observed, would subvert Congress's intention to "afford employers protection when their actions conform to a Board determination under section 10(k)." The Board ordered ILWU to cease and desist from pursuing the maintenance work at Terminal 5 and to notify its mechanics of their obligation to do the same.

Four petitions followed, all of which have been consolidated here. ILWU and PMA each petition for review of the Board's order finding that ILWU violated section 8(b)(4)(D). They argue that the Board erred in rejecting ILWU's work-preservation defense. In the alternative, they contend that the Board's section 10(k) work award was not supported by substantial evidence. IAM also petitions for review. Although it agrees with the Board's legal and factual conclusions, it argues that the Board's remedy is inadequate to prevent ILWU from illegally pursuing disputed work at Terminal 5 and other terminals along the Pacific Coast. Finally, the Board cross-petitions for enforcement of its order. *See* 29 U.S.C. § 160(e), (f).

## II

The parties agree on several preliminary points. They agree that this is a genuine jurisdictional dispute: ILWU and IAM both had valid contracts with SSA (or in ILWU's case, with PMA, to which SSA was bound), and SSA could not simultaneously comply with its obligations under both contracts. They also agree that when both ILWU and IAM pursued the maintenance work, it was appropriate for the Board to resolve the dispute under section 10(k). They even agree that ILWU's pursuit of a grievance in arbitration constituted a prima facie violation of section 8(b)(4)(D).

They disagree, however, on whether ILWU ought to have been permitted to raise a work-preservation defense to SSA's section 8(b)(4)(D) charge against ILWU. Confusingly, two different doctrines both called the "work-preservation defense" are potentially relevant here.

The first, which we have already discussed, is described in the Supreme Court's decision in *ILA*, 447 U.S. 490, and typically applies to unfair labor practice charges under section 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B). That work-preservation defense draws a line between primary union activity, which is permissible, and secondary union activity, which is not. *See National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 622–26 (1967) (explaining that, in drafting the Act, Congress was particularly concerned with the evils of secondary activity). Primary activity is aimed at a dispute between an employer and its employees (or the union that represents those employees). *See Kinder Morgan*, 978 F.3d at 637. For example, a union engages in primary activity if it pickets the premises of its members' employer to induce the employer to offer better terms to its members. Secondary activity, by contrast, is directed at one employer but has the

goal of inducing that employer to take some action against a third party with which the union has a dispute. *See National Woodwork*, 386 U.S. at 622. For example, a union engages in secondary activity if it pickets a construction site to pressure the general contractor to fire its subcontractor because that subcontractor has hired non-union workers. In that scenario, the union exerts direct pressure on the general contractor, who is presumably neutral in the dispute between the union and the subcontractor, with the goal that the general contractor will take some action against the subcontractor.

To show that its conduct was primary, not secondary, a union invoking the work-preservation defense must satisfy a two-part test. First, the union must show that its conduct "ha[d] as its objective the preservation of work traditionally performed by employees represented by the union." *ILA*, 447 U.S. at 504. "Second, the contracting employer must have the power to give the employees the work in question." *Id.*

The Board argues that because the *ILA* work-preservation defense exists to separate permissible primary activity from impermissible secondary activity, it can be invoked only when a union is alleged to have engaged in secondary activity—that is, when a union is accused of conducting a secondary boycott in violation of section 8(b)(4)(B). *See* 29 U.S.C. § 158(b)(4)(B). As the Board explains, a pure jurisdictional dispute—which involves an alleged violation of section 8(b)(4)(D)—necessarily does not involve such allegations. That is because a jurisdictional dispute is really an aggregation of two or more primary disputes: Each union vying for the work has a contract directly with the employer, and each union is attempting to get that employer to take some action within the confines of

the employer-employee relationship. *See International Longshoremen's & Warehousemen's Union v. NLRB*, 884 F.2d 1407, 1412–13 (D.C. Cir. 1989). Applying the *ILA* work-preservation defense in that context would give every union an automatic defense to section 8(b)(4)(D) charges, gutting the Board's section 10(k) authority to resolve jurisdictional disputes.

