**Nos. 23-632, 23-658, 23-780, 23-793**

# In the United States Court of Appeals
FOR THE NINTH CIRCUIT

PACIFIC MARITIME ASSOCIATION,
*Petitioner*,

v.

NATIONAL LABOR RELATIONS BOARD,
*Respondent*,

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, DISTRICT 160, LOCAL LODGE 289,
*Intervenor*.

On Petitions for Review of an Order of the National Labor Relations Board

# PACIFIC MARITIME ASSOCIATION'S RESPONSE TO THE PETITIONS FOR REHEARING EN BANC

GEOFFREY J. ROSENTHAL
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
(215) 963-5141

JONATHAN C. FRITTS
MICHAEL E. KENNEALLY
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-3000

*Counsel for Pacific Maritime Association*

## CORPORATE DISCLOSURE STATEMENT

Pacific Maritime Association is a non-profit mutual benefit corporation organized and existing under and by virtue of the laws of the State of California. There is no parent corporation or any publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......... i
TABLE OF AUTHORITIES .......... iii
INTRODUCTION .......... 1
BACKGROUND .......... 3
ARGUMENT .......... 11
I. *Kinder Morgan* appropriately protects collective bargaining over labor-saving technological advances in complex multiemployer relationships. .......... 11
II. *Kinder Morgan* does not conflict with *Sea-Land* or any other appellate decision. .......... 16
III. This case would be a bad vehicle for revisiting *Kinder Morgan*. .......... 22
CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Highway Truck Drivers & Helpers, Loc. 107* (*Safeway*),
134 N.L.R.B. 1320 (1961) ....................................................................12

*IAM* (*SSA Terminals*),
369 N.L.R.B. No. 126 (July 16, 2020) ..............................................8, 16, 18

*ILWU* (*Cal. Cartage*),
208 N.L.R.B. 986 (1974) ......................................................................6

*ILWU* (*SSA Terminals*),
372 N.L.R.B. No. 66 (Apr. 6, 2023) ...........................................2, 9, 21, 22

*ILWU v. NLRB* (*Sea-Land*),
884 F.2d 1407 (D.C. Cir. 1989)..........................................................*passim*

*ILWU v. NLRB* (*Kinder Morgan*),
978 F.3d 625 (9th Cir. 2020)..............................................................*passim*

*ILWU, Loc. 14 v. NLRB* (*Sierra Pac. Indus.*),
85 F.3d 646 (D.C. Cir. 1996)..................................................................20

*Int'l Tel. & Tel. Corp. v. Loc. 134*,
419 U.S. 428 (1975)................................................................................4

*Int'l Union of Operating Eng'rs, Loc. 18 v. NLRB*,
712 F. App'x 511 (6th Cir. 2017) ...........................................................22

*Loc. 30, United Slate, Tile & Composition Roofers v. NLRB*,
1 F.3d 1419 (3d Cir. 1993) ....................................................................21

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................................23

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Nat'l Woodwork Mfrs. Ass'n v. NLRB*,
386 U.S. 612 (1967)....................4, 5, 11

*New Orleans Typographical Union No. 17 v. NLRB*,
368 F.2d 755 (5th Cir. 1966)....................22

*NLRB v. Int'l Longshoremen's Ass'n* (*ILA I*),
447 U.S. 490 (1980)....................*passim*

*NLRB v. Int'l Longshoremen's Ass'n* (*ILA II*),
473 U.S. 61 (1985)....................5

*NLRB v. Plasterers' Loc. Union No. 79*,
404 U.S. 116 (1971)....................4

*NLRB v. Radio & Television Broad. Eng'rs Union* (*CBS*),
364 U.S. 573 (1961)....................5, 11, 12

*Pac. Mar. Ass'n v. NLRB*,
827 F.3d 1203 (9th Cir. 2016)....................19

*Recon Refractory & Constr. Inc. v. NLRB*,
424 F.3d 980 (9th Cir. 2005)....................4, 11

*S.C. State Ports Auth. v. NLRB*,
75 F.4th 368 (4th Cir. 2023)....................22

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)....................23

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)....................3, 23

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Shipowners Ass'n of the Pac. Coast*,
7 N.L.R.B. 1002 (1938) .......... 6

*Summerlin v. Stewart*,
309 F.3d 1193 (9th Cir. 2002) .......... 24

*United States v. Pac. Mar. Ass'n*,
229 F. Supp. 2d 1008 (N.D. Cal. 2002) .......... 7