Instead, the Board says, the only work-preservation defense that applies here is the one articulated in the Board's decision in *Highway Truck Drivers & Helpers, Local 107* (*Safeway*), 134 N.L.R.B. 1320 (1961). Under that doctrine, a union can compel the Board to drop section 8(b)(4)(D) charges and quash notice of a section 10(k) hearing if the union shows that the case is actually a "work preservation dispute" between the employer and the union, not a jurisdictional dispute between two unions. *Id.* at 1323. To demonstrate that such a dispute exists, the union must show that it previously performed the work at issue for that employer (and therefore is not seeking to expand its work jurisdiction) and that the employer precipitated the dispute by unilaterally taking some action adverse to the union (usually, by reassigning the work). *See, e.g.*, *Recon Refractory & Const. Inc. v. NLRB*, 424 F.3d 980, 990 (9th Cir. 2005); *Steel, Paper House, Chem. Drivers & Helpers Loc. 578*, 280 N.L.R.B. 818, 820 (1986). Unlike the *ILA* work-preservation defense, the *Safeway* work-preservation defense is not an affirmative defense; it is a way of showing that a putative jurisdictional dispute is not a jurisdictional dispute at all.

Because all parties to this case have conceded that it is a classic jurisdictional dispute—and thus that it is *not* a work-preservation dispute—they agree that the *Safeway* work-preservation defense does not apply. The Board ascribes a

further consequence to that concession: The jurisdictional nature of the dispute makes the *ILA* work-preservation defense inapplicable, too. If we were writing on a blank slate, we might find the Board's argument persuasive. But the Board's argument is foreclosed by our decision in *Kinder Morgan*.

*Kinder Morgan* involved a jurisdictional dispute between ILWU and another union, the Electrical Workers, over maintenance work at a marine terminal operated by Kinder Morgan, a PMA-member employer. 978 F.3d at 628–29. Kinder Morgan had historically subcontracted that work "to a subcontractor which employed workers under its own [collective-bargaining agreement] with the Electrical Workers." *Id.* at 631. When that arrangement persisted after the PCLCD became effective and expanded the scope of the longshoremen's work, ILWU demanded the work for its mechanics. *See id.* The Electrical Workers threatened to picket the Kinder Morgan terminal, and Kinder Morgan asked the Board to invoke section 10(k) to resolve the dispute. *See id.*

The Board awarded the work to the Electrical Workers, and ILWU continued to seek the work by pursuing grievance procedures. *See Kinder Morgan*, 978 F.3d at 631–32. The Board then filed an unfair labor practice charge against ILWU under section 8(b)(4)(D) based on the grievance. *See id.* at 632. ILWU invoked the work-preservation affirmative defense, arguing that the grievance was intended to preserve the work that it bargained for in the PCLCD and was directed at the employer, Kinder Morgan, with the power to assign the work. *See id.* The Board rejected that argument. *See id.* at 632–33.

We reversed the Board's order. *See Kinder Morgan*, 978 F.3d at 630. We held that "[a] valid work-preservation objective provides a complete defense against alleged violations of section 8(b)(4)(D), as well as against jurisdictional disputes under section 10(k)." *Id.* at 637. Thus, we explained, a union can avoid liability under section 8(b)(4)(D) by satisfying the two-part test outlined in *ILA*. *See id*. at 637–38 (citing *ILA*, 447 U.S. at 504). And we emphasized that the work-preservation defense can accommodate situations in which a union has not historically performed the precise work at issue but has bargained for the work to preserve its traditional work patterns in the face of technological changes that eliminated jobs. *See id.* at 638 (citing *ILA*, 447 U.S. at 506).

The Board's conclusion that the *ILA* work-preservation defense was inapplicable here cannot be reconciled with our decision in *Kinder Morgan*. Both cases involve jurisdictional disputes that the Board validly resolved under its section 10(k) authority. In both cases, ILWU lost in the section 10(k) proceedings and then attempted to undermine the Board's award in arbitration, which led the Board to pursue unfair labor practices charges under section 8(b)(4)(D). In this case, ILWU fights that charge by pointing to the same contractual entitlement to work that it pointed to in *Kinder Morgan*. Having allowed it to do so there, we must allow it to do so here.