**STATUTES**

28 U.S.C. § 46(c) .......... 24

29 U.S.C.
§ 151 *et seq.* (National Labor Relations Act) .......... *passim*
§ 158(b)(4)(i)-(ii)(B) (NLRA § 8(b)(4)(B)) .......... *passim*
§ 158(b)(4)(i)-(ii)(D) (NLRA § 8(b)(4)(D)) .......... *passim*
§ 160(k) (NLRA § 10(k)) .......... *passim*

## INTRODUCTION

The Panel correctly held that this appeal is controlled by the unanimous ruling in *ILWU v. NLRB* (*Kinder Morgan*), 978 F.3d 625 (9th Cir. 2020). The National Labor Relations Board ("Board" or "NLRB") now contends that "*Kinder Morgan* creates a circuit split on an issue of exceptional importance." NLRB Pet. 2. But the Board's contention is not credible. The agency lost *Kinder Morgan* just as it lost this case, yet it made no effort to challenge its loss in *Kinder Morgan* through a petition for rehearing or writ of certiorari. Had *Kinder Morgan* actually created a circuit split on an exceptionally important issue, the NLRB would have said something at the time. Instead, it accepted *Kinder Morgan* and seemed to move on.

Here, in contrast, the NLRB and the International Association of Machinists and Aerospace Workers ("IAM") mount a broad attack against *Kinder Morgan* based on Judge Miller's concurring opinion in this case. The concurrence argues that *Kinder Morgan* was wrongly decided and created a circuit split with *ILWU v. NLRB* (*Sea-Land*), 884 F.2d 1407, 1408 (D.C. Cir. 1989). Respectfully, the concurrence and rehearing petitions overlook significant differences between this case and that one. *Sea-Land* has not been interpreted as adopting the broad categorical rule that the concurrence and

petitions ascribe to it. On the contrary, *Sea-Land* noted that the International Longshore and Warehouse Union ("ILWU") made a limited argument in that case, and the D.C. Circuit focused on that more limited argument. *Sea-Land* and *Kinder Morgan* are reconcilable, and there is no circuit split. And besides, *Kinder Morgan* soundly applies Supreme Court precedent to the specific circumstances presented here and has not been criticized in any judicial ruling. There is no reason to revisit it.

But even if there were reason to revisit *Kinder Morgan*, this would be an inappropriate case in which to do so. In the administrative decision on review, the NLRB did not espouse the legal theory now advanced by NLRB counsel and reflected in the Panel concurrence—namely that *Kinder Morgan* is wrong because labor law recognizes two distinct "work preservation" doctrines, one applicable to unfair labor practice charges under 29 U.S.C. § 158(b)(4)(i)-(ii)(B) ("Section 8(b)(4)(B)") and the other to charges under 29 U.S.C. § 158(b)(4)(i)-(ii)(D) ("Section 8(b)(4)(D)"). Rather than suggest that *Kinder Morgan* was wrongly decided, the Board in this case tried to distinguish *Kinder Morgan* on factual grounds. *See ILWU* (*SSA Terminals*), 372 N.L.R.B. No. 66, slip op. at 1-2 (Apr. 6, 2023).

Given that rationale, the *Chenery* doctrine precludes this Court from affirming the Board's decision on the different legal theory that the petitions for rehearing want the en banc Court to embrace. Courts reviewing agency action "must judge the propriety of such action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Neither petition for rehearing challenges the Board's attempt to distinguish *Kinder Morgan*, which the panel unanimously rejected. This case would therefore be a poor use of en banc resources.

What's more, the Pacific Maritime Association ("PMA") and ILWU both advanced alternative grounds for reversal that the Panel did not reach given *Kinder Morgan* but that the en banc Court would need to reach if it overruled *Kinder Morgan*. For this reason too, this is a bad candidate for rehearing en banc. The petitions should be denied.