The Board contests this conclusion on two grounds. Neither is persuasive. First, it points out that *Kinder Morgan*, unlike this case, involved allegations of secondary activity. *See* 978 F.3d at 633 n.10. Specifically, the Board there alleged that ILWU attempted to pressure Kinder Morgan to cease doing business with the subcontractor that hired the Electrical Workers rather than ILWU mechanics. *See id.* at

632. In the Board's view, that secondary-activity allegation made it appropriate for the court to permit ILWU to raise the work-preservation defense, but the lack of a comparable allegation makes it inappropriate here.

While the Board is correct that there was an allegation of secondary activity in *Kinder Morgan*, that was not the only allegation to which we held that the work-preservation defense applied. To the contrary, we held that "[a] valid work preservation objective provides a complete defense against alleged violations of section 8(b)(4)(D), as well as against jurisdictional disputes under section 10(k)." 978 F.3d at 637. We made it clear that allegations of secondary activity do not support charges under section 8(b)(4)(D), nor do they give rise to disputes resolved under section 10(k). As we noted in *Kinder Morgan*, the secondary-boycott allegations there were brought under section 8(b)(4)(B). *Id.* at 633 n.10. Thus, *Kinder Morgan* must mean that the *ILA* work-preservation defense provides a "complete defense against alleged violations of section 8(b)(4)(D)" *in addition to* allegations of secondary activity brought under section 8(b)(4)(B). *Id.* at 637. It is for that reason that the court found it unnecessary to "address [section 8(b)(4)(B)] separately" when delineating the scope of the defense. *See id.* at 633 n.10.

Second, the Board suggests that our reading of *Kinder Morgan* is in tension with our decision in *Recon*, 424 F.3d 980. That case involved a dispute between a construction company, Recon, and a union, the Bricklayers. *See id.* at 981. To reduce costs, Recon fired employees represented by the Bricklayers and reassigned their work to employees represented by another union, IPTW. *See id.* at 982. The Bricklayers filed a grievance and a lawsuit for breach of contract, and IPTW threatened economic action if Recon

reassigned the work to the Bricklayers. *See id.* at 984. Recon asked the Board to resolve the dispute under section 10(k), but the Board refused to do so because it found that Recon had precipitated the dispute by unilaterally reassigning the work to employees represented by IPTW. *See id.* at 985. Citing *Safeway*, the Board found that the conflict was "not a jurisdictional dispute suitable for resolution under § 10(k)" but rather a "work preservation dispute" between Recon and the Bricklayers that had to be resolved through arbitration. *See id.* at 985; *accord USCP-WESCO*, 827 F.2d at 583. We affirmed, describing the showing that the Bricklayers made to avoid adjudication of the dispute under section 10(k) as an invocation of "a work preservation defense." *Recon*, 424 F.3d at 988–89 (quoting *International All. of Theatrical & Stage Emps.*, 337 N.L.R.B. 721, 723 (2002)).

But our decision in *Recon* did not say, as the Board contends, that the *Safeway* work-preservation defense is the *only* defense that is available when a union is alleged to have violated section 8(b)(4)(D) in the context of a jurisdictional dispute. Nor could it have—the Board's finding that Recon precipitated the dispute there meant that no genuine jurisdictional dispute existed, and the Board declined to enter a section 10(k) work award for that reason. *See Recon*, 424 F.3d at 985. The court in *Recon* had no occasion to decide whether a union enmeshed in a genuine jurisdictional dispute can rely on the *ILA* work-preservation defense to avoid liability for conduct contravening an adverse section 10(k) award. That is the central question in this case, and *Kinder Morgan* is the only decision from our circuit that answers it.

In sum, *Kinder Morgan* compels us to hold that a union charged with an unfair labor practice under section 8(b)(4)(D) may raise the *ILA* work-preservation defense

even when the union is not alleged to have engaged in illegal secondary activity. The Board's refusal to entertain the work-preservation defense under *Kinder Morgan* was error, so we remand to the Board to evaluate the merits of the defense in the first instance. Because our conclusion that the Board erred requires vacatur of the Board's order, we do not reach ILWU's alternative argument that the underlying section 10(k) work award was not supported by substantial evidence. For the same reason, we also do not reach IAM's argument that the remedy required by the order was insufficient.

\*          \*          \*

ILWU's petition for review (No. 23-632) and PMA's petition for review (No. 23-658) are granted; IAM's petition for review (No. 23-793) and the Board's cross-petition for enforcement (No. 23-780) are denied. Costs shall be taxed against IAM in No. 23-793 and against the Board in Nos. 23-632, 23-658, and 23-780.