## BACKGROUND

I. This case centers on a highly technical area of federal labor law. Congress amended the National Labor Relations Act ("NLRA") in 1947 to provide several protections for employers facing economic pressure from a union. These protections include NLRA Section 8(b)(4)(B) and Section 8(b)(4)(D). 29 U.S.C. § 158(b)(4)(i)-(ii)(B), (D). Section 8(b)(4)(B)

proscribes so-called "secondary" boycotts, which arise when one employer has a dispute with its union and the union pressures a second employer to stop doing business with the first. *See Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 623-25 (1967). Section 8(b)(4)(D), meanwhile, proscribes actions that pressure an employer to assign work to employees in one union rather than another. This provision is "interlocked" with simultaneously enacted NLRA Section 10(k), 29 U.S.C. § 160(k). *NLRB v. Plasterers' Loc. Union No. 79*, 404 U.S. 116, 123 (1971). Section 10(k) directs the Board to resolve disputes arising from alleged violations of Section 8(b)(4)(D) by awarding the disputed work to workers represented by one of the claiming unions, in what is akin to "an advisory opinion." *Int'l Tel. & Tel. Corp. v. Loc. 134*, 419 U.S. 428, 446 (1975).

The Supreme Court has long recognized that the "central theme" pervading Section 8(b)(4) is "protection for the neutral employer"—that is, an employer that is "neutral[] between contending parties . . . in disputes not his own." *Nat'l Woodwork*, 386 U.S. at 625-26. Consistent with that theme, Section 8(b)(4)'s protections do not apply when unions are applying economic pressure to protect work they traditionally performed. *See, e.g., id.* at 635 (discussing Section 8(b)(4)(B) charges); *Recon Refractory & Constr. Inc.*

*v. NLRB*, 424 F.3d 980, 988-89 (9th Cir. 2005) (discussing Section 8(b)(4)(D) charges). Similarly, Sections 8(b)(4)(B) and 8(b)(4)(D) are not meant to undercut lawful work-preservation agreements—that is, contractual provisions entitling a union to certain work. *See, e.g.*, *Nat'l Woodwork*, 386 U.S. at 640-43 (discussing Section 8(b)(4)(B) and 8(e) charges); *NLRB v. Radio & Television Broad. Eng'rs Union* (*CBS*), 364 U.S. 573, 577 n.12 (1961) (discussing Section 8(b)(4)(D) charges).

The NLRB and courts have sometimes disagreed about the appropriate breadth of work-preservation agreements. Most relevant here are a pair of Supreme Court cases addressing work-preservation agreements for a multiemployer bargaining unit of longshore workers on the East and Gulf Coasts. *See NLRB v. Int'l Longshoremen's Ass'n* (*ILA I*), 447 U.S. 490 (1980); *NLRB v. Int'l Longshoremen's Ass'n* (*ILA II*), 473 U.S. 61 (1985).

The *ILA* cases addressed a situation in which longshore workers' "traditional work [was] displaced, or threatened with displacement, by technological innovation." *ILA I*, 447 U.S. at 505; *see also ILA II*, 473 U.S. at 79-82. When technological innovation threatens a union's traditional work, the *ILA* cases permit the union to bargain to "preserve" certain other work even if the union's "members had never performed such work" before the

new technologies threatened their jobs. *ILA I*, 447 U.S. at 506. Under the *ILA* cases, the concept of work preservation is not restricted to work already performed by the workers at a particular location or for a particular employer. Rather, a lawful work-preservation objective exists if the work is *functionally equivalent* to work performed by longshore workers at that location *or elsewhere* in the coastwide bargaining unit. *See id.* at 506-07.

II. PMA and the ILWU have a historic collective-bargaining relationship that has held up for almost ninety years. *See ILWU* (*Cal. Cartage*), 208 N.L.R.B. 986, 987 (1974). It arose out of a devastating coastwide strike—sometimes called the "Big Strike"—which lasted several months in 1934 and required President Roosevelt's intervention. *See Shipowners Ass'n of the Pac. Coast*, 7 N.L.R.B. 1002, 1008-09 (1938). Afterward, the NLRB certified the ILWU as the representative of longshore workers in a coastwide, multiemployer bargaining unit consisting of "all the workers employed at longshore labor in the Pacific Coast ports of the United States." *Id.* at 1022.

For most of their relationship, an important subject for both the ILWU and PMA has been new technologies' effect on longshore work. In 2002, ILWU and PMA negotiations broke down over this topic, leading to work

slowdowns and a lockout of more than 10,000 longshore workers in ports along the Pacific Coast. *See United States v. Pac. Mar. Ass'n*, 229 F. Supp. 2d 1008, 1008 (N.D. Cal. 2002). Having concluded that this Pacific Coast labor dispute threatened national health and safety, President Bush used his statutory power under federal law—a power not invoked in decades—to obtain an injunction against the slowdowns and lockout. *Id.* at 1010-11.