**VACATED and REMANDED.**

---

MILLER, Circuit Judge, concurring:

I join the court's opinion, which correctly applies our decision in *International Longshore and Warehouse Union v. NLRB* (*Kinder Morgan*), 978 F.3d 625 (9th Cir. 2020). I write separately to express my view that *Kinder Morgan* was wrongly decided. *Kinder Morgan* applies an affirmative defense that the Supreme Court created to cabin the reach of one statutory provision, section 8(b)(4)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(B), to cases arising under a separate statutory provision, section

8(b)(4)(D), *id.* § 158(b)(4)(D). It is not supported by precedent; it creates a circuit conflict; and it undermines Congress's decision to empower the Board to resolve jurisdictional disputes.

Under section 8(b)(4)(B), it is an unfair labor practice for a union to "forc[e] or requir[e] any person . . . to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(B). Section 8(b)(4)(B) proscribes only secondary union activity; it does not prohibit "any primary strike or primary picketing." *Id.*; *see National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 620 (1967). That is, a union violates section 8(b)(4)(B) only when it attempts to prevail in a dispute with one employer by involving another employer that is neutral to that dispute. But if a union's conduct is aimed at a dispute within the employer-employee relationship—in other words, if it is primary—the union does not violate section 8(b)(4)(B).

To distinguish between permissible primary conduct and impermissible secondary conduct, the Supreme Court developed the work-preservation defense. The defense requires a two-part showing. First, the union's conduct "must have as its objective the preservation of work traditionally performed by employees represented by the union." *NLRB v. International Longshoremen's Ass'n* (*ILA*), 447 U.S. 490, 504 (1980). By focusing on work historically performed by the union's members, the first part of the test ensures that the union is truly attempting to *preserve* existing work rather than attempting to *acquire* new work. Second, the union must show that "the contracting employer [has] the power to give the employees the work in question." *Id.* If the employer does not have that power, "it is reasonable to infer that the agreement has a secondary objective, that is, to influence

whoever does have such power over the work." *Id.* at 504–05.

Because the *ILA* work-preservation defense allows a union to demonstrate that it did not act with an illegal secondary objective, the Board has historically entertained the defense only when a union is alleged to have engaged in secondary activity in violation of section 8(b)(4)(B). *See, e.g.*, *International Longshoremen's Ass'n*, 372 N.L.R.B. No. 36 (Dec. 16, 2022) (dismissing a section 8(b)(4)(B) charge under the work-preservation defense); *Teamsters Nat'l Auto. Transporters Indus. Negotiating Comm.*, 335 N.L.R.B. 830, 832 (2001) (same). We have done the same. *See, e.g.*, *Associated Gen. Contractors of California, Inc. v. NLRB*, 514 F.2d 433, 438 (9th Cir. 1975) (rejecting work-preservation defense raised against section 8(b)(4)(B) charges after determining that the union's objective was work acquisition).

That changed in *Kinder Morgan*. There, we held that the *ILA* work-preservation defense can be raised "against alleged violations of section 8(b)(4)(D)," in addition to alleged violations of section 8(b)(4)(B). 978 F.3d at 637. Section 8(b)(4)(D) addresses jurisdictional disputes, which arise when two unions have valid contractual claims to the same work and one or both of those unions seeks to secure the work for its employees through means such as picketing. Fearing the labor instability that jurisdictional disputes generate, Congress directed the Board to resolve those disputes through section 10(k), 29 U.S.C. § 160(k). *See NLRB. v. Radio & Television Broad. Eng'rs Union*, 364 U.S. 573, 580 (1961). A section 10(k) work award is not independently binding but is enforced through section 8(b)(4)(D). *See NLRB v. Plasterers' Loc. Union No. 79*, 404 U.S. 116, 126–27 (1971). If the union that is not

awarded the work complies with the Board's work award, the initial section 8(b)(4)(D) charges will be dismissed. *See id.* at 127. But if that union continues to pursue the disputed work, a further section 8(b)(4)(D) complaint will issue, and the union will likely be found guilty of an unfair labor practice. *See id.*

In the context of section 8(b)(4)(D), the Board has recognized a different (but confusingly similarly named) work-preservation defense. *See Highway Truck Drivers & Helpers, Local 107* (*Safeway*), 134 N.L.R.B. 1320 (1961). The *Safeway* work-preservation defense allows a union to compel the Board to drop section 8(b)(4)(D) charges and quash notice of a section 10(k) hearing if it can show that the case is actually a work-preservation dispute between the employer and the union, and not a jurisdictional dispute between two unions. *Id.* at 1323. But it was never meant to apply where, as here, two unions have a genuine jurisdictional dispute.