In 2008, PMA and the ILWU successfully bargained over the introduction of automated machine and equipment technologies and their effects on longshore jobs. Employers would have the right to automate operations and introduce new technologies, and in exchange would assign ILWU longshore workers additional maintenance and repair work on the equipment used to handle cargo and load and unload ships. This bargain was memorialized in a coastwide collective bargaining agreement, the Pacific Coast Longshore Contract Document ("PCLCD"). *See Kinder Morgan*, 978 F.3d at 630-31.

III. One of the facilities subject to this agreement is Seattle Terminal 5. When PMA member SSA Terminals ("SSAT") began operating Terminal 5 in 2018, it assigned maintenance and repair work to ILWU mechanics as the

PCLCD required it to do. But SSAT also has a collective-bargaining relationship with the IAM, which represents mechanics at certain other SSAT facilities that were "red-circled" in the 2008 agreement. In March 2019, the IAM threatened to picket SSAT over its assignment of this maintenance and repair work to ILWU mechanics. Based on that threat, SSAT filed a charge against the IAM under Section 8(b)(4)(D). The Board then conducted a Section 10(k) proceeding and ultimately awarded the work to IAM mechanics rather than ILWU mechanics. *IAM* (*SSA Terminals*), 369 N.L.R.B. No. 126 (July 16, 2020).

After SSAT began assigning the work to IAM mechanics, the ILWU filed a contractual grievance against SSAT under the PCLCD. As SSAT's collective-bargaining representative, PMA defended SSAT during the contractual proceedings. The arbitrator found, however, that SSAT violated the PCLCD based on its conduct during the Section 10(k) hearing—namely, failing to defend its original work assignment to the ILWU mechanics or state a preference to have the work done by the ILWU mechanics.

SSAT and the IAM then filed unfair labor practice charges against the ILWU. Because the PCLCD requires PMA (and the ILWU) to adhere to their arbitrator's rulings, PMA participated in the new Board proceedings as a party in interest to defend the PCLCD's work-preservation provisions and the arbitrator's award.[1]

An NLRB administrative law judge ("ALJ") found that the ILWU failed to establish a legitimate work-preservation defense to the Section 8(b)(4)(D) charges. *ILWU* (*SSA Terminals*), 372 N.L.R.B. No. 66, slip op. at 17. He did not suggest that the *ILA* work-preservation doctrine was categorically inapplicable in Section 8(b)(4)(D) cases. Rather, he found that the doctrine did not apply on the facts because ILWU mechanics did not have a sufficient history of performing maintenance and repair work for SSAT or at the Port of Seattle. *Id.* He also determined that such work was "not the functional equivalent of traditional stevedoring work." *Id.*

---

[1] The Panel opinion misstates PMA's involvement by claiming that PMA supported SSAT's unfair labor practice charge against the ILWU. Panel Op. 10. While PMA defended SSAT in the contractual arbitration proceeding, PMA defended the arbitrator's ruling before the NLRB.

The Board adopted the ALJ's finding that the ILWU failed to establish a legitimate work-preservation defense. *Id.* at 1. Like the ALJ, the Board did not suggest that the work-preservation defense was categorically inapplicable in a Section 8(b)(4)(D) proceeding. Instead, the Board purported to distinguish this Court's decision in *Kinder Morgan*, which had upheld a work-preservation defense in response to a different Section 8(b)(4)(D) charge against the ILWU. *Id.* at 1-2.

In this Court, the Panel disagreed and held that *Kinder Morgan* was not distinguishable. Panel Op. 16-19. Under *Kinder Morgan*, the ILWU could pursue a work-preservation defense under the *ILA* cases, and the Board erred in failing to sufficiently consider that defense. *Id.* at 18-19. The Panel noted that the ILWU's appeal also challenged the Board's underlying Section 10(k) award (as had PMA's), but the Panel did not reach that argument. *Id.* at 19. Judge Miller concurred separately to express his view that *Kinder Morgan* was wrongly decided and in conflict with the D.C. Circuit's decision in *Sea-Land* because it permitted a work-preservation defense against a Section 8(b)(4)(D) charge under the standard from the *ILA* cases.

## ARGUMENT

### I. *Kinder Morgan* appropriately protects collective bargaining over labor-saving technological advances in complex multiemployer relationships.