Grafting the *ILA* work-preservation defense onto section 8(b)(4)(D), as *Kinder Morgan* did, undermines the jurisdictional dispute-resolution scheme enacted by Congress. The Board's section 10(k) work award is effective because of the prospect of a follow-on section 8(b)(4)(D) charge. But a union entangled in a jurisdictional dispute now has little reason to worry about that section 8(b)(4)(D) charge because it will almost always be able to escape section 8(b)(4)(D) liability by raising the work-preservation defense that prevailed in *Kinder Morgan*. That is because every jurisdictional dispute, by its nature, involves two irreconcilable primary disputes—each one between the employer who has the authority to control the work and a union whose collective bargaining agreement seeks to preserve the union's work jurisdiction. *See International*

*Longshoremen's & Warehousemen's Union v. NLRB* (*Sea-Land*), 884 F.2d 1407, 1408 (D.C. Cir. 1989). By providing the disappointed union with a reliable affirmative defense to the prospective section 8(b)(4)(D) charge, *Kinder Morgan* renders the section 10(k) work award illusory by removing the union's incentive to comply with it.

No precedent supports that result. *Kinder Morgan* cited several Supreme Court cases in support of its holding, but each of those cases involved charges brought under section 8(b)(4)(B), not section 8(b)(4)(D). *See National Woodwork*, 386 U.S. at 644–46; *ILA*, 447 U.S. at 503–13; *NLRB v. International Longshoremen's Ass'n*, 473 U.S. 61, 79–82 (1985). And an affirmative defense available in the section 8(b)(4)(B) context should not be reflexively imported to the section 8(b)(4)(D) context because "the theoretical bases for each charge are different." *Sea-Land*, 884 F.2d at 1412 (quoting *International Longshoremen's & Warehousemen's Union, Loc. 62-B v. NLRB*, 781 F.2d 919, 922 (D.C. Cir. 1986)). Indeed, the only other circuit to have squarely confronted this question concluded that the *ILA* work-preservation defense does *not* immunize conduct charged under section 8(b)(4)(D). *See id.* at 1410–13. In so holding, the District of Columbia Circuit intimated what the facts here make clear: Permitting a union to raise the work preservation defense to a section 8(b)(4)(D) charge would unravel the mechanism that Congress created to enable the Board to resolve jurisdictional disputes. *See id.* at 1413.

Attempting to defend *Kinder Morgan*, ILWU argues that allowing a union to raise the section 8(b)(4)(B) *ILA* work-preservation defense to a section 8(b)(4)(D) charge fosters labor peace by assuring contracting parties that their negotiated compromises will be respected. The problem, of course, is that while deference to contractual solutions may

be ILWU's preferred method of ensuring labor peace, it was not Congress's. Congress concluded that jurisdictional disputes should be resolved by the Board under its section 10(k) authority. And although Congress empowered the Board to *consider* the parties' collective bargaining agreements in the section 10(k) hearing, it left to the Board alone the task of weighing that factor against the other relevant considerations. *See International Ass'n of Machinists, Lodge 1743*, 135 N.L.R.B. 1402, 1405–10 (1962); 29 U.S.C. § 160(k).

As a three-judge panel, we are bound by *Kinder Morgan*, which compels us to vacate the Board's order. But the court should reconsider it en banc.

## <u>CERTIFICATE OF SERVICE</u>

I am a citizen of the United States and an employee in the County of Emeryville, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is1375 55th Street, Emeryville, California 94608.

I hereby certify that on July 14, 2025, I electronically filed the foregoing **PETITION FOR HEARING EN BANC**  with the United States Court of Appeals, for the Ninth Circuit, by using the Court's CM/ECF system.

I certify under penalty of perjury that the above is true and correct. Executed at Emeryville, California, on July 14, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Notice of Electronic Filing by CM/ECF system.

Denise Taylor