The NLRB and IAM's argument for rehearing rests on the premise that labor law has two fundamentally different "work-preservation" doctrines. One doctrine, they contend, empowers the Board to quash a notice of a Section 10(k) hearing on the ground that the dispute is not a true "jurisdictional" dispute. A distinct doctrine, according to their description, provides a defense against Section 8(b)(4)(B) charges by showing that the union is seeking to preserve its traditional work and thus acting with a lawful "primary" purpose rather than an unlawful "secondary" purpose. *See* NLRB Pet. 9-14; IAM Pet. 1. In making these arguments, the NLRB and IAM echo Judge Miller's concurring opinion. Panel Op. 19-24.

This dichotomy is mistaken. For *both* Section 8(b)(4)(B) and Section 8(b)(4)(D) charges, long-settled precedent acknowledges a union's right to use economic pressure to enforce collective bargaining agreement provisions that preserve work the union has traditionally performed. *See Nat'l Woodwork*, 386 U.S. at 635, 640-43; *CBS*, 364 U.S. at 577 n.12; *Recon Refractory*, 424 F.3d at 988-91. The Supreme Court has indeed recognized

that one of the "primary purposes" of the NLRA is "the purpose of preserving for the contracting employees themselves work traditionally done by them." *ILA I*, 447 U.S. at 504 (citation omitted). That objective would be thwarted if the Board could freely override lawful work-preservation clauses through Section 10(k) proceedings. Such a regime would "encourage disregard for observance of binding obligations under collective-bargaining agreements and invite the very jurisdictional disputes Section 8(b)(4)(D) is intended to prevent." *CBS*, 364 U.S. at 577 n.12 (citation omitted). That is why the Board has long refused to issue Section 10(k) awards against unions using economic pressure to preserve work they have traditionally performed. *See, e.g.*, *Highway Truck Drivers & Helpers, Loc. 107* (*Safeway*), 134 N.L.R.B. 1320 (1961).

Over time, the framework for determining *what qualifies* as work traditionally performed by employees in a particular union—as opposed to an expansion of the union's jurisdiction through the acquisition of new work—has evolved in ways important to cases like this one. Before *ILA I*, the Board took a strict view finding work acquisition, not preservation, if the employees in the union "had never performed the precise work at issue at the precise location in question." *Kinder Morgan*, 978 F.3d at 638 (citing *ILA I*,

447 U.S. at 506). But the Supreme Court found that view to be too strict—indeed, "incorrect as a matter of law"—in cases where technological advances threaten traditional work patterns in a complex and tremendously important industry like the coastwide maritime shipping industry. *ILA I*, 447 U.S. at 507. Often, the Court explained, "technological innovation may change the method of doing the work, instead of merely shifting the same work to a different location." *Id.* at 505. So in such cases of technological innovation, the concept of work preservation must be more flexible and accommodating than it might be in other contexts. *Kinder Morgan*, 978 F.3d at 639.

That flexibility has been especially important for the longshore industry, as the *ILA* cases illustrate. Those cases grew out of the "containerization" revolution in maritime shipping: the use of "large, reusable metal receptacles, ranging in length from 20 to 40 feet and capable of carrying upwards of 30,000 pounds of freight, which can be moved on and off an ocean vessel unopened." *ILA I*, 447 U.S. at 494. Compared to traditional methods of shipping breakbulk cargo, containers dramatically cut down on the time required to load and unload ships. *Id.* at 494-95. This "was a technological advance of great importance to the shipping industry

which at the same time threatened the jobs of longshoremen by dramatically increasing their productivity." *Id.* at 496. The longshore workers could have dug in their heels and flatly resisted the introduction of this hugely beneficial technological advance. *See id.* Instead, they struck a bargain that accepted containerization in exchange for certain rights to load and empty the containers. *Id.* at 498-99.

More recently, PMA and the ILWU have successfully bargained over valuable new technologies enabling the automation of traditional longshore work. The Court recounted this history in *Kinder Morgan*. PMA members received a right to use more labor-saving automated equipment in exchange for ILWU workers' right to perform maintenance and repair on such equipment. *Kinder Morgan*, 978 F.3d at 631. Allowing the Board to override these important and valuable efforts to preserve longshore work while accommodating technological advances would subvert the goals of federal labor law, which has a strong "preference for addressing 'the threats to workers posed by increased technology and automation' by means of 'labor-management agreements to ease these effects through collective bargaining on this most vital problem.'" *ILA I*, 447 U.S. at 505 (citation omitted). Under too rigid a concept of work-preservation agreements, the "doctrine is sapped

of all life." *Id.* at 508 (citation omitted). That concern is equally valid whether the Board conducts Section 8(b)(4)(B) proceedings (as in *ILA I*) or Section 10(k)/Section 8(b)(4)(D) proceedings (as in *Kinder Morgan* and this case).

Here, as in *Kinder Morgan*, upholding the Board's decisions would undermine these bedrock goals of federal labor law. And not just that, it could jeopardize, on a coastwide basis, the important labor peace that PMA and the ILWU secured through their 2008 bargain. Labor strife within this relationship can be devastating to the nation's economy and security, as shown by the conflicts of 1934 and 2002 and the interventions by Presidents Roosevelt and Bush. The *Kinder Morgan* decision accounts for these complex dynamics and helps guard against such a serious risk.

The petitions for rehearing and Judge Miller's concurrence suggest that applying the *ILA* cases in Section 8(b)(4)(D) cases would effectively eliminate the Board's ability to resolve jurisdictional disputes between unions. This concern is unwarranted. There is no reason to assume that in every jurisdictional dispute both unions will have equally strong work-preservation arguments. Here, for example, while the ILWU has on-point precedent upholding the PCLCD's work-preservation provision under the

*ILA* cases, the IAM has not advanced the same sort of work-preservation argument—not even in the original Section 10(k) proceeding when SSAT filed an unfair labor practice charge against the IAM. There was no reason for the ILWU to assert a work-preservation defense in the Section 10(k) proceeding because SSAT had assigned the work to the ILWU. But the IAM had an incentive to assert any viable work-preservation argument at that stage as a defense to its challenged conduct.

Moreover, any practical problem in this case results not from following *Kinder Morgan* but from the NLRB's erroneous Section 10(k) award. The NLRB improperly awarded the work to the IAM despite SSAT's decision to assign the work to the ILWU according to the PCLCD. *SSA Terminals*, 369 N.L.R.B. No. 126, slip op. at 3-4. Had the NLRB made the correct Section 10(k) award consistent with SSAT's original work assignment, the ILWU would never have had to pursue a contractual grievance or invoke its work-preservation defense.

## II. *Kinder Morgan* does not conflict with *Sea-Land* or any other appellate decision.

The petitions and concurrence invoke the D.C. Circuit's decision in *Sea-Land* to argue that *ILA* work preservation is irrelevant in Section

10(k)/Section 8(b)(4)(D) disputes. But the *Sea-Land* decision does not go so far, and *Kinder Morgan* did not create a circuit split.

In *Sea-Land*, the Board's Section 10(k) decision awarded the disputed work to the Teamsters rather than ILWU-represented employees. 884 F.2d at 1409. Much as here, the ILWU filed a grievance seeking payments for the disputed work after the unfavorable Section 10(k) award, prompting a Section 8(b)(4)(D) charge from the employer. *Id.* at 1410. In *Sea-Land*, however, the ILWU raised several defenses against the Section 8(b)(4)(D) charge—including that the Section 10(k) award did not cover the work for which the ILWU was seeking payment and that the dispute was not a true jurisdictional dispute. *Id.* at 1410-11. The Board and D.C. Circuit rejected both arguments. *Id.* at 1411-12.

Only then did the D.C. Circuit turn to the topic of work preservation. True, the court identified (in a very brief discussion) some differences between Sections 8(b)(4)(B) and 8(b)(4)(D). For example, the court noted that the *ILA* work-preservation test provides a defense to a Section 8(b)(4)(B) charge by establishing a primary dispute rather than a secondary boycott while a Section 8(b)(4)(D) charge "assumes a primary dispute between two separate groups of employees and an employer." *Id.* at 1412. Despite these

observations, however, the D.C. Circuit did not hold that *ILA* work preservation is categorically irrelevant for a Section 8(b)(4)(D) charge or Section 10(k) proceeding. It is not even clear from the court's discussion that *Sea-Land* involved a true *ILA* work-preservation agreement, through which the union bargained for specific work in exchange for the use of new technology. *See id.* at 1408-09. And in all events, the court emphasized that the ILWU "did not challenge the merits of the section 10(k) award" in the other union's favor. *Id.* at 1413 n.10. The court therefore left open the possibility that "[w]ork preservation may or may not be a factor considered by the Board when determining the merits of a section 10(k) proceeding," suggesting it might draw a different conclusion if a future case presented different facts or arguments. *Id.*

Here, unlike *Sea-Land*, the ILWU and PMA both challenge the merits of the Board's Section 10(k) award, which overrode SSAT's assignment of the disputed work to the ILWU through a lawful *ILA* work-preservation agreement. In doing so, the Board discounted compliance with the PCLCD as a valid reason for that assignment. The Board's Section 10(k) decision improperly inferred that "but for the ILWU-PMA agreement," SSAT would have preferred to assign the work to the IAM. *SSA Terminals*, 369 N.L.R.B.

No. 126, slip op. at 4. Had the Board not dismissed the significance of SSAT's compliance with the PCLCD's work-preservation provisions, there would have been no need for the ILWU to litigate a work-preservation defense in later Section 8(b)(4)(D) proceedings.

It is well settled under Supreme Court and Ninth Circuit precedent that the ILWU and PMA are entitled to challenge the merits of the Section 10(k) award through the later Section 8(b)(4)(D) proceedings. *Kinder Morgan*, 978 F.3d at 634-35 (collecting cases). Under this long line of precedent, "[t]he Board is . . . free to revisit in a § 8(b)(4)(D) proceeding issues on which it had previously ruled in a § 10(k) decision." *Pac. Mar. Ass'n v. NLRB*, 827 F.3d 1203, 1211 (9th Cir. 2016). "Indeed, reconsideration of § 10(k) rulings appears implicitly to be contemplated by the statutory scheme, given that a § 8(b)(4)(D) proceeding involves a full adversarial adjudication, in contrast with the informal proceedings required under § 10(k)." *Id.* Neither petition for rehearing challenges this point. Nor do they give any reason to conclude that the principles and concerns that underlie the *ILA* work-preservation test should be disregarded when a Section 10(k) award is subject to a court's reevaluation. Because the D.C. Circuit explicitly left that question open, *Sea-Land* provides no reason to foreclose application of the *ILA* work-

preservation test when, as here, the Section 10(k) award is being challenged in the Section 8(b)(4)(D) proceeding.

Nor has the D.C. Circuit interpreted *Sea-Land* in so sweeping a fashion. Consider *ILWU, Local 14 v. NLRB* (*Sierra Pacific Industries*), 85 F.3d 646, 648 (D.C. Cir. 1996). There, the ILWU raised an *ILA* work-preservation defense to a Section 8(b)(4)(D) charge in a case (unlike *Sea-Land*) where the ILWU also challenged the adverse Section 10(k) decision. Under the NLRB and IAM's broad reading of *Sea-Land*, the D.C. Circuit should have ruled that the *ILA* defense is categorically off-limits for such a charge. But the D.C. Circuit did not write that opinion. It did not say the *ILA* cases were irrelevant as a matter of law. Rather, it rejected the work-preservation defense *on the merits*. *Id.* at 654. And it found the *ILA* cases "plainly distinguishable because they involved disputes between employers and unions regarding the proper interpretation of existing collective bargaining agreements," while Sierra Pacific had "never been party" to an agreement with the ILWU. *Id.* at 654 n.4.

Nor, for its part, has the NLRB previously suggested that *Kinder Morgan* created a circuit split. In *Kinder Morgan* itself, despite this Court's clear holding that *ILA* work preservation is a defense to Section 8(b)(4)(D)

charges, the NLRB did not petition for rehearing or certiorari. The NLRB barely even mentioned *Sea-Land* in its *Kinder Morgan* briefing, citing it only in one footnote, as part of a string-cite, for the idea that pursuing contractual grievances in arbitration can qualify as economic pressure barred by Section 8(b)(4)(D). Br. for the NLRB at 23 n.9, *Kinder Morgan*, *supra* (No. 19-70297). The NLRB did not argue that *ILA* work preservation was categorically unavailable as a defense. It argued, instead, that the ILWU failed to prove that defense, and at most argued that the stricter, pre-*ILA* test for work preservation should apply in cases involving charges under both Section 8(b)(4)(B) and (D). *Id.* at 29-30. Likewise, here, the NLRB's and ALJ's decisions sought to distinguish *Kinder Morgan* on the facts but did not make the broad categorical argument now advanced by Board counsel and the IAM. *SSA Terminals*, 372 N.L.R.B. No. 66, slip op. at 2-3, 17-18.

Because *Kinder Morgan* does not split from *Sea-Land*, the key premise of the petitions for rehearing is mistaken. Nor does *Kinder Morgan* conflict with any of the other circuit court rulings cited in the petitions, which do not address the question whether *ILA* work preservation applies in proceedings under Section 8(b)(4)(D)/Section 10(k)—let alone suggest the answer is no. *See, e.g.*, *Loc. 30, United Slate, Tile & Composition Roofers v. NLRB*, 1 F.3d 1419,

1423-25 (3d Cir. 1993); *New Orleans Typographical Union No. 17 v. NLRB*, 368 F.2d 755, 761-65 (5th Cir. 1966); *S.C. State Ports Auth. v. NLRB*, 75 F.4th 368 (4th Cir. 2023); *Int'l Union of Operating Eng'rs, Loc. 18 v. NLRB*, 712 F. App'x 511, 513-14 (6th Cir. 2017).

And while the NLRB asserts that *Kinder Morgan* "breaks" Section 10(k) and has created "upheaval," NLRB Pet. 18, it provides no support for its hyperbole. The NLRB never sought further review in *Kinder Morgan*, and this issue does not frequently arise. The NLRB does not identify *any case apart from this one* that has even addressed this issue since *Kinder Morgan*, much less a case that criticized this Court's conclusions there.

## III. This case would be a bad vehicle for revisiting *Kinder Morgan*.

Even if there were a reason to rethink *Kinder Morgan*, this is not an appropriate case in which to do so. The petitions ignore two problems.

First, the NLRB decision before this Court never adopts the rationale that the NLRB and IAM now advance. It never states that *ILA* work preservation is flat-out irrelevant in this context or that *Kinder Morgan* was wrong to conclude otherwise. The Board did observe that *Kinder Morgan* involved both Section 8(b)(4)(B) and Section 8(b)(4)(D) charges. *SSA Terminals*, 372 N.L.R.B. No. 66, slip op. at 2. Yet rather than critique *Kinder*

*Morgan*'s application of the *ILA* work-preservation test to Section 8(b)(4)(D) charges, the Board attempted to distinguish *Kinder Morgan* on factual grounds because (1) both unions here have collective bargaining agreements with SSAT and (2) SSAT assigned the work to the ILWU before the Board's Section 10(k) award. *Id.* The Panel unanimously concluded that *Kinder Morgan* is not distinguishable, Panel Op. 16-19, and neither rehearing petition contests that conclusion.

The mismatch between the petitions' theory and the NLRB's decision should be fatal to the rehearing bids. It is "a simple but fundamental rule of administrative law. . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Chenery*, 332 U.S. at 196. Under *Chenery*, "[i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Id.*; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action."). As a result, *Chenery* prevents the en banc Court from

enforcing the Board's order on the ground that *ILA* work preservation cannot provide a defense to Section 8(b)(4)(D) charges.

The second reason this is a bad candidate for en banc review is that even if the en banc Court concluded that *ILA* work preservation is irrelevant, that conclusion alone would not resolve the appeal. The en banc Court would still have to analyze the ILWU and PMA's alternative ground for reversal, which the Panel did not reach: the challenge to the Section 10(k) award. *See* Panel Op. 19. PMA's briefing in this Court explained why the Section 10(k) cannot be sustained under the applicable standards and should be vacated. PMA Br. 49-61; PMA Reply Br. 17-23. The Panel did not address this argument one way or the other.

Granting the petitions would therefore place this highly case-specific argument before the en banc Court. When the Court rehears a case en banc, the en banc panel assumes jurisdiction over the entire case. *Summerlin v. Stewart*, 309 F.3d 1193, 1193 (9th Cir. 2002) (citing 28 U.S.C. § 46(c)). As a result, if the en banc Court were to overrule *Kinder Morgan* and find the work-preservation doctrine inapplicable, it would have to address the ILWU and PMA's alternative ground for reversal. But no one suggests that this alternative, highly case-specific issue merits an en banc panel's attention.

## CONCLUSION

For all these reasons, the petitions for rehearing en banc should be denied.

Dated: September 24, 2025

Respectfully submitted,

s/ Michael E. Kenneally

GEOFFREY J. ROSENTHAL
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
(215) 963-5141

JONATHAN C. FRITTS
MICHAEL E. KENNEALLY
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-3000

*Counsel for Pacific Maritime Association*

## CERTIFICATE OF COMPLIANCE

This response to petitions for rehearing en banc complies with the length limit designated by court order dated August 21, 2025 because it contains **4,947 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's format, type size, and typeface comply with Fed. R. App. P. 32(a)(4), (5), and (6).

Dated: September 24, 2025

s/ Michael E. Kenneally
MICHAEL E. KENNEALLY

*Counsel for Pacific Maritime Association*